PETITIONER'S COPY

1 **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 Name ___DUBYAK,_____SAMUEL_____A.___

      (Last)        (First)     (Initial)

3 Prisoner Number ___D-54700___

                           JAN 2 8 2008

4 Institutional Address _Box 689___C-115L, CTF-Central, Soledad, CA 93960-0689_

6

7 **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**

                                    **JSW**

8 SAMUEL ALLEN DUBYAK         )

  (Enter the full name of plaintiff in this action.)  )

9                              )

10           vs.   **CV 08** ) Case No. **0667**

                           ) (To be provided by the clerk of court)

BEN CURRY, Warden        )

11                            ) **PETITION FOR A WRIT**
                           ) **OF HABEAS CORPUS**

12                            )

13                            ) EVIDENTIARY HEARING
                           ) REQUESTED

14 (Enter the full name of respondent(s) or jailor in this action) )

15                            )

16              Read Comments Carefully Before Filling In

17 When and Where to File

18      You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1 **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 Name ___DUBYAK,_____SAMUEL_____A._____
           (Last)          (First)          (Initial)

3

4 Prisoner Number ___D-54700_____

5 Institutional Address ___Box 689___C-115L, CTF-Central, Soledad, CA_93960-0689

6

7 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8 SAMUEL ALLEN DUBYAK
   _____   )
   (Enter the full name of plaintiff in this action.)   )

9                               )

                   vs.            )    Case No. _____

10                               )    (To be provided by the clerk of court)
   BEN CURRY, Warden
   _____   )

11 _____   )    **PETITION FOR A WRIT**
                                 )    **OF HABEAS CORPUS**

12 _____   )
                                 )    EVIDENTIARY HEARING

13 _____   )    REQUESTED
                                 )

14 (Enter the full name of respondent(s) or jailor in this action)   )
                                 )

15

16 **Read Comments Carefully Before Filling In**

17 **When and Where to File**

18      You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14          San Bernardino Co. Superior Court,    Cucamonga, CA
          _____

15          Court                              Location

16          (b)    Case number, if known _____ OCR-12056 _____

17          (c)    Date and terms of sentence __1987; 25 years to life + 2 years.

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)            Yes _X__    No _____

20                  Where?  CTF-Central, Soledad, California

21                  Name of Institution: ____ CTF-Training Facility _____

22                  Address: Hgy 101 North, Soledad, California _____

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Parole suitability denial is addressed in the instant petition.
    _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

        Arraignment:                Yes __X__    No _____

        Preliminary Hearing:       Yes __X__    No _____

        Motion to Suppress:       Yes __X__    No _____

4. How did you plead?

        Guilty _____    Not Guilty __X__    Nolo Contendere _____

        Any other plea (specify) __None_____

5. If you went to trial, what kind of trial did you have?

        Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes _____    No __X__

7. Did you have an attorney at the following proceedings:

        (a)     Arraignment           Yes __X__    No _____

        (b)     Preliminary hearing     Yes __X__    No _____

        (c)     Time of plea          Yes __X__    No _____

        (d)     Trial                Yes __X__    No _____

        (e)     Sentencing            Yes __X__    No _____

        (f)      Appeal               Yes __X__    No _____

        (g)     Other post-conviction proceeding    Yes _____    No __x__

8. Did you appeal your conviction?        Yes __X__    No _____

        (a)     If you did, to what court(s) did you appeal?

                Court of Appeal          Yes __X__    No _____

                Year: _1987____     Result: _Relief denied_____

                Supreme Court of California    Yes __X__    No _____

                Year: _1989(?)___    Result:____Relief denied_____

                Any other court           Yes __X__    No _____

                Year: _1987–95___    Result:____Relief denied_____

        (b)     If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS      - 3 -

1    petition?                                          Yes _____    No _X___

2    (c)    Was there an opinion?                       Yes _X__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4    Does not apply to this petition    Yes _____    No_____

5    If you did, give the name of the court and the result:

6    _____Does not apply to this petition_____

7    _____parole suitability denial at the BPT trial_____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _X__    No_____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]    Does not apply to this cause of action.

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: _Does not apply to this cause of action_

19    Type of Proceeding: ___Does not apply_____

20    Grounds raised (Be brief but specific):

21    a.____Does not apply_____

22    b._____//_____

23    c._____//_____

24    d._____//_____

25    Result: _____//_____Date of Result:____N/A__

26    II.    Name of Court: _Does not apply to this cause of action_

27    Type of Proceeding://_____

28    Grounds raised (Be brief but specific):

    Does not apply to this cause of action

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1                                a._____ Does not apply to this cause of action

2                                b._____ // _____

3                                c._____ // _____

4                                d._____ // _____

5                                Result: _____ // _____ Date of Result: N/A

6            III.    Name of Court: __Does not apply__

7                    Type of Proceeding: // _____

8                    Grounds raised (Be brief but specific):

9                                a._____ Does not apply

10                             b._____ // _____

11                             c._____ // _____

12                             d._____ // _____

13                             Result: _____ // _____ Date of Result: N/A

14           IV.    Name of Court: __Does not apply__

15                    Type of Proceeding: // _____

16                    Grounds raised (Be brief but specific):

17                                a._____ Does not apply

18                             b._____ // _____

19                             c._____ // _____

20                             d._____ // _____

21                             Result: _____ // _____ Date of Result: N/A

22     (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                            Yes _X_     No____

24             Name and location of court: This court (N.D. Cal.)

25  B. GROUNDS FOR RELIEF    Case No. C-06-0707 JSW (pr)

26         State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. **Subsequent**

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:___See attached petition with points and authorities in

6             support._____

7   Supporting Facts:____See attached petition_____

8   _____

9   _____

10  _____

11  Claim Two:_____See attached petition_____

12  _____

13  Supporting Facts:____See attached petition_____

14  _____

15  _____

16  _____

17  Claim Three:_____See attached petition_____

18  _____

19  Supporting Facts:____See attached petition_____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  __All claims were exhausted in all state courts, ORDER's attached hereto;__

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS     - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4    See attached petition with points and authorities in full

5    _____

6    _____

7  Do you have an attorney for this petition?                    Yes_____      No__x__

8  If you do, give the name and address of your attorney:

9    Petitioner is proceeding pro per as an obvious layman at law

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _1-16-2008_            _Samuel A. Lobato_

14              Date                         Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

Court of Appeal, Fourth Appellate District, Div. 2 - No. E044276
**S157841**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re SAMUEL A. DUBYAK on Habeas Corpus

The petition for review is denied.

Werdegar, J., was absent and did not participate.

**SUPREME COURT
FILED**

JAN − **3** 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

PETITION FOR REVIEW

IN THE

SUPREME COURT OF CALIFORNIA

Comes now, Samuel A. Dubyak, Petitioner in pro se, and through this verified petition for review requests this Honorable Court to review and adjudicate the claims raised thus reviewing the denial(s) from the Appellate and Superior Courts (attached hereto) as both are without a 'reasoned opinion', semi post card denials.

Petitioner contends that the denial by the Superior Court was a miscarriage of the intent of the habeas corpus act as the Superior courts obvious biased language simply because petitioner has claimed innocence, and that court did not adjudicate the "CLASS OF ONE" claim that is independent of being found suitable for parole by the Board.

The Appellate Court's 'post card denial' was a denial on the merits (citations) and that court failed to give a 'reasoned opinion'.

As this Court will discover upon a full and fair reading of this petition for review, the lower courts were obligated to consider 'all'' issues/claims and not just make a finding that; "Petitioner's calculating nature, coupled with his persistent denial of culpability, and his stubborn refusal to program as directed.." (Emphasis added). The courts failed to consider the facts of the petition and only relied on the Board's form/rote language and the courts obvious bias is clear because Petitioner, after 21 years, still maintains actual innocence.

In the case of City of Auburn v. Quest Corp., 260 F.3d 1160 (9th Cir. 2001): Under the Supremacy Clause, the state courts are obligated to apply and adjudicate federal claims that were fairly presented to them.

Respectfully submitted,

Samuel A. Dubyak

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

## ORDER



COURT OF APPEAL FOURTH DISTRICT

In re SAMUEL A. DUBYAK                    E044276

    on Habeas Corpus.                    (Super.Ct.Nos. OCR12056 &
                                      WHCSS700257)

                                     The County of San Bernardino

---

THE COURT

    The petition for writ of habeas corpus is DENIED.

**McKINSTER**
_____
                                    Acting P.J.

cc:    See attached list



1   SUPERIOR COURT OF CALIFORNIA
    COUNTY OF SAN BERNARDINO
2   Civil Division, Department S-32
    303 West Third Street
3   San Bernardino, California 92415

**COPY**

F I L E D
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

AUG 2 0 2007

BY _Olivia McDonald_
                          DEPUTY

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              IN AND FOR THE COUNTY OF SAN BERNARDINO

9                     SAN BERNARDINO DISTRICT          700257

10  In re the Petition of              )    Case No. WHCSS-0257
                                       )
11      SAMUEL A. DUBYAK,              )    ORDER DENYING PETITION
                                       )    FOR WRIT OF HABEAS CORPUS
12  For Writ of Habeas Corpus.        )
                                       )
13  _____)

15        The Petition of SAMUEL A. DUBYAK for Writ of Habeas Corpus was filed in this

16  Court on August 9, 2007.

17        Therein, Petitioner contends that there was no evidence presented which justified

18  the denial of his parole on October 24, 2006.

19        From the transcript of the suitability hearing, the court determines that the eligibility

20  board considered the following factors and facts:

21        1)  The circumstances of the committing offense.

22             Petitioner shot his wife to death in her bed in the family home.  He attempted

23  to destroy the evidence of the murder, the bed, by cutting out of the mattress the

24  bloody bullet holes and dumping the bed along the side of the road.  He falsely

25  claimed to police officers that his wife had disappeared and taken the bed with her.

26  He manufactured a letter on which he forged his wife's signature so that it would

27  appear that his wife was still alive. He persists in claims of innocence.

28        2)  Prior criminal record.

He had a burglary arrest as a juvenile but no prior criminal convictions.

3) Social History.

Petitioner had been a commercial pilot. He has had five children. He did not abuse alcohol or drugs.

4) Conduct while incarcerated.

Petitioner has had very few, and only minor, disciplinary experiences while incarcerated. He has taken numerous college courses, and has completed a Real Estate course, and an Accounting course. He obtained a B.A. in 2001. He has studied French and Spanish.

5) Psychological Assessments.

His violence potential is lower than that of the average citizen.

6) Parole Plans.

Based on the evidence before it, the panel concluded that Petitioner poses an unreasonable risk of danger to society if released. (The transcript says the opposite but it is clear from the context what was meant).

Petitioner's calculating nature, coupled with his persistent denial of culpability, and his stubborn refusal to program as directed by the eligibility board would give any reasonable person a deep concern that Petitioner might harm others if the circumstances justified it, to his mind.

There was ample evidence presented to justify the board's decision.


The Petition is denied.


Dated this _20th_ day of August, 2007.


                                                  **JOHN P. WADE**
                                                  _____

                                                  JOHN P. WADE
                                                  Judge of the Superior Court

1

## STATEMENT OF THE CASE

2      Petitioner incorporates the statement of facts (summary of commitment offense)
3  from the parole hearing transcripts, as though set forth in full, (herein after
4  Ex. "A" pp.##).

5

6

## FACTS AS SET FORTH

7      On October 24, 2006 Petitioner appeared before the Board of Parole Hearings
8  (nerein after "Board") for a subsequent hearing, his second (2nd) hearing. As
9  Ex. "A" establishes, Petitioner was suitable for parole and would not pose a risk
10 to society, nonetheless tne Board denied a term set and/or release date for
11 Petitioner. The record supports tne fact tnat Petitioner was suitable for parole
12 and tnere was no evidence in the record to deny his release.

13     Petitioner's second nearing was 2 montns late and 9 months late in receiving
14 tne transcripts, see attacned order from Monterey County Superior Court and the
15 attorney General's reply, attacned hereto.

16

17

## JURISDICTION AND VENUE

18     Habeas corpus is tne proper remedy for due process violations by tne Board.
19 In re Powell (1988) 45 Cal.3d 894, 903. This Court has original jurisdiction to
20 issue the writ, Cal. Const., Art. VI, §10; Cal. P.C. §1508, and venue to adjudicate
21 this petition. Griggs v. Superior Court (1976) 16 Cal.3d 341; see also, In re
22 Sena (2001) 94 Cal.App.4th 836.

23     This Court also issued an ORDER TO SHOW CAUSE on Petitioner's "first" parole
24 suitability denial, which is currently before tne Northern District Court in San
25 Francisco.

26                                    //
27                                    //
28                                    ii

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE
LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A
"REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING
WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years 'to life' shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. United States Constitutional Amendments, V, XIV.

It is now settled that California parole scheme, codified in California Penal Code section §3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole applicants continue to have a "liberty interest" in parole release.

//

//

1

1

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT
OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE
I, Sec. 7(a), WHEN THEY FAILED TO SET A RELEASE DATE AND/OR
UNIFORM TERM AFTER PETITIONER WAS FOUND SUITABLE FOR PAROLE
AND FOUND NOT TO BE A THREAT TO PUBLIC SAFETY.

2

3

4

5    On October 24, 2006 Petitioner went before the Board of Prison Hearings

6    (herein after "Board") for his second/subsequent suitability hearing, the subject

7    of the instant petition before this Court.

8    The panel consisted of James Davis, Presiding Commissioner, Noreen Blonien,

9    Deputy Commissioner, Peter Ferguson, Petitioner's Board appointed attorney.

10    As the record establishes, Petitioner did not receive his hearing transcripts

11    until July 23, 2007, 9 months late and 2 months late on the 2nd hearing, see

12    attached Monterey County Order and the Attorney General's response attached

13    hereto.

14    Petitioner submits that he was found suitable, and, would not pose a threat

15    to the public at his hearing (Exhibit "A" p.39):

16    Commissioner Davis stated at (Ex "A") p.39: "...the panel reviewed all the

17    information received from the public and relied on the following circumstances

18    in concluding that the prisoner suitable for parole and would not pose

19    unreasonable risk of danger to society or threat to public safety if released

20    from prison." (Emphasis added). Therefore Penal Code §3041(b) has been satisfied

21    in that Petitioner does not pose a threat to public safety.

22    The "overarching consideration" in determining whether to grant parole "is

23    'public safety.'" (See, In re Scott (2005) 133 Cal.App.4th 573, 591 (Scott II).)

24    That is, under the applicable "Penal Code section §3041, the Board 'shall set

25    a release date unless it determines that the gravity of the current convicted

26    ... offenses, or the timing and gravity of current or past convicted ... offenses,

27    is such that consideration of the public safety requires a more lengthy period

28    of incarceration for this individual...'". The goal of subdivision (a) of Penal

2

1  Code section §3041, it has been noted, is that "release on parole is the rule,
2  rather that the exception." (In re Smith (2003) 114 Cal.App.4th 343, 351 (Smith)
3  accord In re Lee (2006) 143 Cal.App.4th 1400, 1405 (Lee) ["defendant sentenced
4  to indeterminate life term is normally entitled to parole if the board finds
5  he does not pose an unreasonable risk to public safety"]). (In re David Barker,
6  2007 DJDAR 7548, May 24, 2007).

7      As the Court of Appeal put it in Lee, 143 Cal.App.4th, p.1414: "To deny
8  parole, the reason must relate to a defendant's continued unreasonable risk to
9  public safety."

10      "A life term offense or any other offenses underlying an indeterminate
11  sentence must be particularly egregious to justify the denial of a parole date."
12  (Rosenkrantz, 29 Cal.4th at p.683, 128 Cal.Rptr.2d 104, 59 P.3d 174). Also, In
13  re Ramirez, (9-13-2000), (94 Cal.App.4th 549), that court held that: parole could
14  not be withheld absent a factual finding that the offense was "particularly
15  egregious".

16      As Exhibit "A" establishes, not only was Petitioner found suitable for
17  parole, and, would not pose unreasonable risk of danger to society or threat
18  to public safety (at p.39), it is evident from the record (pages 39-43) that
19  the Board used the following excuses from their Rules and Regulations, Title
20  15, §2402 criteria to deny a release date and/or a uniform term setting under
21  P.C. §3041(a):

22      1). "dispassionate and calculated." (p.39). Note* Subdivision (c) of §2402
23  sets forth six factors tending to show unsuitability for parole, which include:
24  (B) The offense was carried out in a dispassionate and calculated manner, such
25  as an execution-style murder. Therefore "dispassionate and calculated manner"
26  cannot be applied to Petitioner as he was not tried or convicted of an execution-
27  style murder.

28      2). "motive ... inexplicable." (p.39).

3

3). "Juvenile arrest (no disposition) in 1957." (p.39).

4). "used a firearm." (p.39).

5). "programmed ... limited manner." (p.39).

6). "one 128 counseling chrono." (p.40).

7). "one serious 115 in 1994." (Classified as 'Administrative'). (p.40).

It is apparent that there is "no evidence" in the record under either the "some evidence" standard, or, "preponderance of evidence" standard, or, even a "modicum" of evidence to support the Board's arbitrary action in not setting a release date for Petitioner after he was found suitable or a term setting as the record establishes that Petitioner has passed through the 'gateway' imposed by §3041(b) to enter into the realm of §3041(a).

The Board's arbitrary action to not follow Penal Code §3041(a) deprived Petitioner of a parole date by not calculating his term. The Board cannot apply or use Title 15 C.C.R. §§2400-2411 to over-ride the Legislative intent of P.C. §3041(a)(b). Subsection (b):

> "The panel or board shall set a release date unless it determines that the gravity of the current offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

> "After the effective date of this subdivision, any decision of the parole panel finding an inmate suitable for parole shall become final within 120 days of the date of the hearing." (Note* Petitioner's hearing was on October 24, 2006, and, became final within the intent of P.C. §3041(b), on February 21, 2007.)

When an administrative regulation conflicts with a statute, the statute controls. (Government Code §11342.2).

Regulations that contravenes a statute is/are invalid. R & W Flammann GMBH v. U.S., 339 F.3d 1320 (Fed. Cir. 2003).

A statute by its very nature, trumps conflicting regulations. Caldera v. J.S. Alberici Const. Co. Inc., 153 F.3d 1381 (Fed. Cir. 1998).

4

1   An agencies regulations cannot legitimate the violations of constitutional

2   or statutory rights. U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999).

3   A regulation (Title 15 C.C.R. §§2400-2411) cannot over-ride a clearly stated

4   statutory enactment (P.C. §3041(a)(b).) Aerolineas Argentinas v. U.S., 77 F.3d

5   1564 (Fed. Cir. 1996).

6   In Willis v. Kane, USDC N.D. Cal. No. 05-3153 (April 26, 2007), among other

7   issues, the court held that:

8   > "Willis' petition for writ of habeas corpus is GRANTED. Having decided
    > that the petition will be granted, the next issue concerns the proper
9   > remedy. Because Willis has never been found suitable for parole, the
    > BPH has never moved past the suitability-finding function in California
10  > Penal Code §3041(b) to calculate a term and set a release date as
    > required by §3041(a). It is now time to do so. Within thirty days of
11  > the date of this order, the BPH must calculate a term for Willis and
    > set a date for his release in accordance with the requirements of
12  > California Penal Code §3041(a)." (Emphasis in original).

13  The California Supreme Court has concluded that the "nature of the prisoner's

14  offense, alone, can constitute a sufficient basis for denying parole." Dannenberg,

15  29 Cal.4th at p.682. One indicator of parole unsuitability is that "[t]he prisoner

16  committed the offense in an especially heinous, atrocious or cruel manner."

17  (Regs., §2402, subd. (c)(1).) The Dannenberg majority decided that the Board

18  and Governor can find the commitment offense to be especially heinous, atrocious

19  or cruel so long as the crime involved elements beyond "the minimum necessary

20  to sustain a conviction for that offense," without comparing the crime to other

21  similar crimes. (Dannenberg, supra, 34 Cal.4th at pp. 10941098). (See, In re

22  BRANDEE TRIPP, 2007 DJDAR 5877).

23  Nonetheless, the Board found Petitioner 'suitable' and 'that he would not

24  pose a threat to the public'. It is apparent that the Board did not set a uniform

25  term, (See, P.C. §3041(a)), within the Matrix, as Petitioner has currently served

26  28 years (inclusive of earned credits), and, the Boards citations to Petitioner's

27  commitment offense, a 50 year old juvenile issue (with no disposition), his 128

28  counseling chrono, a 115 with an age of 13 years which was an "administrative"

5

1    action because of mailing out legal work for another inmate (proof of service),
2    Petitioner's use of a firearm, his alleged lack of programming although Petitioner
3    works on college courses, studies 2 languages, does video reports, and, the fact
4    that the denial of a release date for '3' years with EXACTLY the same rote
5    language as was used to deny Petitioner's release and/or uniform term setting.

6         At p.41 of (Ex. "A"): "With regard to parole plans, we find that you do
7    have appropriate residential parole plans." "With regard to employment, the Panel
8    notes that you are eligible for Social Security."

9         One of the implementing regulations, 15 Cal. Code Regs. §2401, provides:
10   A parole date shall be set if the prisoner is found suitable for parole under
11   Section 2402(a). "A parole date set under this article shall be set in a manner
12   that provides uniform terms for offenses of similar gravity and magnitude with
13   respect to the threat to the public." The regulation also provides that "[t]he
14   panel shall first determine whether the life prisoner is suitable for release
15   on parole. Regardless of the length of time served, a life prisoner shall be
16   found unsuitable for and denied parole if in the judgment of the panel the
17   prisoner will pose an unreasonable risk of danger to society if released from
18   prison." Under state law, the matrix is not reached unless and until the prisoner
19   is found suitable for parole. Id at 1070-71; 15 Cal. Code Regs. §2403(a) ("[t]he
20   panel shall set a base term for each life prisoner who is found suitable for
21   parole"). See, Thomas v. Brown, USDC N.D. Cal., No. C05-1332, Dec. 21, 2006.

22        Although Petitioner was found suitable, and, would not pose a risk to
23   society, CLAIM (III) establishes that an inmate does not have to be found suitable
24   to receive a uniform term set and/or release date. See, Exhibits "B & C".

25        The "PSYCHOLOGICAL EVALUATION", dated August 2006, (Ex. "D"), "his violence
26   potential is lower than the average citizen." Supporting the Board's conclusion
27   that Petitioner would not pose a risk to society, also, no where in the Evaluation
28   is there a need for any 'anger management' self-help book reports.

6

STATE AND FEDERAL CLAIM NUMBER THREE (III)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE
UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT
OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and U.S. Constitution.

The U.S. Constitutions Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." See also, California Constitution Article I, Sec. 7(a). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that, "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However, Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

7

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B". (With reference to numbered paragraphs).

Schiold was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into a "SETTLEMENT AGREEMENT" transferring Schiold to Sweden. (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7, of Exhibit "B").

Explicitly at paragraph #8 (of Exhibit "B"): "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph #16 (of Exhibit "B"), establishes that: The agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page 3 (of Exhibit "B"), of the "SETTLEMENT AGREEMENT" expressly states that "he will be held in custody of the government of Sweden UNTIL January 1, 2007." Petitioner asserts that this date, January 1, 2007, established a 'term setting' under §3041(a). (Emphasis added).

A foreign national (Schiold) is being treated distinctly different than 'all' U.S. Citizens, and, foreign nationals that have not caused legal actions

8

1    to enter into "SETTLEMENT AGREEMENTS", in California serving a sentence of life
2    with the possibility of parole. Petitioner is being treated distinctly different
3    than Schiold because he cannot be transferred to another country, and all
4    similarly situated prisoners, thus creating separate and distinct "classes" of
5    inmates for release criteria.

6        The fact that Schiold was found suitable by the Board is irrelevant to the
7    claim herein, as the Governor over-ruled the Board's determination and found
8    Schiold to be unsuitable, which nullified the Board's finding of suitability.
9    See, paragraphs #2,3,6 (of Exhibit "B"). Schiold's term was set at January 1,
10   2007, AND, Schiold does not have to serve any parole time after being released.
11   See, "SETTLEMENT AGREEMENT".

12       The most basic requirement for a claim of violation of equal protection
13   under the Fourteenth Amendment of the U.S. Constitution lies on the issue of
14   non-equal treatment of a "CLASS", or, a showing of separate and/or distinct
15   difference in treatment, both criminally and civilly, among groups or "CLASSES"
16   of persons.

17       The U.S. Supreme Court has established a "class of one" in the case of
18   Village of Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073
19   (2000) at pp.1074-75: "We granted certiorari to determine whether the Equal
20   Protection Clause gives rise to a cause of action on behalf of a "class of one"
21   where the plaintiff did not allege membership in a class or group." (527 U.S.
22   1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).):

23                   "Whether the complaint alleges a class of one or a class of five is
24                   of no consequence because we concluded that the number of individuals
                     in a class is immaterial for equal protection analysis."

25       Our cases have recognized successful equal protection claims brought by
26   a "class of one", where the plaintiff alleges that he/she has been intentionally
27   treated differently from others similarly situated and that there is no rational
28   basis for the difference in treatment. Sioux City Bridge Co., v. Dakota County,

1  260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburg Coal Co.
2  v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688
3  (1989). "In so doing, we have explained that 'the purpose of the equal protection
4  clause of the Fourteenth Amendment is to secure every person within the State's
5  jurisdiction against intentional and arbitrary discrimination, whether occasioned
6  by express terms of a statute or by its proper execution through duly constituted
7  agents." Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190 (quoting Sunday
8  Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918).)

9  "It is clearly established that a state violates the equal protection clauses
10  when it treats one set of persons differently from others who are similarly
11  situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

12  Petitioner has established separate treatment, discrimination, and the
13  Board's failure to follow U.S. Supreme Court precedents, thus their failure to
14  set Petitioner's term, as was done to Schiold, violates both the California and
15  U.S. Constitutions Equal Protection Clauses.

16  <u>FAILURE TO CONSIDER TERM SETTING</u>

17  At no time during the hearing(s), nor at any time during Petitioner's
18  incarceration has the Board considered the determinate term that Petitioner would
19  serve, as calculated by Title 15 C.C.R. §2404, (Matrix), or the time he has
20  actually served as factors in the suitability equation. The Court of Appeals
21  in, In re Ramirez, (2001) 94 Cal.App.4th 549, at 569 held:

22  "The Board cannot ignore the determinate term prescribed for a
   commitment offense when it considers the gravity of the crime as a
23  factor weighing against a finding of suitability for parole. The Board
   must make its determination 'in a manner that will provide uniform
24  terms for offenses of similar gravity and magnitude in respect to their
   threat to the public.' (P.C. §3041(a).) Determining what would be a
25  'uniform' term for an inmate serving a determinate term for offenses
   that include concurrent determinate terms is not an exact science.
26  However, the Board should strive to achieve at least a rough balance
   between the gravity of the offense, the time the inmate has served,
27  and the sentences prescribed by law for the commitment offense."
   //
28  //

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At page 570, the court said:

> "The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by P.C. §3041(a)."

The gravity of Petitioner's offense must be measured not in terms of the life maximum potential, but in relation to the determinate terms prescribed for such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note: The Board is still in violation by rules and regulations that they are applying.)

## FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. In re Rodriguez, (1975) 14 Cal.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-19. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior Court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as (Exhibit "C") to MOTION FOR JUDICIAL NOTICE, specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term: "On September 9, 1999, petitioner was found <u>unsuitable</u> <u>for</u> <u>parole</u> but the panel set his prison term." A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (See, Schiold and Rosenkrants, supra), or by sub-summing term-fixing under the parole function. Petitioner is

11

entitled to the fixing of his primary term as an ultimate, immutable release
date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment.
See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at
502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrants, supra.

In McGinnis v. Royster, 93 S.Ct. (1973) the court held, at page 1057 that:

> "Each inmate has both a 'minimum' parole date, which is the earliest
> date on which he 'may' be paroled at the discretion of the Parole Board,
> and a 'statutory release' date which is the earliest date he 'must'
> be paroled by the Parole Board. (Fn.3), "He also has a maximum
> expiration date which is the date of the maximum sentence to which
> an inmate can be held if he receives no good time credits at all."

The case refers to an 'indeterminate sentence' and establishes that there
are actually three (3) dates to such a sentence; (1) the minimum parole date,
(2) the statutory release date, (3) the maximum expiration date (i.e., death).

While P.C. §1170 et seq., apply to determinate sentences, the current
provisions of P.C. §3041 governing parole for inmates serving indeterminate terms
were added as part of the bill enacting the Determinate Sentencing Law, and were
intended to serve the same purpose as the determinate sentencing provisions.
(Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176,
182). Our Supreme Court has made it clear that the 'uniform terms' called for
by section §3041(a) are analytically equivalent to determinate sentences imposed
under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96).

Apparently, the State of California only follows the law and sets a life
prisoner's term when it is convenient, to avoid or terminate legal actions (by
entering into "SETTLEMENT AGREEMENTS"), or in an arbitrary manner, with no regard
to violating due process and equal protection rights under both California and
U.S. Constitutional mandated guidelines.

//

//

//

12

1
2
3
4

STATE AND FEDERAL CLAIM NUMBER FOUR (IV)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE
FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION,
AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), WHEN THEY
DENIED PAROLE SUITABILITY BASED ON UNCHANGING FACTORS, i.e.
HISTORICAL EVENTS, WITHOUT "SOME EVIDENCE", AND APPLYING
ARBITRARY AND CAPRICIOUS CONCLUSIONS TO BOOTSTRAP A
PREDETERMINED DENIAL OF SUITABILITY.

5
6
7
8

Not withstanding Petitioner's CLAIM NUMBER TWO (II), PAGES 2-6 of this

petition, also see Superior Court's DENIAL attached hereto, Petitioner asserts

this 'some evidence' claim.

At page 39 of exhibit "A", the Boards states:

9

### DECISION

10
11
12

"The panel the panel (sic) reviewed all the information received from
the public and relied on the following circumstances in concluding that
the prisoner suitable for parole and would not pose unreasonable risk
of danger to society or threat to public safety if released from prison."

13
14

Page 39: "The offense was carried out in a manner that dispassionate
(sic) and calculated."

15

Page 39: "The motive was inexplicable in relation to the offense."
"...used a firearm."

16
17

Page 39: "...we find that criminal conduct consists of a juvenile arrest
in 1957."

18

Page 39: "With regard to institutional behavior we find that you
programmed while (sic) in a limited manner while incarcerated."

19
20

Page 40: The Panel strongly encourages you to look beyond your current
education process and look to forms of self-help."

21
22

Page 40: "With regard to your other institutional behavior we find that
there is one 128 counseling chrono, the last of which was in 4/99 and
one serious 115 that's been recorded in 2/1994."

23
24

Page 40: "According to the psychological report in August 2006 by Dr.
Merek, we find that it is supportive." "The basis of assessing Mr. Dubyak
as 'lower than the average citizen.'"

25
26

Page 40: "This is the one in 2003 from Dr. Steward, where in the
assessment of dangerousness, item B if release (sic) to the community
is not (sic) possible to predict the dangerousness since he did not
discuss the event and the details of the conviction."

27
28

Page 41: "With regard to parole plans, we find that you do have
appropriate residential parole plans." "With regard to employment, the
Panel notes that you are eligible for Social Security."

Page 41: "These positive aspects of behavior do not outweigh the factors of unsuitability."

### 3 YEAR DENIAL

Page 41: "In a separate decision, the Hearing Panel finds the prison (sic) has been convicted of murder and it is not reasonable to expect him to that (sic), Page 42: parole to be granted within the next three years." "We come to this conclusion, first and foremost, by the commitment offense." "The offense was carried out in a manner that (sic) dispassionate and calculated manner." "The motive was inexplicable in relation to the offense." "...used a firearm to kill the victim..." "We find that there is criminal conduct that exists with a juvenile arrest in 1957, however that you have programmed in a limited manner while incarcerated." "The panel strongly encourages you to look beyond your current education process and look to other forms of self-help." "There are two incidents of disciplines while incarcerated one a 128 counseling chrono in 4/99 and one serious 115 disciplinary report in 2/1994."

### RECOMMENDATIONS

Page 43: "With regard to recommendation, the Panel would recommend that you have no more 115's, 128's and 128(a)s, that you would participate in self-help programs." "I would encourage you that if you do not find a program that are appropriate for you or that you can participate in because you think that limitations that you look to some independent reading in the area of self-help." "And the Panel would accept book reports, some sort of report, two or three paragraphs..."

Petitioner feels it is important to note, the 115 was not classified as "serious" but rather as "administrative" when Petitioner proof of serviced another inmate's legal mail due to prison staff interference with his legal mailings. Secondly, the 1957 alleged arrest, 50 years ago when Petitioner was 14 years old and wrongly entered a dilapidated empty garage while riding a bicycle down an alley, true, Petitioner had no right what so ever to enter the garage but there is no nexus establishing how this 50 year old historical relic supports a denial of suitability.

The Superior Court's scathing denial, attached hereto:

### SUPERIOR COURT'S DENIAL

"Based on the evidence before it, the panel concluded that petitioner poses an unreasonable risk of danger to society if released. (The transcript says the opposite but it is clear from the context what was meant)."
"Petitioner's calculating nature, coupled with his persistent denial

14

of culpability, and his stubborn refusal to program as directed by the eligibility board would give any reasonable person a deep concern that Petitioner might harm others if the circumstances justified it, to his mind." (Emphasis added).

During Petitioner's trial he was offered a 'manslaughter' plea bargain, twice, and acceptable by the trial judge, Petitioner chose to exercise his constitutional right to a trial and was subsequently convicted, 21 years later he is still being punished by the Board and trial court for claiming his innocence, see also P.C. §5011(a)(b). Understanding that Petitioner is only a 'threat' to the public because he did not plead guilty. The trial judge and prosecutor have established over 21 years ago, that Petitioner was not a threat to society within the intent of P.C. §3041(a)(b) because he would have been back among society over 18 years ago.

There are only two (2) excuses given in the superior courts denial; Petitioner's "persistent denial of culpability", and, his "stubborn refusal to program as directed." Obviously a failure in the "some evidence" arena.

### DISPASSIONATE AND CALCULATED

Title 15, C.C.R. §2402(c); Unsuitability criteria factors. At (B): The offense was carried out in a dispassionate and calculated manner, such as an execution style murder. Petitioner was not charged with, tried for nor convicted of an "execution style murder" thus this section and wording cannot be applied to his commitment offense.

Courts must ensure that the evidence relied on by the Board in meeting the 'some evidence' standard is both reliable and of a solid value. (Rosenkrantz, 29 Cal.4th 616 at 655; see C.C.R. §§2402(b), 2281(b); see also In re Scott (2005) 133 Cal.App.4th 573, 591.) It is not sufficient for the Board to derive findings from a silent or misconstrued record.

The Board labeled Petitioner's commitment offense as "dispassionate and calculated", "motive was inexplicable", without explaining how it went beyond the usual callousness inherent in the crime of murder. (In re Smith, 114

1  Cal.App.4th at pp.365-366). Absent such an explanation, the Board's finding
2  violated the "some evidence" standard by failing to support the finding with
3  evidence in the record. (Id., at p.667).

4  When reviewing the Board's decision, "[t]he test is not whether some evidence
5  supports the reasons ... for denying parole, but whether some evidence indicates
6  a parolee's release unreasonably endangers public safety." (In re Lee (2006) 143
7  Cal.App.4th 1400, 1408.)

8  ## INEXPLICABLE MOTIVE

9  Regarding the Board's statement that "The motive was inexplicable in relation
10 to the offense." As was observed in Scott I, 119 Cal.App.4th at p.892, "An
11 'inexplicable' motive, as we understand it, is one that is unexplained or
12 unintelligible, as where the commitment offense does not appear to be related
13 to the conduct of the victim[s] and has no other discernible purpose. A person
14 whose motive for a criminal act cannot be explained or is unintelligible is
15 therefore unusually unpredictable and dangerous." (Id. at p.893). Barker's motive
16 was not "inexplicable" under this definition.

17 Similarly, the record does not indicate that Barker's motive was "very trivial
18 in relationship to [his] offense." (§2281(c)(1)(E).) "The offense committed by
19 most prisoners serving life terms is, of course, murder. Given the high value
20 our society places upon life, there is no motive for unlawfully taking the life
21 of another human being that could not reasonably be deemed 'trivial'. The
22 Legislature has foreclosed that approach, however, by declaring that murderers
23 with life sentences must 'normally' be given release dates when they approach
24 their minimum eligible parole dates... (Scott I, 119 Cal.App.4th at p.893).

25 ## SELF-HELP BOOK REPORTS

26 At page 40 of Exhibit "A"; "The panel strongly encourages you to look beyond
27 your current education process and look to forms of self-help", again at page
28 43: "And the Panel would accept book reports, some sort of report, two or three

1    paragraphs...", also eloquently stated by the superior court: "...and his stubborn
2    refusal to program as directed by the eligibility board..."

3       Although worded as an 'encouragement' to Petitioner it is only meant as
4    another hoop to jump through for an excuse to bolster a predetermined denial
5    without even taking the most basic steps to ensure that the prison library does
6    in fact have self-help books available. Even if one could figure out how writing
7    "two or three paragraphs" would make him a less danger to public safety regardless
8    of the fact that the clinical psychologist made no such finding for self-help
9    in his observations, defies common sense and logic.

10       A plethora of very recently issued California state and district court
11    decisions uniformly holds that evidence of even particularly egregious facts of
12    commitment offenses is not tantamount to evidence of undue current parole risk
13    absent articulation of a nexus between those entities. Willis v. Kane, 485
14    F.Supp.2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of
15    the crime, the critical question the BPH was supposed to decide at the parole
16    suitability hearing was whether 'consideration of the public safety requires a
17    more lengthy period of incarceration for this individual' ... Willis' 1983 crime
18    did not provide sufficient evidence to find him unsuitable for parole in 2003"];
19    Martin v. Marshall, 431 F.Supp.2d 1038, 1049 (N.D. Cal. 2006); Blankenship v.
20    Kane, 2007 WL 1113798 at *10 (N.D. Cal. 2007) ["...the California regulations
21    require ... some evidence that the prisoner poses a present danger to society
22    ... continued reliance over time on an unchanging factor ... the commitment offense
23    ... does not provide evidence of a present danger to society"]; Thomas v. Brown,
24    2006 WL 3783555 at *6 (N.D. Cal. 2006) [not some evidence that the murder shows
25    current parole unsuitability]; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1086
26    (C.D. Cal. 2006) ["the facts surrounding petitioner's crime no longer amount to
27    'some evidence' supporting the conclusion that petitioner would pose an
28    unreasonable risk of danger if released on parole"]. State cases: In re Scott,

1  133 Cal.App.4th at 595 ["the commitment offense can negate suitability only if
2  circumstances of the crime ... rationally indicate that the offender will present
3  an unreasonable public safety risk if released from prison"]; In re Elkins, 144
4  Cal.App.4th at 496, 499 ["Thus, a governor, in reviewing a suitability
5  determination, must remain focused not on circumstances that may be aggravating
6  in the abstract but, rather, on facts indicating that release currently poses
7  'an unreasonable risk of danger to society'"]; In re Lee, 143 Cal.App.4th at 1413
8  ["... the board and Governor must focus their parole decisions on whether a
9  prisoner continues to pose an unreasonable risk to public safety ..."]; see also
10 In re Lawrence, 150 Cal.App.4th 1511, 1554-1556 (2007); In re Gray, 151 Cal.App.4th
11 379 (2007); In re Barker, 151 Cal.App.4th 346, 375-377 (2007).

12     The Board deemed Petitioner unsuitable for parole (absent CLAIM NUMBER TWO)
13 by reciting several of the sub-factors listed under Title 15 C.C.R. §2402(c)(1)
14 describing the commitment offense as being "carried out in a manner that
15 dispassionate (sic) and calculated", "The motive was inexplicable in relation
16 to the offense."

17     These factors are sub-categories listed under the heading of a murder
18 committed "in an especially heinous, atrocious, or cruel manner." (15 C.C.R.
19 §2402(c)(1).) The Board copied the language from Cal. Penal Code §190.2, a "special
20 circumstances" applicable only to particularly egregious first degree murders
21 punishable by the "death penalty or life imprisonment without parole." Sub-section
22 (a)(14) of the special circumstances statute, Cal. P.C. §190.2, reads, "the murder
23 was especially heinous, atrocious, or cruel" which, the statute explains, means
24 "manifesting exceptional depravity ... a conscious or pitiless crime that is
25 unnecessarily tortuous to the victim."

26     Accordingly, the Board deemed Petitioner a current unreasonable risk to public
27 safety by arbitrarily and capriciously characterizing his commitment offense as
28 a premeditated special circumstance first-degree murder.

18

1    In Irons v. Carey, 479 F.3d 658 (2001), the Ninth Circuit's third in a trilogy
2  that includes Biggs and Sass addressed the issue whether, consistent with due
3  process, the immutable facts of commitment offenses may be employed repeatedly
4  or interminably to preclude the parole of one like Petitioner who indisputably
5  satisfies all parole requirements, has been psychologically evaluated to pose
6  no parole risk and has served 28 years (inclusive of earned credits).

7    The court held that the BPH panel's use of Iron's crime, a particularly
8  egregious murder, before he had served the minimum prison term imposed by the
9  trial court, satisfied the "some evidence" test sufficiently to uphold the BPH
10 panel's decision finding that Irons was unsuitable for parole. The court focused
11 on Irons' egregious murder: he fired 12 rounds into the victim, then, when he
12 found the victim was still alive, stabbed him twice. After leaving the corpse
13 in a sleeping bag for 10 days, Irons removed and weighted it, and dropped it in
14 the ocean.

15   The court emphasized that Irons, like Sass and Biggs before him, had not
16 served "the minimum number of years to which they had been sentenced at the time
17 of the challenged parole denial by the Board." The court explained, contrary to
18 the Board's notion, why Biggs was not overturned by Sass, and re-emphasized that
19 continued use of the commitment offense facts to find such an inmate unsuitable
20 for parole may constitute a due process violation after the minimum term has been
21 served:

22      "We note that in all the cases in which we have held that a parole
        board's decision to deem a prisoner unsuitable for parole solely on
23      the basis of his commitment offense comports with due process, the
        decision was made before the inmate had served the minimum number of
24      years required by his sentence. Specifically, In Biggs, Sass, and here,
        the petitioners had not served the minimum number of years to which
25      they had been sentenced at the time of the challenged parole denial
        by the Board. [] All we held in those cases and all we hold today,
26      therefore, is that, given the particular circumstances of the offenses
        in these cases, due process was not violated when these prisoners were
27      deemed unsuitable for parole prior to the expiration of their minimum
        terms." (Irons v. Carey, supra, at 664-665).
28

19

1    Under the Irons standard, at the time of Petitioner's 2006 parole hearing,

2   his second, at age 65, he had served (including jail time and earned credits)

3   twenty eight (28) years in prison, 11 years more than the minimum and at the

4   maximum in the Matrix.

5    A district court recently elaborated on Iron's reasoning:

6        "Another critical difference between this case and Biggs, Sass and Irons
         is that Brown has served a substantial amount of time beyond the minimum
7        sentence. This court must consider that at some point after an inmate
         has served his minimum sentence the probative value of his commitment
8        offense as an indicator of "unreasonable risk of danger to society"
         recedes below the "some evidence" required by due process to support
9        a denial of parole. See, Irons, 479 F.3d at 665. A decision to revoke
         parole based solely on an inmate's commitment offense that can no longer
10       be considered probative of dangerousness to society would be arbitrary
         and not comport with the "some evidence" standard. See Hill, 472 U.S.
11       at 545-55, 457. This is one of those cases..."

12   The wording of "minimum term" is being mis-applied. Under California law

13   an indeterminately sentenced inmate, like Petitioner, must be granted parole at

14   his **initial** hearing or no later than at his first subsequent hearing at which

15   his parole no longer poses an unreasonable risk of danger to public safety, Cal.

16   P.C. §3041; 15 C.C.R. §§2401, 2402(a). The 'initial' hearing occurs one year before

17   the inmate's minimum eligible parole date (MEPD) (Ibid.), "the earliest date on

18   which an ISL or life prisoner may be legally released on parole" (15 C.C.R.

19   §2000(b)(67)), which in Petitioner's case was August 30, 2003 (one year prior

20   to the MEPD).

21   The Board appears to only take into consideration "earned credits" after

22   the inmate is found suitable, then a date is calculated which is always far past.

23   This act defies logic and common sense because the MEPD date is based on earned

24   credits of 1/3rd time, i.e., Petitioner was sentenced to 25 years to life plus

25   a 2 year gun enhancement, thus 27 years to life, less earned credits establish

26   a **minimum sentence** of 18 years. (See Proposition 7 of 1978).

27   In, In re Ramirez, Marin County Superior Court, Case No. SC109829A (9-13-

28   2000), (94 Cal.App.4th 549), the court held that parole could not be withheld

20

1    absent a <u>factual</u> <u>finding</u> that the offense was "particularly egregious."

2         To re-iterate a fact, Petitioner asserts that the Board's DECISION never

3    even addressed the wording of "particularly egregious" and with the understanding

4    of Ramirez, supra, that, reasonably interpreted, a factual finding of "particularly

5    egregious" must be found to deny a parole date. See also, In re Rosenkrantz, 29

6    Cal.4th 616, 683, 128 Cal.Rptr.2d 104, 161 (2002)

7                                **PSYCHOLOGICAL EVALUATION**

8         The facts at issue regarding the psychological evaluation are that the report

9    is  prepared  by  a  state  licensed,  expert  in  his  field,  professional

10   psychiatrist/psychologist with years of formal education and training with the

11   ability to make sound judgments regarding an inmate's "potential" for "future

12   violence" thus a threat or risk level assessment of current risk to public safety.

13        The  Commissioners  however  have  no  such  formal  training,  and  none  is

14   established in Exhibit "A", or rather the lack of existence in the record that

15   the Commissioners have a modicum of psychiatric knowledge or training, lacking

16   professional credentials as a board certified expert or even at the level of

17   knowledge required for a CDC Correctional Counselor as set forth in the Department

18   of Corrections Operational Manual, at §62090.14.1 requiring staff to have at least

19   two (2) years of "graduate training in psychiatry" to make an evaluation for

20   an inmate. When the Board over-rides or contravenes a Psychological Evaluation

21   without "some evidence" to support their "re-evaluation" they are indeed practicing

22   medicine without a license under California law.

23        The  Psychological  Evaluation  Report  is  'always'  over-ridden  and/or

24   contradicted by the Board when the evaluation is favorable to an inmate for

25   suitability of release on parole. The Board, nearly always, requires "selfhelp,

26   book reports, AA, NA, and/or anger management in spite of what the Evaluation

27   states or rather what is <u>not</u> recommended by the psychologist making the evaluation.

28        Exhibit "D", under 'XI': "If paroled, he plans to live with his sister and

                                        21

1  collect Social Security. The prognosis for successful, responsible, legal,
2  prosocial community is good." (Emphasis added).

3      At 'XII': "He exhibited no depressive or psychotic symptomatology. His
4  intellectual functioning was estimated to be in the average range. He was calm,
5  cooperative and alert. His mood affect and flow of thought were all normal. His
6  insight and judgment were good. He is not currently in need of any mental health
7  treatment."(Emphasis added).

8      At 'XIV': "...his violence potential is lower than the average citizen."

9      At 'XV': "He does not have a mental health disorder that would necessitate
10 treatment either while incercerated or on parole." "There are no obvious mandatory
11 conditions of parole and recommendations."

12     The Board cannot legally apply 15 C.C.R. §§2400-2411 to over-ride or control
13 the legislative intent of Cal. P.C. §3041. See, Aerolineas Argentinas v. U.S.,
14 77 F.3d 1564 (Fed. Cir. 1996).

15     When an administrative regulation conflicts with a statute, the statute
16 controls. (Government Code §11342.2). Petitioner asserts that §§2400-2411 rules
17 and regulations are in direct conflict with P.C.'s §3041 et seq., wherein §3041
18 only carries one basic requirement for a parole release date, i.e.,, consideration
19 of public safety. Although the Board may use 'all' available information to arrive
20 at their decision the intent of the penal code still controls and the Board cannot
21 change, add to or delete the requirements for parole release suitability, an issue
22 already decided (threat level assessment) by a state certified Psychiatrist.

23     An agencies regulations cannot legitimate the violations of constitutional
24 or statutory rights. U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999). No other
25 excuses/reasons given by the Board for denial of suitability are legally valid.

26     The Board has effectively amended P.C. §3041(a)(b) and the legislative intent
27 has been circumvented. Proposition 7, 1978, did not allow such amendment without
28 voters approval. See, In re Oluwa, (1989) 207 Cal.App.3d 447.

1

## UNCHANGABLE CIRCUMSTANCES

2       Greenholtz, supra, spoke in detail about the purpose of parole being
3   rehabilitation and, most important, recognized that an inmate's record during
4   confinement indicates whether release on parole is appropriate. Therefore, even
5   in the absence of Ninth Circuit case law clarifying the scope of Biggs, Greenholtz
6   is still compelling law.

7       The facts of the unchanged circumstances must indicate a present danger to
8   the community if released, and this can only be assessed not in a vacuum, after
9   four or five eligibility hearings, but counterposed against the backdrop of prison
10  events. Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D. Cal. 2005),
11  report and recommendation adopted by, 2005 WL 3081634 (E.D. Cal. 2005).

12      In Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936,
13  947 (E.D. Cal. 2005) the court asks rhetorically:

14          "What is it about the circumstances of petitioner's crime or motivation
            which are going to change? The answer is nothing. The circumstances
15          of the crimes will always be what they were, and petitioner's motive
            for committing them will always be trivial. Petitioner has no hope for
16          ever obtaining parole except perhaps that a panel in the future will
            arbitrarily hold that the circumstances were not that serious or the
17          motive was more than trivial. Given that no one seriously contends lack
            of seriousness or lack of triviality at the present time, the potential
18          for parole in this case is remote to the point of non-existence.
            Petitioner's liberty interest should not be determined by such an
19          arbitrary, remote possibility."

20      The court's holding that the Board's use of unchanging factors to deny parole
21  is in violation of due process. Rosenkrantz v. Marshall, 444 F.Supp.2d, 1063 (C.D.
22  Cal. 2006).

23

## RECIDIVISM STUDIES

24      The purpose of this information is to bring to the court's attention of
25  studies done several years ago regarding recidivism rates among inmates that the
26  Board appears to ignore, given the no parole policy due to alleged threat or risk
27  level to the public safety, always used by the Board and/or governor as excuses
28  for parole suitability denials, at the current rate of 99% denials, I submit the

23

1 | following information.

2 | * * * * * * * * * * * * * *

3 | "Studies of parole success repeatedly indicate that those who commit murder
4 | are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation
5 | and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard
6 | to the commission of felonies in general and the crime of homicide, no other
7 | offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty
8 | in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some
9 | of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd
10 | Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2.
11 | "Compared with other groups, murderers are actually the best parole risks." Bedau,
12 | Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton
13 | p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in
14 | 10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death
15 | Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the
16 | California Board of Prison Terms (1983-1987) it was concluded that no one released
17 | after committing a murder had been returned to prison for murder. Ellwood, Eldridge
18 | T., PH.D, Research Projects On Life Prisoners, p.3, April 1989, California BPT.
19 | "As a matter of statistical probability, murderers released from a prison are
20 | far less likely to commit a new crime than any other category of offender." Orland,
21 | Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be
22 | released immediately after conviction with little likelihood of offending again."
23 | Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of
24 | Incarceration, p.126, 1976. These authorities, from some of the most respected
25 | sociologists in our country, reveal the fallacy of assumptions regarding the
26 | dangerousness of those convicted of murder.

27 | In reference to a murder case: Hending v. Smith, 781 F.2d 850 (11th Cir.
28 | 1986) ["[I]t is a matter of general knowledge that except for professional killers,

24

1 | few people commit more than one murder in a life time. It is a crime involving
2 | a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444
3 | F.Supp.2d 1063, 2006 WL 2327085 at *12-17.
4 | //
5 | //
6 | //

STATE AND FEDERAL CLAIM NUMBER FIVE (V)

THE STATE OF CALIFORNIA HAS CREATED A MORE COMPREHENSIVE
RIGHT FOR ITS RESIDENTS THAN THE FEDERAL GOVERNMENT FOR THE
APPLICABLE EVIDENCE STANDARD APPLIED TO PAROLE SUITABILITY
HEARINGS UNDER CALIFORNIA EVIDENCE CODE Sec. §115 HEREIN.

The Board of Prison Hearings has violated Petitioner's due process and equal protection rights under the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), a right created by the Legislature of California and by its intent to create an evidence code (§115) that creates a minimal standard of 'evidence' requirement for all situations.

'Some evidence', as applied by the Board, and, used as a judicial tool to review the Board's decision for due process violations, is not the legal standard, especially under California law, see Evidence Code §115; also, U.S. Supreme Court precedents, herein asserted, establish that "preponderance of evidence" is the legal (minimum) evidence standard for parole suitability hearings and not the defunct 'some evidence' standard relied upon by either the Board, and/or Governor. Although the courts do rely on "some evidence" to determine if there is any evidence in the Board's denials (records) it must be "some evidence" that a "preponderance of evidence' exists in the record to support a denial.

The U.S. Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004) stated that:

"As the Government itself has recognized, we have utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof."

The Court further explains that:

"It primarily has been employed by courts in examining an administrative record developed after an adversarial process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting." See, e.g., Hill, 472 U.S., at 455457, 105 S.Ct. 2768.

The Hamdi court further explains that: "...for determining the procedures that are necessary to ensure that a citizen is not "deprived of life, liberty or property, without due process of law," U.S. Const. Amdt. 5, is the test that

1    we articulated in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d

2    18, (1976):

3           "We agree with the prevailing view and conclude that Hill addressed
            only the appropriateness of 'some evidence' as a standard of appellate
4           review, not as a standard of proof. Therefore, we now seek to determine
            through our own analysis the appropriate fact-finding standard to be
5           used by the DOC. To determine whether a standard of proof in a
            particular type of proceeding satisfies due process, the Supreme Court
6           has prescribed a three-factor test that examines: (1) the private
            interest affected, (2) the risk of erroneous deprivation of such
7           interest, and (3) the government's interest."

8        In Carrillo, Supreme Court of Minnesota, 710 N.W.2d 763, 2005 Minn. LEXIS,

9    424, Filed July 28, 2005, that court relied on Eldridge and Hamdi and held that:

10          "Taking the Supreme Court's three factors into consideration, we
            conclude that the "some evidence" standard is inappropriate for use
11          by the DOC at the fact-finding level. We conclude that the
            "preponderance of evidence" standard better protects against an
12          erroneous deprivation of an inmate's liberty interest in his supervised
            release date and does not pose an unacceptable burden on the DOC.
13          Therefore, we conclude that a DOC hearing officer must find by a
            preponderance of evidence that Carrillo has committed a disciplinary
14          offense before the commissioner can extend the date of his supervised
            release. Accordingly, we hold that the district court and the court
15          of appeals erred when they denied Carrillo's petition for writ of habeas
            corpus."

16
        The State of California, by Legislative intent, has conferred more, or a
17
    greater, evidence standard upon the Board, and Governor's review, (and judicial
18
    review), by making the 'minimum' evidence standard "preponderance of evidence",
19
    rather than that espoused in Hill, i.e., "some evidence". See also, Jurasek v.
20
    Utah State Hospital, 158 F.3d 506 (10th Cir. 1998), "The state may confer more
21
    comprehensive due process protection upon its citizens than does the federal
22
    government."
23
        Petitioner contends that a reasonable understanding of the holding in Hamdi
24
    v. Rumsfeld, relied upon in Carrillo, supra, Eldridge, supra, is that a court
25
    will apply the "some evidence" standard to review records, of both the Board's
26
    and Governor's denials for suitability of parole, to see if there was proof under
27
    the "preponderance of evidence" standard mandated by California Evidence Code
28

                                          27

1  Sec. §115, not, that the record of the Board's, or Governor's, denial of

2  suitability, decision only requires "some evidence" of proof, as is always applied

3  by the Board for denial, and, by the Governor for review.

4      Petitioner's due process rights were violated when the defunct minimally

5  necessary evidence (some evidence) standard was applied in place of preponderance

6  of evidence as is mandated by California Evidence Code section §115, second

7  paragraph; "Except as otherwise provided by law, the burden of proof requires

8  proof by a preponderance of the evidence."), and U.S. Supreme Court precedents

9  herein listed.

10      Thus, the Hill, supra, "some evidence" standard is being applied to

11  circumvent and over-ride the California Constitutions duly elected Legislatures

12  intent to confer a greater due process protection upon its citizens when they

13  enacted Evidence Code §115 (Preponderance of evidence as the minimal standard

14  of proof or review) than does the federal courts Hill standard of "some evidence".

15                          //

16                          //

17                          //

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

It is established in the Psychological Evaluation that Petitioner is not a current threat or risk to public safety. There was no evidence either under the "some evidence" "modicum of evidence" or any other evidence standard to support the denial of suitability, nor was there any evidence to support the Board's requirement for book reports under the guise of self-help as a requisite to suitability.

Petitioner was entitled to a term setting under his equal protection "class of one" claim at his first (initial) hearing.

The Board's predetermined denial was arbitrary and capricious and fails 'any' evidence test to support the denial.

Remanding Petitioner back to the Board for another pre-determined denial would be fruitless as is obvious to the courts that the Board does not follow direction or constructive criticism in various court orders, nor does the Board follow the intent of California Penal Codes and defies the California and U.S. Constitution with impunity.

The only alternative is for this court to issue and order to the Board to set Petitioner's release date as required by law. See, In re Scott, 133 Cal.App.4th at pp.603-604 [ordering immediate release instead of remand where no evidence supported denying parole].

Respectfully submitted,

1-16-2008

Samuel A. Dubyak

29

PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests that this Court declare/order that:

1). Respondents show cause why Petitioner is not entitled to the relief requested:

2). The Board set a release date consistent with Title 15 C.C.R. 'Matrix' and as is established in P.C. §3041(a):

3). There was no evidence in the record to deny Petitioner a release date and/or uniform term setting after being found suitable and would not pose a risk to public safety:

4). The Board's denial of a release date was arbitrary and contrary to P.C. §3041(a)(b) language:

5). The Board set Petitioner's term as was done to Schiold and Rosenkrants (Claim No. III):

6). If the Board fails to set a parole release date and/or uniform term under Petitioner's Claims No. TWO and THREE, that this Court issue an order for Petitioner's release forthwith:

7). The Boards decision on October 24, 2006 became final 120 days after, per P.C. §3041(b):

8). Petitioner's release date and/or uniform term date become effective on October 24, 2006:

9). Grant Petitioner such other relief as this Court deems just and proper in the interest of justice as Petitioner is a layman at law.

//

//

//

1  Samuel A. Dubyak D-54700
   Box 689   C-115L
2  California State Prison
   Soledad, CA 93960-0689
3
         Petitioner, in pro se
4

5

6
                    IN THE SUPERIOR COURT OF CALIFORNIA
7
                  FOR THE COUNTY OF SAN BERNARDINO
8

9  SAMUEL A. DUBYAK,                 )    Case No. _____
                                     )
10        Petitioner,                )
                                     )
11 v.                                )    MOTION/REQUEST FOR JUDICIAL NOTICE
                                     )
12 CURRY, Warden,                    )
                                     )
13        Respondent.                )
   _____)
14

15 To: THE HONORABLE JUDGE(S) OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN
16 BERNARDINO.

17      Pursuant to California Evidence Code sections 451 subdivision (a), 452
18 subdivision (a), (c) & (d), and 459 subdivision (a), Commode Home System, Inc.
19 v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and, Adamson v. Zipp, (1984)
20 163 Cal.App.3d Supp. 1, n.17, Petitioner hereby asks this Court to take "Judicial
21 Notice" of the documents submitted and currently attached to the herein petition
22 as the following listed exhibits: "A", Parole Board suitability hearing
23 transcripts, "B" designated as "SETTLEMENT AGREEMENT, Re, Schiold, "C" designated
24 as an order, Re, Rosenkrantz, "D" designated as Petitioner's Psychological
25 Evaluation.

26      This Court must take Judicial Notice of the factual findings of other courts,
27 and this court's previous orders, even though the Court need not accept the truth
28 of those findings. See, Mack v. State Bar of California, (2001) 92 Cal.App.4tn

                                     1

1  957, 961, renearing denied, review denied; <u>Duggal v. G.E. Capitol Communications</u>
2  <u>Service, Inc.</u>, (2000) 81 Cal.App.4th 81, 82; <u>People v. Moore</u>, (1997) 59 Cal.App.4th
3  168, 178.

4       Petitioner has obtained the above mentioned documents from the prison law
5  library and from the Swedish Consulate's office, (through another inmate Petitioner
6  assisted). All of the attached cases arose out of habeas corpus proceedings in
7  the aforementioned Courts. Review of the attached cases will assist this Court
8  in evaluating the claims presented in Petitioner's habeas corpus petition along
9  with this MOTION/REQUEST FOR JUDICIAL NOTICE.

10                    Respectfully submitted,

11
12
13
14                    Samuel A. Dubyak
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

# E X H I B I T

# A

FILED

JUL 0 5 2007

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
DEPUTY

S. GARSIDE

1    SUPERIOR COURT OF CALIFORNIA

2    COUNTY OF MONTEREY

3

4    In re                                    )   Case No.: HC 5740
                                              )
5    Samuel A. Dubyak                         )   ORDER
                                              )
6              On Habeas Corpus.              )

7

8    On May 29, 2007, Petitioner Samuel A. Dubyak filed a petition for writ of habeas corpus.

9    Petitioner is currently incarcerated at the Correctional Training Facility (CTF) in Soledad.

10   Petitioner describes the background of the petition as follows.

11   On October 24, 2006, Petitioner's second parole suitability hearing was held. To date,

12   Petitioner has not received a copy of the transcript from this hearing.

13   Pursuant to California Rules of Court, 4.551(b), the court requests an informal response

14   from the Attorney General's Office (Respondent). The informal response should address when

15   Petitioner will receive a copy of his parole suitability hearing transcript.

16   The informal response shall be filed within 15 days from the date of service of the order.

17   Petitioner may file a reply within 15 days from the date of service of the informal response upon

18   Petitioner.

19   IT IS SO ORDERED.

20   Dated: July 5, 2007.

21

22                                    Hon. James W. Luther
                                      Judge of the Superior Court
23

24

25

1

*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5774
Facsimile: (415) 703-5843
E-Mail: Stacey.Schesser@doj.ca.gov

July 20, 2007

The Honorable James W. Luther
Monterey County Superior Court
P.O. Box 1051
Salinas, CA 93902-0414

RE:     INFORMAL RESPONSE
        **In re SAMUEL A. DUBYAK, Case No. H5740**

Dear Judge Luther:

This letter is written pursuant to the court's request for an informal response to inmate Samuel Dubyak's petition for writ of habeas corpus. Petitioner Dubyak is a California state inmate at the Correctional Training Facility (CTF) who alleges that he has not received a copy of the transcript from his parole consideration hearing held on October 24, 2006. (Petn.) Petitioner's claims, however, are moot.

As a general principle, it is the duty of a court to decide only "actual controversies" by judgments which can be carried into effect. Courts must avoid rendering opinions on moot questions, abstract propositions, or declaring rules of law which cannot affect a matter at issue in a pending case. (*National Association of Wine Bottlers v. Paul* (1969) 268 Cal.App.2d 741, 746.) "[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or questions which will not be decided by the court." (*Wilson v. Los Angeles County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453.)

///

///

///

James W. Luther
July 20, 2007
Page 2

Attached to this informal response is a copy of Dubyak's October 24, 2006 parole consideration hearing. (Exh. 1 – Parole Consideration Hearing Transcript.) Given that Dubyak will receive a copy of this informal response and the attached exhibit upon service, he will have the parole consideration hearing transcript he requested. Because Dubyak already received the relief requested, this court can no longer grant relief and respondent requests the petition be dismissed.

Sincerely,

Stacey D. Schesser

STACEY D. SCHESSER
Deputy Attorney General
State Bar No. 245735

For    EDMUND G. BROWN JR.
Attorney General

SDS:ls

Attachments: Exhibit 1

20096325.wpd

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **In re Dubyak**

No.:    **H5740**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On July 20, 2007, I served the attached

### INFORMAL RESPONSE

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Samuel A. Dubyak**
**D-54700**
**Correctional Training Facility**
**P.O. Box 689, D-115L**
**Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on July 20, 2007, at San Francisco, California.

| | |
|---|---|
| L. Santos | ᗡ - Santos |
| Declarant | Signature |

20096958.wpd

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )          CDC Number D-54700
Hearing of:               )
                          )
SAMUEL DUBYAK             )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 24, 2006

1:30 P.M.

PANEL PRESENT:
JAMES DAVIS, PRESIDING COMMISSIONER
NOREEN BLONIEN, DEPUTY COMMISSIONER

OTHERS PRESENT:

SAMUEL DUBYAK, INMATE
PETER FERGUSON, ATTORNEY FOR INMATE
JENNIFER DAWSON, DEPUTY DISTRICT ATTORNEY

*RECEIVED 1-23-2007*

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Beth Lewis     Northern California Court Reporters**

ii

INDEX

Page

Proceedings ............................................... 1

Case Factors ............................................. 9

Pre-Commitment Factors .................................. 17

Post-Commitment Factors ................................. 22

Parole Plans ............................................ 29

Closing Statements ...................................... 33

Recess .................................................. 38

Decision ................................................ 39

Adjournment ............................................. 44

Transcriber Certification ............................... 45

--oOo--

1

1    **PROCEEDINGS**

2    **--oOo--**

3    **DEPUTY COMMISSIONER BLONIEN:**  We are on record.

4    **PRESIDING COMMISSIONER DAVIS:**  This is a

5    subsequent parole consideration hearing for Samuel

6    Dubyak.

7         **INMATE DUBYAK:**  Yes, sir.

8    **PRESIDING COMMISSIONER DAVIS:**  Am I pronouncing

9    that correctly?

10        **INMATE DUBYAK:**  Yes, sir.

11   **PRESIDING COMMISSIONER DAVIS:**  CDC number D-

12   54700.  Today is date is October 24, 2006 and we're

13   located at CTF in Soledad.  The inmate was received on

14   April 23, 1987 from San Bernardino County.  The life term

15   beginning on April 23, 1987 with a minimum eligible

16   parole date of August 31, 2004.  The controlling offense

17   for which the inmate has been committed is murder first

18   with use of a firearm.  Case number CR12056, count one

19   Penal Codes Section 187/12022.5 for which he received a

20   term of 25 years to life plus two. This hearing is being

21   tape recorded so for the purpose of voice identification

22   we'll each state our first and last name, spelling our

23   last name.  And when it reaches you Mr. Dubyak if you'll

24   also give us your CDC number, please sir.  I'll start and

25   move to my left, I'm James Davis, D-A-V-I-S,

26   Commissioner.

27        **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen Blonien,

2

1    B-L-O-N-I-E-N, Deputy Commissioner.

2         **DEPUTY DISTRICT ATTORNEY DAWSON:**  Jennifer

3    Dawson, D-A-W-S-O-N, Deputy District Attorney, San

4    Bernardino County.

5         **ATTORNEY FERGUSON:**  Peter Ferguson,

6    F-E-R-G-U-S-O-N, counsel for Mr. Dubyak.

7         **INMATE DUBYAK:**  Samuel Dubyak, D-U-B-Y-A-K.

8         **PRESIDING COMMISSIONER DAVIS:**  And your CDC

9    number?

10        **INMATE DUBYAK:**  Oh sorry, D-54700.

11        **PRESIDING COMMISSIONER DAVIS:**  Very well thank

12   you, and let the record reflect that we are joined today

13   with two correctional officers who are here for security

14   purposes and will not be actively participating in the

15   hearing.  Mr. Dubyak, in front of you in that laminated

16   piece of paper is the American's with Disabilities Act,

17   will you please read that aloud?

18        **INMATE DUBYAK:**  "The Americans with

19             Disabilities Act, ADA, is a law to help

20             people with disabilities.  Disabilities

21             are problems that make it harder for some

22             people to see, hear, breathe, talk, walk,

23             learn, think, work or take care of

24             themselves than it is for others.  Nobody

25             can be kept out of public places or

26             activities because of disabilities.  If

27             you have a disability you have the right

3

1              to ask for help to get ready for your BPT
2              Hearing, get to the hearing, talk, read
3              forms and papers, and understand the
4              hearing process. BPT will look at what
5              you ask for to make sure that you have a
6              disability that is covered by ADA, and
7              that you have asked for the right kind of
8              help.  If you do.not get help or if you
9              don't think you got the kind of help you
10             need, ask for a BPT Form 1074 grievance
11             form, you can also get help to fill it
12             out."

13      **PRESIDING COMMISSIONER DAVIS:**  Very well, thank
14  you.  Our records indicate that on May 10, 2006 that
15  together with staff at the institution on November 18,
16  2005 you reviewed and signed a BPT form 1073 indicating
17  that you do not have any disabilities that would
18  qualifying under the American's with Disabilities Act, is
19  that correct?

20      **INMATE DUBYAK:**  That is correct.

21      **PRESIDING COMMISSIONER DAVIS:**  Has anything
22  changed since that time?

23      **INMATE DUBYAK:**  No.

24      **PRESIDING COMMISSIONER DAVIS:**  And you were able
25  to read that without glasses, do you normally need
26  glasses?

27      **INMATE DUBYAK:**  I'm blind in my right eye, that's

4

1   why I move it back and forth.  I have glasses yes.

2        **PRESIDING COMMISSIONER DAVIS:**  Okay but you were

3   able to read it without them.  But you do have glasses as

4   an accommodation in the event that you need them?

5        **INMATE DUBYAK:**  Yes.

6        **PRESIDING COMMISSIONER DAVIS:**  And you had those

7   when you read your C-File in preparation of this hearing?

8        **INMATE DUBYAK:**  Yes.

9        **PRESIDING COMMISSIONER DAVIS:**  And you can hear

10  me all right?

11       **INMATE DUBYAK:**  Yes.

12       **PRESIDING COMMISSIONER DAVIS:**  And you made it up

13  here under your own steam, you walked here all right?

14       **INMATE DUBYAK:**  Yes.

15       **PRESIDING COMMISSIONER DAVIS:**  Feel healthy and

16  fit and ready to go?

17       **INMATE DUBYAK:**  Ready.

18       **PRESIDING COMMISSIONER DAVIS:**  Any reason that

19  you can think of that you would not be able to actively

20  participate in this hearing today?

21       **INMATE DUBYAK:**  No.

22       **PRESIDING COMMISSIONER DAVIS:**  I do see that you

23  have some medical conditions including not lifting

24  certain things, no climbing, no bending, stooping and so

25  forth, some other medical conditions that did not

26  interfere with you getting to the hearing?

27       **INMATE DUBYAK:**  No, I'm careful when I climb

5

1    steps I try to make steps (inaudible).

2         **PRESIDING COMMISSIONER DAVIS:**  So you have a cane

3    as a partial accommodation as well. And you're able to

4    make it up the steps all right.

5         **INMATE DUBYAK:**  Yes.

6         **PRESIDING COMMISSIONER DAVIS:**  All right.

7    Counsel and you're satisfied with that as well?

8         **ATTORNEY FERGUSON:**  Yes, sir.

9         **PRESIDING COMMISSIONER DAVIS:**  This hearing is

10   being conducted pursuant to Penal Code Section 3041 and

11   3042 of the Rules and Regulations of the Governing Board

12   of Parole for life inmates.  The purpose of today's

13   hearing is to once again consider the number and nature

14   of the crimes that you were committed, your prior

15   criminal and social history, and your behavior and

16   programming since your commitment.  We've had the

17   opportunity to review your Central File and your prior

18   transcripts.  And you'll be given the opportunity to

19   correct or clarify the record as we proceed.  Now we will

20   reach a decision today and inform you whether or not we

21   find you suitable for parole and the reasons for our

22   decisions.  If you are found suitable for parole the

23   length of your confinement will be explained to you.

24   Nothing that will happen here today will change the

25   findings of the court.  The Panel is not here to retry

26   your case, we are here for the sole purpose of

27   determining your suitability for parole, do you

6

1   understand that sir?

2           **INMATE DUBYAK:**  Yes.

3           **PRESIDING COMMISSIONER DAVIS:**  This hearing will

4   be conducted in two phases.  First I will discuss with

5   you the crime that you were committed for, your prior

6   criminal and social history.  Commissioner Blonien will

7   discuss with you your progress since your commitment,

8   your counselor's report, and your psychological

9   evaluation, your parole plans, and any letters of support

10  or opposition as they may exist.  Once that's concluded

11  the Commissioners, the District Attorney, your attorney

12  will have the opportunity to ask you questions.  The

13  questions that come from the District Attorney will asked

14  through the Chair and you will respond back to the Panel

15  with your answer.  Following that the District Attorney,

16  then your attorney will have an opportunity for a final

17  closing statement.  Which will be followed by your

18  closing statement, which should focus on your suitability

19  for parole.  The California Code of Regulations states

20  that regardless of time served an inmate shall be found

21  unsuitable and denied if in the judgement of the Panel

22  the inmate would pose an unreasonable risk of danger to

23  society if released from prison.  And you have certain

24  rights those rights include a timely notice to the

25  hearing, the right to review your Central File and the

26  right to present relevant documents.  Counsel are you

27  satisfied that your client's rights have been met today?

7

1      **ATTORNEY FERGUSON:**  Yes, we are.

2      **PRESIDING COMMISSIONER DAVIS:**  You have an

3  additional right to be heard by an impartial panel, you

4  heard Commissioner Blonien and I introduce ourselves

5  today, do you have any reason to believe that we would

6  not be impartial?

7      **INMATE DUBYAK:**  I have no knowledge of either of

8  (inaudible).

9      **PRESIDING COMMISSIONER DAVIS:**  You believe that

10  we would be impartial?

11      **INMATE DUBYAK:**  That you don't have anything

12  against me.

13      **PRESIDING COMMISSIONER DAVIS:**  All right, very

14  well. You will receive a written copy of our tentative

15  decision today, that decision becomes effective within

16  120 days and a copy of the decision and a copy of the

17  transcript will be sent to you.  The Board has eliminated

18  it's appeal process, if you do disagree with anything in

19  today's hearing you have the right to go directly to

20  court with your appeal.  Now you're not required to

21  discuss your offense or admit your offense, however the

22  Panel does accept the findings of the court as true.  Do

23  you understand that?

24      **INMATE DUBYAK:**  Yes, sir.

25      **PRESIDING COMMISSIONER DAVIS:**  All right,

26  Commissioner Blonien, are we going to be using anything

27  from a confidential file.

1          **DEPUTY COMMISSIONER BLONIEN:**  There is nothing in
2     a confidential file.

3          **PRESIDING COMMISSIONER DAVIS:**  All right.  I
4     previously passed to both counsel a checklist counsel and
5     district attorney the checklist of documents.  Will you
6     both take a look at that please, make sure that you both
7     have those?

8          **ATTORNEY FERGUSON:**  We've received the indicated
9     documents.

10         **DEPUTY DISTRICT ATTORNEY DAWSON:**  I have them all
11    here.

12         **PRESIDING COMMISSIONER DAVIS:**  Counsel, any
13    additional documents?

14         **ATTORNEY FERGUSON:**  Yes, Mr. Dubyak has very
15    consciously put together a whole packet, which includes
16    various documents as far as his plans go.

17         **PRESIDING COMMISSIONER DAVIS:**  Good, thank you,
18    we'll take a look at those at the appropriate time.  Any
19    preliminary objections?

20         **ATTORNEY FERGUSON:**  None at this time.

21         **PRESIDING COMMISSIONER DAVIS:**  All right, and
22    will your client be speaking to us today?

23         **ATTORNEY FERGUSON:**  Yes, and he will be
24    stipulating to the official version of the facts.

25         **PRESIDING COMMISSIONER DAVIS:**  All right, then.
26    Is that you don't want to talk about the incident offense
27    itself then, your just going to stipulate that?  That way

1   we'll just avoid any questions regarding the incident
2   offense. All right, if you'll raise your right hand then
3   for all other matters. Do you solemnly swear or affirm
4   that the testimony that you at to give at this hearing
5   will be the truth and nothing but the truth?
6       **INMATE DUBYAK:** I do.
7       **PRESIDING COMMISSIONER DAVIS:** All right, without
8   objection I'd like to incorporate reference the Court of
9   Appeals document pages two through three. And refer to
10  the Board report dated July 2003 for the summary of the
11  crime, which states that,
12          "On August 27, 1985, Mr. Raul Rodriquez
13          R-O-D-R-I-G-U-E-Z of Marovis,
14          M-A-R-O-V-I-S, Puerto Rico, contact the
15          police department regarding the
16          disappearance of his sister, Lourdes
17          L-O-U-R-D-E-S, Dubyak. The investigation
18          was turned over to Detective Beckman, B-
19          E-C-K-M-A-N, Mr. Rodriquez advised
20          Detective Beckman that no one had seen or
21          heard from Lourdes after the accident in
22          1985. Mr. Rodriquez further indicated
23          that the victim kept in close contact
24          with her family. In addition, Mr.
25          Rodriquez indicated that had his sister
26          left the area, she would have taken her
27          two year old daughter Angelica, A-N-G-E-

10

1          L-I-C-A, Mr. Rodriguez had also advised

2          Detective Beckman that he had been in

3          contact with Lourdes' husband Samuel

4          Dubyak, the defendant and had received

5          inconsistent statements from him.  He

6          also advised Detective Beckman that he

7          had called his sister at 9:00 p.m.

8          Pacific Daylight time and was advised by

9          Dubyak that she was not home.  According

10         to the information received from a

11         neighbor the victim left her house

12         between 8:15 and 8:30 p.m. and would have

13         easily returned home prior the 9:00 p.m.

14         telephone call.  Mr. Rodriguez indicated

15         that his sister and her husband have been

16         having marital problems for a period of

17         time and the victim had consulted with

18         him regarding divorcing her husband.  Mr.

19         Rodriguez had further indicated that the

20         victim had been having affairs with

21         several individuals over the last several

22         months, a fact that which the inmate was

23         aware.  Upon receiving this information,

24         Detective Beckman started his own

25         investigation about the whereabouts of

26         Lourdes Dubyak.  Detective Beckman was

27         able to establish that on the weekend of

11

1      August 9th through August 11th, 1989, the

2      victim spent time with her lover, Marcel

3      Berasalece, B-E-R-A-S-A-L-E-C-E, in a

4      motel.  Mr. Berasalece dropped the victim

5      off at her residence on August 11, 1985

6      in the early afternoon.  The victim

7      telephoned him later that afternoon and

8      what was the last he heard of her.  They

9      made arrangements to have a lunch date on

10     Tuesday, August 13, 1985, however the

11     victim failed to keep her engagement.

12     Detective Beckman interviewed Debbie

13     Alongis, A-L-O-N-G-I-S, a close friend

14     and neighbor of the victim.  She

15     indicated that she had last seen the

16     victim on August 11, 1985 at

17     approximately 8:00 p.m. the victim left

18     her residence and was on her way home.

19     That was the last Ms. Alongis ever saw

20     the victim.  However the following

21     morning Dubyak arrived at Ms. Alongis'

22     home and requested a videotape which had

23     been loaned to her family.  Mr. Dubyak

24     advised Ms. Alongis that the victim had

25     left him.  On August 30, 1985 the inmate

26     was interviewed by Detective Beckman

27     after being advised his rights, Dubyak

12

```
 1          advised that his wife, Lourdes, had left
 2          him on Sunday, August 11, 1985, between
 3          9:00 and 9:30 p.m. he indicated that she
 4          made a telephone call dropped off the
 5          baby off in his room and said she had to
 6          go out for awhile.  Mr. Dubyak assumed
 7          that the victim had taken her car.
 8          However upon waking in the morning he
 9          discovered that his wife had not left in
10          the automobile.  As the investigation
11          continued Detective Beckman learned that
12          Dubyaks slept in separate bedrooms and
13          the bedroom that Mrs. Dubyak slept in had
14          been converted into a television room.
15          The double bed that Mrs. Dubyak slept in
16          was currently gone.  When Detective
17          Beckman question Mr. Dubyak regarding
18          this, he indicated that the victim must
19          have taken this as he had no idea where
20          the bed was.  The investigation of
21          Lourdes Dubyak continued, Detective
22          Beckman learned that on August 16, 1985
23          the inmate and his brother, Peter Dubyak,
24          along with a 13 year old juvenile from
25          the neighborhood had loaded a bed from
26          Dubyak's house into a truck.  And
27          subsequently and had dumped it on the
```

13

| 1 | side of the road, east of Ontario |

1    side of the road, east of Ontario
2    International Airport.  On November 5,
3    1985, that bed was discovered
4    approximately 200 yards east of Vineyard
5    Street in Ontario.  The bed was
6    subsequently identified by family members
7    and neighbors as the bed, which was
8    originally in the victim's bedroom.  On
9    November 6, 1985 the mattress, box
10   springs, and headboard were preliminary
11   examined by a San Francisco crime
12   laboratory.  Tests for traces of human
13   blood were conducted negative results,
14   however during the examination two holes
15   were found to have been cut in the foam
16   part of the mattress.  The complete
17   examination of the bed was completed on
18   November 8, 985, at which time a
19   projectile exit hole was located on the
20   underside of the mattress.  The
21   projectile exit hole was found in the box
22   spring of the mattress.  The projectiles
23   were later determined to be made from a
24   .22 caliber long rifle with gold-jacketed
25   bullet.  After presenting the above
26   information, Detective Beckman obtained
27   an arrest warrant for the inmate and his

14

1          brother Peter Dubyak for investigation of

2          murder.  On December 2, 1985 a search

3          warrant was executed at 12248 Kumquat,

4          K-U-M-Q-U-A-T, Street.  On that date a

5          luminol, L-U-M-I-N-O-L, reagent test was

6          conducted by San Bernardino County

7          Criminalistics Laboratory.  The test was

8          made in an attempt to locate traces of

9          blood in the residence.  When the luminol

10         reagent was applied in the bedroom in

11         which the bed had been, traces of

12         bloodstains were located in the wall near

13         the headboard of the bed around the light

14         switch and on the carpet itself.  In

15         addition, bloodstains were also located

16         on the carpet of the hallway leading up

17         to the laundry room and the garage.

18         Additionally, the presence of blood was

19         located in the rear hatchback of the

20         vehicle belonging to Dubyak.  In

21         addition, several hundred rounds of

22         Remmington .22 caliber ammunition were

23         recovered from the residence.  Although

24         the inmate was arrested on December 2,

25         1985, charges were not filed and he was

26         subsequently released on December 4,

27         1985.  At that point the investigation

15

| | |
|---|---|
| 1 | continued, at that point the additional |
| 2 | information was obtained continued to |
| 3 | indicate that Samuel Dubyak was |
| 4 | responsible for the disappearance and |
| 5 | probable death of Lordes Dubyak.  Checks |
| 6 | of the victim's charged card revealed |
| 7 | that no charges had been made during that |
| 8 | time and there had been no activity on |
| 9 | the part of the victim on a joint |
| 10 | checking account. During the time it had |
| 11 | been established that Dubyak had reported |
| 12 | to work on Monday August 12, 1985. |
| 13 | However after being there approximately |
| 14 | 45 minutes, he had left ill.  Dubyak |
| 15 | subsequently returned to work the |
| 16 | following day, during that time the |
| 17 | investigation continued as to the |
| 18 | whereabouts of the victim and other |
| 19 | evidence was obtained from additional |
| 20 | witnesses.  On March 3, 1986 Dubyak |
| 21 | contacted Vivian Almovodar, |
| 22 | A-L-M-O-V-O-D-A-R, the victim's aunt. |
| 23 | The inmate showed the Mrs. Almovodar a |
| 24 | letter which he said had been received on |
| 25 | March 1, 1986, Mrs. Almovodar indicated |
| 26 | that the letter was typed, however the |
| 27 | letter was signed by the victim, Lourdes. |

16

```
1            The letter was subsequently obtained by
2            Chino Police Department on April 1986,
3            however tests from the Federal Bureau of
4            Investigations indicated that the
5            signature of "Lourdes" had been traced
6            from another signature.  On September 3,
7            1986, after almost 13 months of
8            investigation the inmate was again
9            arrested for the murder of Lourdes
10           Dubyak.  On November 12, 1986 criminal
11           information was filed in the West
12           District Superior Court by Deputy
13           District Attorney Robert Guizzino,
14           G-U-I-Z-Z-I-N-O, accusing the defendant
15           of murder in violation of Penal Code
16           Section 187, an additional allegations
17           that the defendant used a firearm pursant
18           to Penal Code Section 12022.5.  On
19           February 26, 1987 after deliberating less
20           than six hours the jury found the
21           defendant guilty of murder in the first
22           degree with enhancement of use of a
23           firearm."
24  And this was all from the probation officer's report.
25  And as always counsel if your client would like to he
26  certainly welcome to address the Board however we
27  understand that he has an absolute right not to and that    ✓
```

17

1    will not be held against him.  Under prisoner's version
2    in the same report it does state that on March 9, 1987
3    the inmate was interviewed that the San Bernardino County
4    Jail.  Mr. Dubyak assisted in completing the face sheet
5    of the probation report, however indicated that on the
6    advice of an attorney he did not wish to discuss the
7    matter with the undersigned officer related that he
8    anticipates his conviction to be appealed.  He did state
9    however to the undersigned officer "I am innocent."  Mr.
10   Dubyak was aware that he would be sentenced to state
11   prison on the matter however requested the clerk postpone
12   his delivery to the Department of Corrections until after
13   April of 1987.  And it goes on to that's really to some
14   exception of the statement.  In terms of prior arrests,
15   we note that in terms of the juvenile record you have a
16   record 6/4/1987 from Los Angeles Police Department had
17   one arrest for suspicion of burglary.  There was no
18   disposition available.  And that the commitment offense
19   was the only adult offense for Mr. Dubyak.  Is that
20   correct sir?

21        **INMATE DUBYAK:**  There was no disposition; there
22   was a trial on 19th of December.

23        **PRESIDING COMMISSIONER DAVIS:**  And what happened
24   as a result of that?

25        **INMATE DUBYAK:**  Does that say '87?

26        **PRESIDING COMMISSIONER DAVIS:**  Oh that's the
27   record from 1987, on 3/11/1957 was the burglary arrest.

18

1  Was there a trial for that?

2         **INMATE DUBYAK:**  No.

3         **PRESIDING COMMISSIONER DAVIS:**  Okay.

4         **INMATE DUBYAK:**  (Inaudible).

5         **PRESIDING COMMISSIONER DAVIS:**  Oh, it was in

6  1957.  But no adult arrests other than the commitment

7  offense, is that correct sir?

8         **INMATE DUBYAK:**  Correct.  (Inaudible)

9         **PRESIDING COMMISSIONER DAVIS:**  Okay.

10        **INMATE DUBYAK:**  There was an arrest in either 68

11  or 69when I worked at a grocery store.  There was a child

12  and I (inaudible).

13        **PRESIDING COMMISSIONER DAVIS:**  What was the crime

14  that you were accused of?

15        **INMATE DUBYAK:**  I seen him liquored up at the

16  store and I had sold him my car and I needed registration

17  and I didn't change the registration and (inaudible).  The

18  car was impounded the next day.

19        **PRESIDING COMMISSIONER DAVIS:**  You had nothing to

20  do with it whatsoever.  Okay.

21        **INMATE DUBYAK:**  But I got arrested for it.

22        **PRESIDING COMMISSIONER DAVIS:**  So you were born

23  in Pennsylvania.

24        **INMATE DUBYAK:**  Yes, sir.

25        **PRESIDING COMMISSIONER DAVIS:**  The middle child

26  of three siblings, the family moved to California, you

27  settle in Los Angeles.  Attended Washington High School

19

1    from 1958 to 1960.  And attended the Northrop Institute

2    from 63-64, what's the Northrop Institute?

3          **INMATE DUBYAK:**  That's aircraft technology,

4    aircraft engineering.

5          **PRESIDING COMMISSIONER DAVIS:**  And what did you

6    learn to do there?

7          **INMATE DUBYAK:**  I did some engineering and I did

8    some aircraft (inaudible).

9          **PRESIDING COMMISSIONER DAVIS:**  In '66-'67 you

10   attended Rose School of Aviation in Hawthorne as a

11   commercial pilot, so you were a commercial pilot at one

12   time?

13         **INMATE DUBYAK:**  Yes, sir.

14         **PRESIDING COMMISSIONER DAVIS:**  And for whom did

15   you fly?

16         **INMATE DUBYAK:**  Just Rose Aviation and

17   (inaudible).

18         **PRESIDING COMMISSIONER DAVIS:**  So you were flying

19   what, private?

20         **INMATE DUBYAK:**  Yes, private and air tours.

21         **PRESIDING COMMISSIONER DAVIS:**  In terms of

22   employment history you worked for Ethic Manufacturing in

23   Los Angeles as a foreman from 72-77.  And is it Andal

24   Corporation,

25         **INMATE DUBYAK:**  A-M-D-A-L

26         **PRESIDING COMMISSIONER DAVIS:**  Oh, it's A-M,

27   Amdal Corporation in Marina Del Rey.  As a production

20

1    planner from 77-82 and Hughes Helicopters in Culver City
2    as a production analyst from 82-86.  You were in the
3    United States Marine Corp from 1960-63, and honorable
4    discharge.  What was your rank at discharge?
5         **INMATE DUBYAK:**  Lance Corporal E-trade. $E$-3 $S.D.$
6         **PRESIDING COMMISSIONER DAVIS:**  You previously
7    married a Virginia Chicon?
8         **INMATE DUBYAK:**  Chicon.
9         **PRESIDING COMMISSIONER DAVIS:**  In 1973, oh the
10   marriage ended in divorce in 73 or 75?
11        **INMATE DUBYAK:**  I think it was  73 or 72.
12        **PRESIDING COMMISSIONER DAVIS:**  It says you have a
13   five children, is that from the first marriage?
14        **INMATE DUBYAK:**  Four in the first marriage and
15   the fifth one in the second marriage.
16        **PRESIDING COMMISSIONER DAVIS:**  Do you keep in
17   contact with your children?
18        **INMATE DUBYAK:**  Yes, I do.
19        **PRESIDING COMMISSIONER DAVIS:**  All of them?
20        **INMATE DUBYAK:**  Yes, I do.
21        **PRESIDING COMMISSIONER DAVIS:**  Including the one
22   from the second marriage?
23        **INMATE DUBYAK:**  Yes.
24        **PRESIDING COMMISSIONER DAVIS:**  And how do you,
25   cards and letters so forth.
26        **INMATE DUBYAK:**  We started writing and I found
27   (inaudible) I started writing and she responded back and

21

1    I was able to make a few telephone calls and (inaudible).

2         **PRESIDING COMMISSIONER DAVIS:**  And now when you

3    say she, it's the daughter of Lourdes?

4         **INMATE DUBYAK:**  Lourdes.

5         **PRESIDING COMMISSIONER DAVIS:**  Lourdes and your

6    daughter.  During the interview of 4/3/03 (inaudible)

7    married in Costa Rica and were divorced in Torrence

8    California, not in Las Vegas, Nevada, as stated in the

9    P.O.R, Dubyak and Lourdes, the victim were married on the

10   Queen Mary in the Long Beach Harbor in 1981.

11        **INMATE DUBYAK:**  Correct.

12        **PRESIDING COMMISSIONER DAVIS:**  Let me know if

13   there is an error at some point in time.  Anything else

14   about your life prior to the incident offense itself or

15   your prior arrest record or anything else you want to

16   clarify or add any detail to?

17        **INMATE DUBYAK:**  No.

18        **PRESIDING COMMISSIONER DAVIS:**  All right, if you

19   think of something as we move along, please don't

20   hesitate say wait a minute I remember one of those

21   things.  Questions?

22        **ATTORNEY FERGUSON:**  None.

23        **PRESIDING COMMISSIONER DAVIS:**  All right, then

24   I'll ask you to move your attention over to Commissioner

25   Blonien.

26        **DEPUTY COMMISSIONER BLONIEN:**  Mr. Dubyak, this is

27   your first subsequent hearing and your last appearance

22

1    before the Board was September 2, 2003.  And the Panel
2    decision was a three year denial, the Panel recommended
3    that you become and remain disciplinary free and you
4    participate in self help.  Specific recommendation was to
5    participate in anger management.  Your custody level is
6    medium A, your classification score is 19, which is the
7    lowest possible for a lifer inmate.  So in order to do
8    this report, I read the Board Report, prepared by your
9    counselor, Berdsoto, B-E-R-D-S-O-T-O, dated June 30 of
10   2006.  I read the new psych report by Dr. Merek,
11   M-E-R-E-K, dated Septemeber of '06.  I've gone through
12   your C-File and I see that you did an Olsen review of
13   your C-File on May 10 of '06.  Correct?

14            **INMATE DUBYAK:**  Correct.

15            **DEPUTY COMMISSIONER BLONIEN:**  And I've gone
16   through the whole Board packet.  So since you've been in
17   the institution you've only had one 115 in 1994 and that
18   was for manipulating the mail process.  You had one 128
19   in 1999 for a physical, a very minor physical
20   altercation.  At your last hearing they asked you about
21   your high school diploma, that wasn't in your C-file, it
22   is now in your C-File.  You graduated in June 1, 1960,
23   correct?

24            **INMATE DUBYAK:**  Correct.

25            **DEPUTY COMMISSIONER BLONIEN:**  And you've taken
26   several college courses in Political Science, Accounting,
27   Real Estate, Spanish, you completed Spanish course in

23

1   2000 and 2001. You completed the Real Estate course in
2   November of 2005 and you're currently taking the
3   Accounting course, right?

4       **INMATE DUBYAK:** I just finished the Accounting
5   course (inaudible) two, three, four months ago.

6       **DEPUTY COMMISSIONER BLONIEN:** What grade did you
7   get?

8       **INMATE DUBYAK:** I'm waiting for my results.

9       **DEPUTY COMMISSIONER BLONIEN:** Well you do well in
10  the courses that you take, I saw that. And you also have
11  a Bachelor of Science from Embry-Riddle Aeronautic
12  University in Aviation Technology. And you got that in
13  2001. I was compiling a lot of my grades in my downtime
14  and my previous aeronautic experience.

15      **DEPUTY COMMISSIONER BLONIEN:** So that must have
16  taken you quite a bit of time to put that together.

17      **INMATE DUBYAK:** Well I've been flying for 49
18  years, I've got quite a few hours on my commercial
19  (inaudible).

20      **DEPUTY COMMISSIONER BLONIEN:** So where is Embry-
21  Riddle Aeronautic University?

22      **INMATE DUBYAK:** They have one in San Francisco, I
23  think in Florida.

24      **DEPUTY COMMISSIONER BLONIEN:** So you put together
25  a packet of the courses that you've taken and your flying
26  time and you submitted that to them.

27      **INMATE DUBYAK:** And some other different

24

1    (inaudible), just a minute.

2         **DEPUTY COMMISSIONER BLONIEN:**  Okay, do you need

3    water?

4         **INMATE DUBYAK:**  I just took some pills before

5    (inaudible).

6         **DEPUTY COMMISSIONER BLONIEN:**  You need a minute.

7         **INMATE DUBYAK:**  No, a little dry mouth as I

8    expected to get.  I got some help from a person on the

9    outside that got some of my past history together

10   (inaudible).  My flight time.

11        **DEPUTY COMMISSIONER BLONIEN:**  Do you want to take

12   a break just for five minutes?

13        **ATTORNEY FERGUSON:**  Just some water.

14        **INMATE DUBYAK:**  I don't want to pass out.

15        **DEPUTY COMMISSIONER BLONIEN:**  We don't want you

16   to do that.  Well we got you in a very stable chair.

17   Well let's just go off for a minute, let him drink his

18   water?

19        **PRESIDING COMMISSIONER DAVIS:**  Sure.

20   (OFF RECORD)

21        **DEPUTY COMMISSIONER BLONIEN:**  Okay, you were

22   telling me about how you put together this packet.

23        **INMATE DUBYAK:**  I put together my flight time and

24   total aviation administration, my commercial pilot's

25   license.  And through my flight hours and my education

26   and my other credits, I was entitled to a degree from the

27   school.

25

1          **DEPUTY COMMISSIONER BLONIEN:**  And in talking with
2    your counselor, your psychologist, you study different
3    legal issues also related to your case?
4          **INMATE DUBYAK:**  Yes, I studied different
5    languages, French and Spanish.
6          **DEPUTY COMMISSIONER BLONIEN:**  I saw all the
7    Spanish, I didn't see the French.  How much French did
8    you have?
9          **INMATE DUBYAK:**  I have to take a course and quite
10   frankly the rules (inaudible) I can't recognize words and
11   memorize (inaudible).
12         **DEPUTY COMMISSIONER BLONIEN:**  It's different than
13   Spanish and English. You worked as a ~~wayne~~ *WING* porter.
14         **INMATE DUBYAK:**  Yes.
15         **DEPUTY COMMISSIONER BLONIEN:**  Although your
16   supervisor evaluations, I couldn't find one after 03 and
17   they were totally satisfactory.  But I didn't see a
18   current one.
19         **INMATE DUBYAK:** (Inaudible).
20         **DEPUTY COMMISSIONER BLONIEN:**  I'm not sure
21   either, I do see that.  You were assigned there.   In
22   terms of -- well the big question.  The last Panel was
23   pretty specific in recommending that you participate in
24   self-help therapy and specificity in anger management and
25   anger control.  And I don't see anything in that arena,
26   are you reading a book in that area?
27         **INMATE DUBYAK:**  No, but I invest about two or

26

1    three hours a day in anger management.  Walking out on
2    the wing, going to the yard and people have no idea what
3    you have to deal with in here and in the get into the
4    shower and have to wait for other people who are shooting
5    up drugs.  And sitting down by your table and they're
6    getting and yelling in your ears, while you're trying to
7    hold a conversation.  I'm getting to go through more
8    anger management in the general population then any class
9    is going to get me. (Inaudible).

10        **DEPUTY COMMISSIONER BLONIEN:**  There are different
11   ways to approach anger control and anger management.  In
12   what you're just talking about is a possible way.  But
13   you and I having a conversation about it is not the same
14   as presenting documentation that you've given it some
15   thought.  That you've been introspective about your past
16   life and decisions that you made there.  And how critical
17   thinking is bringing you a way from an angry response
18   now.  And if you'll just document it, what you're doing
19   in that arena, the Board accepts self-help in terms of
20   self-study.  In terms of we talked about education, we
21   talked about work, we talked about (inaudible) since '94.
22   When I look at your psych report by Dr. Merek, he talks a
23   lot about your education history and gives you no
24   diagnosis under anything wrong under Axis I or Axis II.
25   He notes that your many physical issues and gives you a
26   Global Assessment Functioning Score of 80.  So there was
27   never any alcohol or drug abuse in your history.

27

1          **INMATE DUBYAK:**  I never used drugs in my life.  I
2     maybe drink once a month (inaudible).  That's been my
3     (inaudible) since I've been 24-25 years old.

4          **DEPUTY COMMISSIONER BLONIEN:**  It's sort of
5     unusual with a military history.

6          **INMATE DUBYAK:**  Yes.

7          **DEPUTY COMMISSIONER BLONIEN:**  You sort of see a
8     lot of people with military history, and for some reason
9     drinking issues.  How did you stay out of that?

10         **INMATE DUBYAK:**  I entered the Marine Corps when I
11    was 17 years old.  (Inaudible) and when I came out of
12    high school I was, I don't want to use the word naïve, I
13    was a country boy and I just never drank, never really
14    cared for it.  I took a drink one time in the Marine
15    Corps when they have what they call a Beer.~~Buzz~~ *Bust* parties
16    out in the desert someplace, I always drunk a can of Coke
17    or something, just never got into it.

18         **DEPUTY COMMISSIONER BLONIEN:**  I know once a Marine
19    always a Marine, when did you get out of the Marine Corps.

20         **INMATE DUBYAK:**  I guess I'm not out.  I got out in
21    '63.

22         **DEPUTY COMMISSIONER BLONIEN:**  And how come you
23    didn't pursue your flying?

24         **INMATE DUBYAK:**  When I went in at 17, at the time
25    I had a 144 IQ so they waived the college requirement on
26    me.  I was supposed to go right into the (inaudible)
27    program, but because I was 17 they said I couldn't get

28

1    into the program until I was 18. And that was six to nine
2    months down the road. When I became 18 I needed to
3    reenlist and I was short of time the way they did the
4    program and I just didn't care the way they did the
5    (inaudible).

6        **DEPUTY COMMISSIONER BLONIEN:** So you pursued that
7    interest on the private sector. In talking about your
8    assessment of dangerousness, the doctor said in a            ✻
9    controlled setting your violence potential is lower than
10   that of an average inmate, you only received the one 115
11   and one custodial chrono. But if released to the
12   community your violence potential is lower than that of     ✗
13   the average citizen. You spent most of your life being
14   responsible and the incident offense is the only adult
15   conviction. He is indeed guilty of the current offense,
16   it doesn't seem likely that he would commit murder again.
17   Since he does not have a life pattern of violence, the
18   only apparent risk factor a precursor to violence would be
19   to some how revisit the same sort of marriage scenario
20   that you had with your second wife and not seeing where
21   this could lead. It would seem based on his history of      ✗
22   responsible behavior, good institutional behavior, efforts
23   as self improvement, intelligence and an external desire
24   to not return to prison, that he would be able to
25   extricate himself from this predicament before it got
26   worse. He's confident and responsible for his behavior
27   and has the capacity to abide by institutional standards

29

1    and has primarily done so during his incarceration.  He
2    does not have a mental health disorder and that would
3    necessitate treatment while incarcerated or on parole.
4    There's no obvious mandatory conditions or
5    recommendations.  Parole decisions should be based on
6    custody factors.  So with that I am going to return to the
7    chair.

8        **PRESIDING COMMISSIONER DAVIS:**  Can you explain the
9    115 in 1994?

10       **DEPUTY COMMISSIONER BLONIEN:**  The mail?

11       **PRESIDING COMMISSIONER DAVIS:**  Yep.

12       **INMATE DUBYAK:**  I used to do legal work for
13   inmates.  And this one inmate used to hassle with his
14   staff and his mail getting out.  And I didn't a service
15   for him, it was my address on the outside of the envelope.
16   (Inaudible).  But I was nonetheless given the 115.

17       **DEPUTY COMMISSIONER BLONIEN:**  The other thing that
18   I didn't say that I should have said that you also sit
19   with other inmates and help them with their reading. And I
20   think that's pretty important.  Oh and I didn't talk to
21   you about your parole plans and you made this wonderful
22   packet here.  That you plan to reside with your sister,
23   you have a type written letter from your sister dated
24   6/22/06, her name is Delores Warwick, W-A-R-W-I-C-K, and
25   that you are welcome to live with her, that you have her
26   support and the support of your daughters that will help
27   you reintegrate back into society in a positive way.  That

30

1   she knows you'll be applying for social security.  She

2   also knows about your physical issues, she also knows

3   about your education and that you've received while you're

4   in the institution.  I don't recommend you become a day

5   trader, I think that would be pretty amazing.

6          **INMATE DUBYAK:**  I'm talking about day trading on

7   the computer, I used to play stocks a few years ago.

8          **DEPUTY COMMISSIONER BLONIEN:**  It's going well

9   right now.  You also have your estimated social security

10  benefits, which would be $875 a month at 62, and if you

11  wait until your full retirement which is 65 and four

12  months you'll get 1148, you also probably eligible for

13  disability, SSI.  And you have the application that you

14  filled out for that.  You have a letter from the Federal

15  Aviator Administration on 10/11, the date's a little

16  blurred here talking about your commercial license

17  certification, wanted a copy of that, and correspondence

18  dealing with that issue.  A letter from your counsel to

19  the Federal Aviation Administration talking about your

20  lack of participation in drugs or alcohol while

21  incarcerated.  Talking about your entrepreneurship class.

22  So you live with your sister, you get social security, and

23  then you continue your education and use your education to

24  succeed in the area of stocks and you visit your children

25  when you have permission of your parole agent.  And your

26  sister lives in ~~Pomone~~ *NIPOMO* California.  Where's that?  *JB.*

27          **INMATE DUBYAK:**  It's about 80 miles down the road

31

1   a little.

2       **DEPUTY COMMISSIONER BLONIEN:**  Does she come visit
3   you?

4       **INMATE DUBYAK:**  No.  Basically I've been permitted
5   to visit since I've been here (inaudible).

6       **DEPUTY COMMISSIONER BLONIEN:**  We also sent out
7   3042 notices to law enforcement, victim next of kin, and
8   although I don't get any written letters in response, the
9   District Attorney from San Bernardino is here and at the
10  appropriate time she'll be allowed to make her comments on
11  the record.  So anything else I missed that we haven't
12  talked about in terms of what you've been doing in the
13  institution?

14      **INMATE DUBYAK:**  Apparently I'm waiting for,
15  there's only about 12 to 14 courses that I can get at.
16  I'm waiting for business math, a business law course
17  (inaudible).

18      **DEPUTY COMMISSIONER BLONIEN:**  How do you pay for
19  these courses?

20      **INMATE DUBYAK:**  These ones are free.

21      **DEPUTY COMMISSIONER BLONIEN:**  Does anyone on the
22  outside send you any money?

23      **INMATE DUBYAK:**  Occasionally my daughter and my
24  sister send me something, my sister sends me a quarter
25  package, a package every quarter.  My daughter in
26  Washington DC (inaudible). And the Spanish course I had a
27  former girlfriend holding $ that I had because she bought

32

1   a Spanish course years ago and it cost something like
2   $386, (inaudible).

3      **DEPUTY COMMISSIONER BLONIEN:**  And have you ever
4   thought about going to a self-help course.  Are you on any
5   waiting list or anything?

6      **INMATE DUBYAK:**  Honestly, I'm not (inaudible) I
7   have problems sitting and problems standing.  I have real
8   bad problems with drug addicts and alcoholics (inaudible).

9      **DEPUTY COMMISSIONER BLONIEN:**  There's a lot of
10  drug addicts out in society now.

11     **INMATE DUBYAK:**  Yeah.

12     **DEPUTY COMMISSIONER BLONIEN:**  And the world's gone
13  (inaudible).

14     **INMATE DUBYAK:**  It's just, it's just not my thing.
15     **DEPUTY COMMISSIONER BLONIEN:**  I'll turn back to
16  the chair.

17     **PRESIDING COMMISSIONER DAVIS:**  All right thank
18  you.  Any of the -- with your disability you do quite a
19  bit of sitting, so how are you able to complete that given
20  the limitations that you have.

21     **INMATE DUBYAK:**  I take about five semester credits
22  a month and between (inaudible).

23     **PRESIDING COMMISSIONER DAVIS:**  I mean in terms of
24  your sitting and reading.

25     **INMATE DUBYAK:**  I either take a book out to the
26  yard with me or I do one chapter and then I got my answers
27  (inaudible).

33

1        **PRESIDING COMMISSIONER DAVIS:**  And have you

2    thought about using any of the self-help books in the same

3    way?

4        **INMATE DUBYAK:**  Honestly no.  Not that I haven't

5    thought about it, I just haven't looked at it.

6        **PRESIDING COMMISSIONER DAVIS:**  Do you know that

7    the last Panel told you was important?

8        **INMATE DUBYAK:**  I just didn't feel like I had an

9    anger management problem, I wasn't an alcoholic, I just

10   couldn't see --

11       **PRESIDING COMMISSIONER DAVIS:**  I'm talking about

12   self-help, not AA or anything like that.

13       **INMATE DUBYAK:**  Oh I thought self-help was more

14   toward me furthering my education and guidelines.

15       **PRESIDING COMMISSIONER DAVIS:**  That's self-help as

16   well but it doesn't get to the more specific issue of

17   anger management and so forth.  But you described what you

18   were doing.  I don't have any questions, Commissioner do

19   you?

20       **DEPUTY COMMISSIONER BLONIEN:**  No, I don't.

21       **PRESIDING COMMISSIONER DAVIS:**  Does the District

22   Attorney have questions?

23       **DEPUTY DISTRICT ATTORNEY DAWSON:**  No, sir.

24       **PRESIDING COMMISSIONER DAVIS:**  All right, Counsel

25       **ATTORNEY FERGUSON:**  I have no questions.

26       **PRESIDING COMMISSIONER DAVIS:**  All right, closing?

27       **DEPUTY DISTRICT ATTORNEY DAWSON:**  Thank you,

34

1    although the Board has already touched on it, I believe
2    that the previous Board in no uncertain terms explained
3    that they wanted him to participate in self-help in
4    dealing with this situation.  He claims that he is not an
5    angry person yet there was indication that his wife was
6    having an affair and that she was murdered.  I find the
7    doctor's statement on his second to last page, that he is
8    indeed guilty of the current offense.  I think that is an
9    obscene statement for the doctor to put in his report
10   considering this man was found guilty by a jury and
11   through the appeals process continues to be found guilty.
12   Obviously he has an anger problem, he has a low tolerance
13   for quite a few people.  He obviously had an episode with
14   his wife.  He not only killed her, her body's never been
15   found.  He tried to destroy all of the evidence that would
16   link him to that murder.  He is an intelligent man, who
17   used his intelligence for that.  However the forensics
18   were a little bit better than he was.  He is still a
19   danger.  There has been no insight into anything.  The
20   Distirct Attorney's Office of San Bernardino would ask the
21   Board at this time to deny parole date at this time.
22         **PRESIDING COMMISSIONER DAVIS:**  All right, thank
23   you.  Counselor?
24         **ATTORNEY FERGUSON:**  Yes, thank you.  Much has been
25   said here about anger management and self-help.  This kind
26   of institution is a pretty volatile place and I think
27   we're all aware of that, there's conflictual situations

35

1    that come up on a daily if not hourly basis for somebody

2    in Mr. Dubyak's position. He's been remarkably been able

3    to deal with those situation and deflect any kind of

4    conflict that has come his way over these many years.

5    There must have been dozens, scores, untold numbers of

6    occasions wherein Mr. Dubyak had to turn the other cheek,

7    extricate himself from somebody coming at him in a

8    physical manner. Given the fact that he has had zero

9    incidents of any kind of violence within the institution.

10   Really any disciplinary history of any nature whatsoever,

11   I think speaks volumes of the fact that he is not a

12   violent person. In fact he's quite adaptive in avoiding

13   violence. That's born out by the lack of any 115s, other

14   than the single one so many years ago. Wherein he was

15   accused of circumventing the mail procedures. Otherwise,

16   as the doctor pointed out he has been an excellent

17   prisoner. And the Board back in 03 acknowledged that as

18   well. But in any event, the self-help has benefit for

19   some people clearly, somebody that needs or has AA or NA,

20   people who are involved in conflictual. (tape turned

21   over)

22        **DEPUTY COMMISSIONER BLONIEN:** Side two.

23        **ATTORNEY FERGUSON:** And it's not that Mr. Dubyak

24   is the type of inmate that is just killing time. He keeps

25   himself busy, clearly. He studies languages, reads a lot,

26   has channeled his energy into constructive manners and

27   with regards to the things that he's accomplished. Other

36

1    than the life crime, Mr. Dubyak really has no other

2    history.  It's the mission of this Board to determine if

3    Mr. Dubyak presents an unreasonable risk of danger to be

4    released into free society.  And on that count it's not

5    only his lack of problems within the institutional

6    setting, but is also underscored by the doctor's

7    assessment of dangerousness.  Wherein Dr. Merek indicates

8    that while in a controlled setting his violence potential

9    is lower than that of the average inmate, he too

10    acknowledges the fact that there's only been the one 115.

11    And further more if released to the community his violence

12    potential is lower than the average citizen.  Lower than

13    the average citizen.  Not the same as the average citizen,

14    but lower than the average citizen.  And the doctor

15    acknowledges that he doesn't have the pattern of violence,

16    the only apparent significant risk factor and precursor to

17    violence would be if some how revisiting the same sort of

18    marital scenario he had with his second wife and not see

19    where this could lead.  And it would be seem based on his

20    history of responsible behavior and institutional

21    adjustment efforts in self-improvement and intelligence in

22    external desire to not return to prison that he would be

23    able to extricate himself from this predicament before it

24    got worse.  To me that's a complete endorsement of Mr.

25    Dubyak's readiness for parole.  That coupled with the fact

26    that he does have family, his sister in Pomona who has a

27    place for him to go to.  The residence situation is taken

37

1    care of.  He has provided the Board with a well thought

2    out packet of information wherein he has established that

3    he has the financial resources in terms of Social Security

4    and that can also be enhanced with disability payments

5    which he would seemingly be entitled to.  So for all these

6    reasons, we would urge the Board to find Mr. Dubyak

7    suitable because we believe strongly that has a

8    (inaudible).  And with that we'll submit.

9         **PRESIDING COMMISSIONER DAVIS:**  All right, thank

10   you.  Mr. Dubyak it is now your opportunity to address the

11   Panel directly regarding your suitability for parole.

12   You've been sitting here now for a little bit I know you

13   have some difficulty sitting and so forth for longer

14   periods of time, do you need a break before you start?

15        **INMATE DUBYAK:**  No.

16        **PRESIDING COMMISSIONER DAVIS:**  Okay.

17        **INMATE DUBYAK:**  Well, I would like to say that my

18   understanding of, that my furthering my education it was

19   more on the self-help basis.  That I believe I don't have

20   an anger management problem.  But the Board does see that

21   I have an anger management problem twenty years ago.  The

22   incident that I was convicted of twenty years ago is

23   appropriate for today statement that I had an anger

24   management problem.  I've done, I've kept myself clean.

25   I've never had any alcohol or drug problems in here that

26   I've seen more drugs in here than I see on the outside.

27   I'm not a violent person, most people see a violent crime

38

1    that (inaudible) conviction.  So that was 21 years in the
2    past, I am 64 years old.  Deputy District Attorney stated
3    that the forensics were better than me, that is not the
4    case.

5            **PRESIDING COMMISSIONER DAVIS:**  Mr. Dubyak, I would
6    like you to confine yourself to your suitability for
7    parole. Not answering what the  District Attorney said.

8            **INMATE DUBYAK:**  I plan on furthering my education
9    on the outside (inaudible) paralegal of course.  I've
10   educated myself since high school and never stopped.  I've
11   never had any problems in high school or (inaudible).
12   There is no reason in my mind for denial. If I need more
13   (inaudible) or I need self-help I can still legally get a
14   date.  (Inaudible).  That's all I don't know what else to
15   say.  (Inaudible).  Thanks and I don't know what else to
16   say.

17           **PRESIDING COMMISSIONER DAVIS:**  All right.  Thank
18   you very much.  We'll now recess for deliberations.

19

20                        **R E C E S S**

21

22

23

24

25

26

27

39

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                          **DECISION**

3        **DEPUTY COMMISSIONER BLONIEN:**  We are on record.

4        **PRESIDING COMMISSIONER DAVIS:**  All right, let the

5   record reflect that all those previously identified as

6   being in the room have returned.  This is in the matter

7   of Samuel Dubyak, CDC number D-54700. The panel the panel

8   reviewed all the information received from the public and

9   relied on the following circumstances in concluding that

10  the prisoner suitable for parole and would not pose

11  unreasonable risk of danger to society or threat to

12  public safety if released from prison.  We come to this

13  conclusion, first and foremost, by the commitment

14  offense.  The offense was carried out in a manner that

15  dispassionate and calculated.  The motive was

16  inexplicable in relation to the offense.  These

17  conclusions are drawn from the statement of facts where

18  the prisoner, based on his conviction, used a firearm to

19  kill the victim, then went to great length and

20  significant deception to hide his involvement.  Given his

21  history he clearly had the opportunity and ability to

22  choose other non-violent options but did not do so.  With

23  regard to criminal conduct, we find that criminal conduct

24  consists of a juvenile arrest in 1957.  With regard to

25  institutional behavior we find that you programmed while

26  in a limited manner while incarcerated.  You have

27  **SAMUEL DUBYAK   D-54700   DECISOIN PAGE 1       10/24/06**

40

1  described your pursuit of education as self-help, however

2  you have a responsible job and education when you were

3  convicted of this murder.  The Panel strongly encourages

4  you to look beyond your current education process and

5  look to forms of self-help.  With regard to your other

6  institutional behavior we find that there is one 128

7  counseling chrono, the last of which was in 4/99 and one

8  serious 115 that's been recorded in 2/1994.  According to

9  the psychological report in August 2006 by Dr. Merek, we

10 find that it is supportive.  The basis of assessing Mr.

11 Dubyak as 'lower than the average citizen'.  And looking

12 to into the future if released and he does not find

13 himself in a similar situation seems at best

14 questionable.  And seemingly based on a questionable,

15 seeming to base the question on whether or not Mr. Dubyak

16 had committed the crime for which he has been convicted.

17 We also note that seems to be in conflict with the prior

18 assessment.  This is the one in 2003 from Dr. Steward,

19 where in the assessment of dangerousness, item B if

20 release to the community is not possible to predict the

21 dangerousness since he did not discuss the event and the

22 details of the conviction. Since inmate Dubyak is not a

23 mass murderer it is unlikely he would recommit such an

24 offense, however if he were to become involved in a

25 trusting and intimate relationship in which he feels

26 betrayed then there's potential of him handling the

27 **SAMUEL DUBYAK   D-54700   DECISOIN PAGE 2      10/24/06**

41

1    situation in a similar manner.  However one hopes that
2    with maturity he would not do so.  There is concern for
3    his calculating and detached nature in which he conducted
4    himself during the investigation.  And I would underline
5    however that this is simply the doctor report and the
6    Panel again does not hold the fact that he does not
7    discuss his conviction against him.  With regard to
8    parole plans, we find that you do have appropriate
9    residential parole plans.  With regard to employment, the
10   Panel notes that you are eligible for Social Security.
11   The plan to be a day trader is something that the Panel
12   cannot assess, except to say that does not seem to be a
13   strong option with the track record of success for most
14   people.  With regard to the 3042 notices we note that the
15   District Attorney from San Bernardino County is here in
16   person by representative and does oppose parole.  And
17   never the less we want to commend you for obtaining your
18   B.S. from Embry-Middle University, for your accounting
19   work the class that you just completed and are awaiting
20   the results, your real estate course, for being a wayne
21   porter with satisfactory rating through 2003.  However
22   there has been no rating since 2003 that we can find.
23   These positive aspects of behavior do not outweigh the
24   factors for unsuitability.  In a separate decision, the
25   Hearing Panel finds the prison has been convicted of
26   murder and it is not reasonable to expect him to that
27   **SAMUEL DUBYAK   D-54700   DECISOIN PAGE 3       10/24/06**

parole to be granted within the next three years. We come to this conclusion, first and foremost, by the commitment offense. The offense was carried out in a manner that dispassionate and calculated manner. The motive was inexplicable in relation to the offense. These conclusions are drawn from the statement of facts wherein the prisoner, based on his conviction, used a firearm to kill the victim, then went to great lengths and significant deception to hide his involvement. Given his history he clearly had the opportunity and ability to choose other non-violent options but did not do so. We find that there is criminal conduct that exists with a juvenile arrest in 1957, however that you have programmed in a limited manner while incarcerated. You have described your pursuit of education as self-help, however you have a responsible job and education when you committed the murder. The Panel strongly encourages you to look beyond your current education process and look to other forms of self-help. There are two incidents of disciplines while incarcerated one a 128 counseling chrono in 4/99 and one serious 115 disciplinary report in 2/1994. The psychological report of August 2006 by Dr. Merek is supportive. However is somewhat questionable on part of the Panel for all of the reasons previously quoted in the first decision. In regard to the parole plans, we do note that you have appropriate plans for a

1    residence.  And do have an (inaudible) for Social
2    Security.  However the plan to be a day trader is
3    something that the Panel cannot assess.  Except to say
4    that it does not seem to be a strong option with the
5    track record of success for most people. With regard to
6    the 3042 notices we note that the District Attorney from
7    San Bernardino County is here in person by representative
8    and does oppose parole.  With regard to recommendation,
9    the Panel would recommend that you have no more 115s,
10   128s, and 128(a)s, that you would participate in self-     ✷
11   help programs.  I would encourage you that if you do not
12   find a program that are appropriate for you or that you
13   can participate in because you think that limitations
14   that you look to some independent reading in the area of  ✷
15   self-help.  And the Panel would accept book reports, some
16   sort of report, two or three paragraphs, indicating that
17   you understand that you read and the impact that it had
18   on you and the effect that it had on you.  That you
19   continue to earn positive chronos.  Commissioner do you
20   have anything you'd like to add?

21        **DEPUTY COMMISSIONER BLONIEN:**  No I don't, thank
22   you.
23   --//
24   --//
25   --//
26   --//
27   **SAMUEL DUBYAK   D-54700   DECISOIN PAGE 5        10/24/06**

44

1          **PRESIDING COMMISSIONER DAVIS:**  All right, we wish

2     you the best of luck and we are adjourned.

3

4                    **A D J O U R N M E N T**

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     **PAROLE DENIED THREE YEARS**

24     **THIS DECISION WILL BE FINAL ON: February 21, 2007**

25     **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26     **DATE, THE DECISION IS MODIFIED.**

27     **SAMUEL DUBYAK    D-54700   DECISOIN PAGE 6    10/24/06**

4 5

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, BETH LEWIS, a duly designated transcriber,
NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare
and certify under penalty of perjury that I have
transcribed tape(s) which total two in number and cover a
total of pages numbered 1 through 44, and which recording
was duly recorded at CORRECTIONAL TRAINING FACILITY, in
SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT
PAROLE CONSIDERATION HEARING of SAMUEL DUBYAK, CDC No. D-
54700, on OCTOBER 24, 2006 and that the foregoing pages
constitute a true, complete, and accurate transcription
of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in
the above-captioned matter and have no interest in the
outcome of the hearing.

Dated January 14, 2007 at Sacramento County,
California.

Beth Lewis

_____
Beth Lewis
Transcriber
**Northern California Court Reporters**

# EXHIBIT

# B

COPY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re<br><br>**MIKAEL SCHIOLD,**<br><br>                Petitioner-Appellee,<br><br>On Habeas Corpus. | A103107 |

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

## SETTLEMENT AGREEMENT AND FULL
## AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| In re                                    | A103107 |
|------------------------------------------|---------|
| **MIKAEL SCHIOLD,**                      |         |
|                    Petitioner-Appellee,  |         |
| **On Habeas Corpus.**                    |         |

## SETTLEMENT AGREEMENT AND FULL
## AND FINAL RELEASE OF ALL CLAIMS

"Releasor":  MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
              GOVERNOR OF THE STATE OF CALIFORNIA; THE
              BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
              IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
              MULE CREEK STATE PRISON; AND CAROL A. DALY,
              IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
              OF THE BOARD OF PRISON TERMS

1.   Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon. Schiold's sentence is fifteen years to life plus one year. Schiold is
identified by the Department of Corrections as inmate number D-31112.

2.   The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002. On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

3.   Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.    Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.    This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.    Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.    Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.     Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.     Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.     Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.     In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them. It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made. Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

COPY

16.    Facsimile signatures shall bind the parties to this agreement.

Date: _10/22/03_

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold

Date: _10/22/03_

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

40009425.wpd

5

# E X H I B I T

# C

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk
By _____, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

|  |  |
|---|---|
| In re, | Case No.: BH003529 |
|  | ORDER RE: WRIT OF HABEAS CORPUS |
| ROBERT ROSENKRANTZ, |  |
| Petitioner, |  |
| On Habeas Corpus |  |

The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

ep                                             1

1  unsuitability based on commitment offense, the Board may consider as a factor whether the
2  victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15,
3  § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of
4  times he was shot and the manner in which he was shot." In addition, the Board concluded that
5  the case "rises to the highest level of second-degree murder." The Board further stated in its
6  decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed
7  parole. While the Board is required to consider such opposition (see Penal Code section 3042),
8  that opposition is not a factor on which the Board may rely to deny parole as enumerated in title
9  15, section 2281 of the California Code of Regulations.

10     Towards the conclusion of the hearing, the Board summarily mentioned its concern that
11  petitioner is a danger to his brother, Joey. The court finds that this assertion is not only
12  unsupported by the record, but belied by the record, which contains documented evidence that
13  contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court
14  rejects the Board's inference that the absence of yearly supportive letters from petitioner's
15  brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and
16  traverse draws attention to a recent psychological evaluation addressing and dismissing the
17  Board's concern for the safety of petitioner's brother. However, because this psychological
18  evaluation was not evidence before the Board at the time of petitioner's hearing, the court may
19  not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there
20  is no evidence in the record that supports the conclusion that petitioner remains a danger to his
21  brother.

22     The Board's sole reliance on the gravity of the offense to justify denial of parole can be
23  initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir.
24  2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate
25  exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the
26  nature of the commitment offense raises serious questions involving his liberty interest in parole.
27  (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct
28  as well as his vocational and educational achievements over a period of many years. Indeed,

ep                                                        2

1  petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2  may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3  (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4       The court finds that petitioner's continual parole denials have been based mainly on the

5  gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6  Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7  original sentence of life with the possibility of parole into a sentence of life without the

8  possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9  crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11       Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep                                                          3

1     Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2  granted.

3

4  June 26, 2006

5

6                          DAVID S. WESLEY

7                          Judge of the Superior Court

8  Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep                        4

# E X H I B I T

# D

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
REVISED AUGUST 2006
PAROLE CONSIDERATION HEARING
SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

CORRECTIONAL TRAINING FACILITY-SOLEDAD
August 18, 2006

This is the third psychological evaluation for the Board of Parole Hearings on inmate Samuel Dubyak, CDC# D-54700. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Dubyak is a 63-year-old, single, Caucasian male serving 25-years-to life for Murder in the First Degree. His stated religion is Catholic. He denies nicknames or aliases and has no unusual physical characteristics.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim. He says he was born at home.

## III. EDUCATION:

He has a Bachelor of Science degree in Aeronautical Engineering. He has a 12-plus measured grade point level He has no history of special education or academic/behavioral problems. His current interests are in legal work and in studying Spanish and French. He said he recently completed a college real estate course and two semesters of accounting.

## IV. FAMILY HISTORY:

His father died of a heart attack at age 62. His mother died at 77. He has an older sister, age 69, who has five children. He has a younger brother, age 58, who has one child. No one in the family has been involved in criminal activity. He is primarily in contact with his sister, who lives in California.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk behavior or sexual aggression.

## VI. MARITAL HISTORY:

His first marriage in 1966 lasted five years. This union produced four children. The marriage was good until the second or third year when she began to accuse him of false infidelities. They divorced in 1973. His second marriage (to Lourdes, the victim) began in 1981 and ended in 1985, when he was arrested for her murder. His file indicates that she was unfaithful to him. This marriage produced one child, who lives in Puerto Rico. He is in contact with all five children.

## VII. MILITARY HISTORY:

He served in the Marine Corps from 1960 to 1963. He received an honorable discharge as a lance corporal (E-3).

## VIII. EMPLOYMENT/INCOME HISTORY:

When 13 years old, he worked full-time in a grocery store so he could pursue flying lessons while attending school. At age 17, he entered the Marines. Following his discharge three years later, he entered a trade school in aeronautical engineering, while also returning to work in the same supermarket where he was employed as a teenager. From 1968 to 1972, when he was approximately 26 to 30, he worked for NCR as a warehouse foreman. From 1972 to 1976, age 30 to34, he worked in a manufacturing company in the parts department. From 1976 to 1981, age 34 to 39, he worked for a company as a production control planner. From 1981 to 1986, age 39 to 44, he worked for Hughes Aircraft as a production control analyst.

## IX. SUBSTANCE ABUSE HISTORY:

He says he never abused alcohol or drugs. He rarely drank.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

He has several current medical problems including a pinched sciatic nerve, legs that become numb, a degenerative disc, prostate problems, stomach difficulties, carpal tunnel syndrome and has only 10% vision in his right eye. Some of the medical issues are the consequence of a 1981 car accident. Due to the pinched sciatic nerve, he walks with a cane but sometimes loses his grip.

## XI. PLANS IF GRANTED RELEASE:

If paroled, he plans to live with his sister and collect Social Security. The prognosis for successful, responsible, legal, prosocial community adjustment is good.

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology. His intellectual functioning was estimated to be in the average range. He was calm, cooperative and alert. His mood,

affect and flow of thought were all normal. His insight and judgment were good. He is not currently in need of any mental health treatment.

## CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | None |
| AXIS II: | None |
| AXIS III: | Multiple physical problems |
| AXIS IV: | Incarceration |
| AXIS V: | GAF=80 |

The prognosis for him maintaining his current mental status is good.

## XIII.  REVIEW OF LIFE CRIME:

He chose not to discuss the case. Since he has denied any role in the death of his wife, he expressed no remorse or regret.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, his violence potential is lower than the average inmate. He has only received one 115 and one Custodial Chrono during his incarceration. If released to the community, his violence potential is lower than the average citizen. He spent much of his adult life being responsible with the instant offense his only adult conviction. If he is, indeed, guilty of the current offense, it does not seem likely that he would commit murder again. Since he does not have a life pattern of violence, the only apparent significant risk factor and precursor to violence would be his somehow revisiting the same sort of marital scenario he had with his second wife and not seeing where this could lead. It would seem, based on his history of responsible behavior, good institutional adjustment, efforts at self-improvement, intelligence and an external desire to not return to prison, that he would be able to extricate himself from this predicament before it got worse.

## XV.  CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior and has the capacity to abide by institutional standards and has primarily done so during his incarceration. He does not have a mental health disorder that would necessitate treatment either while incarcerated or on parole. There are no obvious mandatory conditions of parole and recommendations. Parole decisions should be based on custody factors.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare that;

    I am over 18 years of age and that I am the pro per Petitioner to the within attached cause of action; my complete mailing address is; Samuel A. Dubyak, D-54700, Box 689  C-115L. California State Prison, Soledad, CA 93960-0689. That I served a true and correct copy or original of the attached petition by placing said documents in sealed envelopes with postage fully prepaid, placing said envelopes in the U.S. Mail Box, to the address(es) listed below:

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483


    I declare under penalty of perjury that the foregoing is true and correct. Executed this _16_ day of January, 2008, at Soledad, CA.

Samuel A. Dubyak