1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | JULIE L. GARLAND
Senior Assistant Attorney General
4 | JESSICA N. BLONIEN
Supervising Deputy Attorney General
5 | STACEY D. SCHESSER, State Bar No. 245735
Deputy Attorney General
6 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 | Telephone: (415) 703-5774
Fax: (415) 703-5843
8 | Email: Stacey.Schesser@doj.ca.gov

9 | Attorneys for Respondent
SF2008401606
10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **SAMUEL A. DUBYAK,**                          C 08-0667 JSW

16 |                                Petitioner,    **RESPONDENT'S MOTION TO**
                                                   **DISMISS; MEMORANDUM OF**
17 |                 v.                            **POINTS AND AUTHORITIES**

18 | **BEN CURRY, WARDEN,**

19 |                                Respondent.    Judge: The Honorable Jeffrey S. White

20

21 |    TO PETITIONER SAMUEL DUBYAK, IN PRO PER:

22 |    PLEASE TAKE NOTICE THAT pursuant to 28 U.S.C. § 2254 and Rule 4 of the Rules

23 | Governing § 2254 Cases in the United States District Courts, Respondent moves the Court for an

24 | order dismissing the above-entitled action on the ground that petitioner has not exhausted state

25 | judicial remedies for all claims presented. Failure to oppose this motion may result in dismissal

26 | of the action. Since petitioner is not represented by counsel and is proceeding in pro per, this

27 | motion will be decided on the papers without a hearing.

28 | ///

Mot. to Dismiss; Supporting Mem. of P. & A.                          *Dubyak v. Curry*
                                                                       C 08-0667 JSW

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **INTRODUCTION**

3  Petitioner Samuel Dubyak filed a Petition for Writ of Habeas Corpus in this Court on

4  January 28, 2008, raising several claims regarding the Board of Parole Hearings' October 24,

5  2006 decision finding him unsuitable for parole. Because Dubyak did not fairly present these

6  claims to the California Supreme Court, he failed to properly exhaust state court remedies for his

7  claims. Therefore, this Court should dismiss this Petition.

8  **ARGUMENT**

9  **I.**

10  **THE COURT SHOULD DISMISS DUBYAK'S PETITION BECAUSE HE FAILED
   TO PROPERLY EXHAUST HIS CLAIMS BEFORE THE CALIFORNIA**
11  **SUPREME COURT.**

12  Prisoners in state custody who wish to challenge collaterally in federal court either the fact

13  or length of their confinement by a petition for writ of habeas corpus are first required to exhaust

14  state judicial remedies by presenting the highest state court available with a fair opportunity to

15  rule on the merits of each and every issue they seek to raise in federal court. 28 U.S.C. §

16  2254(b), (c); *Granberry v. Greer*, 481 U.S. 129, 134 (1987); *McNeeley v. Arave*, 842 F.2d 230,

17  231 (9th Cir. 1988). It is the petitioner's burden to prove he has exhausted his state court

18  remedies before filing his federal habeas petition. *Williams v. Craven*, 460 F.2d 1253, 1254 (9th

19  Cir. 1972) (per curiam). To satisfy this requirement, a petitioner must "fairly present" the

20  substance of his federal claim to the state court to provide that court a "fair opportunity" to apply

21  controlling legal principles to the facts bearing upon his constitutional claim. *Picard v. Connor*,

22  404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Thus, a claim for habeas

23  relief must include reference to a specific federal constitutional guarantee, as well as a statement

24  of the facts that entitle the petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

25  "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court

26  must read beyond a petition or a brief (or a similar document) that does not alert it to the

27  presence of a federal claim in order to find material, such as a lower court opinion in the case,

28  that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). In *Baldwin*, the Supreme Court found

1  that an Oregon inmate who attached lower court decisions to his state supreme court petition had
2  not fairly presented his claim, even though the state supreme court had the opportunity to read
3  these attached opinions. *Id*. at 30-32. Federal habeas corpus law did not mandate that the
4  Oregon Supreme Court read the lower court opinions in order to discover a federal claim. *Id*. at
5  31; *see also O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

6  Similarly, in *Gatlin v. Madding*, 189 F.3d 882 (9th Cir. 1999), the Ninth Circuit held that a
7  petition for review that incorporates by reference arguments raised in a brief to the lower state
8  appellate court clearly contravenes California Rule of Court 28. *Id*. at 888 (citing Cal. R. of Ct.
9  28(e)(5)[1/]). Thus, because the petitioner's incorporation only by reference was contrary to state
10  rules, the Ninth Circuit determined that it constituted a failure to exhaust. *Id*. The court was also
11  not obliged to construe a pro se petitioner's papers more liberally, as the exhaustion requirement
12  applies equally because "just as pro se petitioners have managed to use the federal habeas
13  machinery, so too should they be able to master this straightforward exhaustion requirement."
14  *Id*. at 889 (citing *Rose v. Lundy*, 455 U.S. 509, 520 (1982).)

15  Here, Dubyak's petition for review to the California Supreme Court does not "fairly
16  present" his due process claims. (Ex. 1, Cal. Sup. Ct. Pet.) The state petition, rather, consisted
17  of one page in which he failed to plead any specific facts, including the date of his contested
18  parole hearing. *Gray v. Netherland*, 518 U.S. at 162-63. The only mention of any federal claim
19  involves a citation to *City of Auburn v. Quest Corp.*, 260 F.3d 1160 (9th Cir. 2001) in support of
20  his contention that "state courts are obligated to apply and adjudicate federal claims that were
21  fairly presented to them."[2/] (Ex. 1.) However, this case opinion does not support Dubyak's
22  ///

23
24
25

─────────────────────────────────────────────────────

26  1. The California Rules of Court were renumbered, effective January 1, 2007. Rule 28 is
   now California Rules of Court, rule 8.504.
27

28  2. The citation for the amended Opinion of April 24, 2001 is reported at 2001 U.S. App.
   LEXIS 15518.

Mot. to Dismiss; Supporting Mem. of P. & A.                                    *Dubyak v. Curry*
                                                                                C 08-0667 JSW

3

1  argument.[3/]  In addition to failing to state a federal claim, Dubyak incorporated by reference his

2  lower court petitions and the appellate and superior court decisions. (*Id.*)  Given *Gatlin's*

3  identical set of facts and express prohibition of incorporation by reference under California Rule

4  of Court 28, Dubyak has failed to exhaust his state court remedies. *Gatlin v. Madding*, 189 F.3d

5  at 888-889.  Dubyak also cannot rely on the fact that he is representing himself pro se. *Id* at 889.

6  Therefore, Dubyak has not met his burden of exhaustion under 28 U.S.C. § 2254. *Baldwin v.*

7  *Reese*, 541 U.S. at 32.

8       Federal courts impose a requirement of "total exhaustion" with respect to federal habeas

9  petitions. *Rhines v. Weber*, 544 U.S. 269, 274 (2005).  The proper remedy, therefore, is to allow

10  a petitioner to amend the petition to delete the unexhausted claims, or accept dismissal without

11  prejudice to pursuing the unexhausted claims in state court. *Rose v. Lundy*, 455 U.S. at 510.  As

12  Dubyak has not exhausted any of his claims, this Court should dismiss the Petition without

13  prejudice to allow him to return to the California state courts and fairly present his claims.

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25

26       3. The Supremacy Clause issue which petitioner refers to in his petition for review is not
relevant to the California Supreme Court's review of any of his claims.  Rather, this case adjudicated

27  whether state law and the Federal Telecommunications Act of 1996 preempt certain city ordinances
that establish a franchise system to manage telecommunications facilities in rights-of-way. *Auburn*,

28  260 F.3d 1165-66, 1180-81.

1

## CONCLUSION

2     Dubyak did not fairly present his claims to the California Supreme Court and therefore he

3   has not exhausted his state judicial remedies.  Therefore, the Court should dismiss this Petition

4   without prejudice to allow Dubyak to return to state court to exhaust his claims.

5

6          Dated:  August 20, 2008

7                              Respectfully submitted,

8                              EDMUND G. BROWN JR.
                             Attorney General of the State of California

9                              DANE R. GILLETTE
                             Chief Assistant Attorney General
10
                             JULIE L. GARLAND
11                             Senior Assistant Attorney General

                             JESSICA N. BLONIEN
12                             Supervising Deputy Attorney General

13

14

15                             STACEY D. SCHESSER
                             Deputy Attorney General
16                             Attorneys for Respondent

17

18   20131525.wpd
     SF2008401606
19

20

21

22

23

24

25

26

27

28

Mot. to Dismiss; Supporting Mem. of P. & A.

*Dubyak v. Curry*
C 08-0667 JSW

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Dubyak v. Curry**

No.:   **C 08-0667 JSW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar, at which member's direction this service is made. I am 18 years of age or
older and not a party to this matter. I am familiar with the business practice at the Office of the
Attorney General for collection and processing of correspondence for mailing with the United
States Postal Service. In accordance with that practice, correspondence placed in the internal
mail collection system at the Office of the Attorney General is deposited with the United States
Postal Service that same day in the ordinary course of business.

On August 21, 2008, I served the attached

### RESPONDENT'S MOTION TO DISMISS;
### MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid,
in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate
Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Samuel Allen Dubyak, D54700**
**CTF-Central**
**P.O. Box 689**
**Soledad, CA 93960-0689**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on August 21, 2008, at San Francisco,
California.

| L. Santos | |
|---|---|
| Declarant | Signature |

20134145.wpd

# EXHIBIT 1

ORIGINAL

MC–275

| Name | Samuel A. Dubyak |
| Address | Box 689   C-115L |
| | California State Prison |
| | Soledad, CA 93960-0689 |
| CDC or ID Number | D-54700 |

S157841

SUPREME COURT
FILED

NOV 5 - 2007

Frederick K. Ohlrich Clerk

DEPUTY

## SUPREME COURT OF CALIFORNIA

## AT SAN FRANCISCO
(Court)

| SAMUEL A DUBYAK | |
| Petitioner | |
| vs. | |
| BEN CURRY, Warden | |
| Respondent | |

~~PETITION FOR WRIT OF HABEAS CORPUS~~

**PETITION FOR REVIEW**

No. _____

(To be supplied by the Clerk of the Court)

**EVIDENTIARY HEARING REQUESTED**

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page 1 of 6
Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

MC–275

**This petition concerns:**

☐ A conviction       ☐ Parole

☐ A sentence       ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☒ Other *(specify):* <u>Violation of due process at a parole suitability hearing.</u>

1. Your name: <u>Samuel A. Dubyak</u>

2. Where are you incarcerated? <u>CTF-Central, Soledad, California</u>

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

     a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

         <u>First degree murder with gun use enhancement</u>

     b. Penal or other code sections: <u>P.C. §§187 & 12022.5</u>

     c. Name and location of sentencing or committing court: <u>Superior Court of San Bernardino County,</u> <u>Cucamonga, California</u>

     d. Case number: <u>OCR-12056</u>

     e. Date convicted or committed: <u>February, 1987</u>

     f. Date sentenced: <u>February-March, 1987</u>

     g. Length of sentence: <u>25 years to life plus 2 years</u>

     h. When do you expect to be released? <u>Unknown due to current politics</u>

     i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

     <u>Michael J. calvert, current address unknown</u>

4. What was the LAST plea you entered? *(check one)*

     ☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

     ☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

See attached petition

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

See attached petition

7. **Ground 2 or Ground** _____ *(if applicable):*                                    MC–275

<u>See attached petition</u>
_____
_____
_____
_____

a. Supporting facts:

                          See attached petition
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

b. Supporting cases, rules, or other authority:

                          See attached petition
_____
_____
_____
_____

MC–275

8. Did you appeal from the conviction, sentence, or commitment?   ☒ Yes.  ☐  No.  If yes, give the following information:

   a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   Does not apply to this instant petition before this Court

   b.  Result ___N/A___     c.  Date of decision: ___N/A___

   d.  Case number or citation of opinion, if known: ___Does not apply___

   e.  Issues raised:  (1) _____// _____

   (2) _____// _____

   (3) _____// _____

   f.  Were you represented by counsel on appeal?  ☒ Yes.  ☐  No. If yes, state the attorney's name and address, if known:

   William Flenniken, San Francisco, CA (??)

9. Did you seek review in the California Supreme Court?  ☒ Yes  ☐  No.  If yes, give the following information:

   a.  Result ___N/A___     b.  Date of decision: ___N/A___

   c.  Case number or citation of opinion, if known: ___Does not apply___

   d.  Issues raised:  (1) _____// _____

   (2) _____// _____

   (3) _____// _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   Does not apply to this instant petition before this Court

11. Administrative Review:

   a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

   There is no administrative review available for parole board denials

   b.  Did you seek the highest level of administrative review available?  ☐  Yes.  ☒  No Does not apply
       *Attach documents that show you have exhausted your administrative remedies.*

MC–275

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a.  (1) Name of court:  Superior Court of San Bernardino, CA.

   (2) Nature of proceeding (for example, "habeas corpus petition"):  Habeas Corpus petition

   (3) Issues raised: (a)  See attached petition in full as presented to the court.

       (b)  Same as above

   (4) Result (Attach order or explain why unavailable):  Justice denied

   (5) Date of decision:  August 20, 2007

  b.  (1) Name of court:  Second Appellate District Court at Riverside, CA

   (2) Nature of proceeding:  Habeas corpus petition/petition for review

   (3) Issues raised: (a)  See attached petition in full as presented to the court.

       (b)  Same as above

   (4) Result (Attach order or explain why unavailable):  Post card denial on the merits, attached hereto

   (5) Date of decision:  October 25, 2007

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   No hearings held nor was the petition properly adjudicated

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   No delay is asserted although Petitioner's transcripts were 9 months late

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:
   Petitioner is pro se and an obvious layman at law

17. Do you have any petition, appeal, or other matter pending in any court?  ☒ Yes.  ☐ No. If yes, explain:
   Habeas corpus in Northern District of California, Case No. C-06-0707 JSW (pr)

   In re, first suitability hearing denial in 2003

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   This is the highest state court prior to filing in the federal courts

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  10-30-07                                    _____
                                                        (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 2007]          PETITION FOR WRIT OF HABEAS CORPUS                      Page 6 of 6

1

PETITION FOR REVIEW

2

IN THE

3

SUPREME COURT OF CALIFORNIA

4    Comes now, Samuel A. Dubyak, Petitioner in pro se, and through this verified

5    petition for review requests this Honorable Court to review and adjudicate the

6    claims raised thus reviewing the denial(s) from the Appellate and Superior Courts

7    (attached hereto) as both are without a 'reasoned opinion', semi post card denials.

8    Petitioner contends that the denial by the Superior Court was a miscarriage

9    of the intent of the habeas corpus act as the Superior courts obvious biased

10   language simply because petitioner has claimed innocence, and that court did not

11   adjudicate the "CLASS OF ONE" claim that is independent of being found suitable

12   for parole by the Board.

13   The Appellate Court's 'post card denial' was a denial on the merits

14   (citations) and that court failed to give a 'reasoned opinion'.

15   As this Court will discover upon a full and fair reading of this petition

16   for review, the lower courts were obligated to consider 'all'' issues/claims and

17   not just make a finding that; "Petitioner's calculating nature, coupled with his

18   persistent denial of culpability, and his stubborn refusal to program as

19   directed.." (Emphasis added). The courts failed to consider the facts of the

20   petition and only relied on the Board's form/rote language and the courts obvious

21   bias is clear because Petitioner, after 21 years, still maintains actual innocence.

22   In the case of City of Auburn v. Quest Corp., 260 F.3d 1160 (9th Cir. 2001):

23   Under the Supremacy Clause, the state courts are obligated to apply and adjudicate

24   federal claims that were fairly presented to them.

25                               Respectfully submitted,

26

27                               Samuel A. Dubyak

28

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**



OCT 2 5 2007

COURT OF APPEAL FOURTH DISTRICT

In re SAMUEL A. DUBYAK                    E044276

on Habeas Corpus.                    (Super.Ct.Nos. OCR12056 &
                                      WHCSS700257)

                                      The County of San Bernardino

THE COURT

    The petition for writ of habeas corpus is DENIED.


                            _____
                            McKINSTER
                                            Acting P.J.


cc:    See attached list



1    SUPERIOR COURT OF CALIFORNIA
      COUNTY OF SAN BERNARDINO

2    Civil Division, Department S-32
      303 West Third Street
      San Bernardino, California 92415

 COPY

F I L E D
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

AUG 2 0 2007

3

4

5                                     BY _Olivia McDonald_
                                                       DEPUTY

6

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8            IN AND FOR THE COUNTY OF SAN BERNARDINO

9               SAN BERNARDINO DISTRICT     700257

10   In re the Petition of             )    Case No. WHCSS-0257

11          SAMUEL A. DUBYAK,        )    ORDER DENYING PETITION
                                       )    FOR WRIT OF HABEAS CORPUS

12

13   For Writ of Habeas Corpus.        )

14

15       The Petition of SAMUEL A. DUBYAK for Writ of Habeas Corpus was filed in this

16   Court on August 9, 2007.

17       Therein, Petitioner contends that there was no evidence presented which justified

18   the denial of his parole on October 24, 2006.

19       From the transcript of the suitability hearing, the court determines that the eligibility

20   board considered the following factors and facts:

21       1) The circumstances of the committing offense.

22           Petitioner shot his wife to death in her bed in the family home. He attempted

23   to destroy the evidence of the murder, the bed, by cutting out of the mattress the

24   bloody bullet holes and dumping the bed along the side of the road. He falsely

25   claimed to police officers that his wife had disappeared and taken the bed with her.

26   He manufactured a letter on which he forged his wife's signature so that it would

27   appear that his wife was still alive. He persists in claims of innocence.

28       2) Prior criminal record.

1        He had a burglary arrest as a juvenile but no prior criminal convictions.

2   3)  Social History.

3        Petitioner had been a commercial pilot.  He has had five children.  He did not

4   abuse alcohol or drugs.

5   4)  Conduct while incarcerated.

6        Petitioner has had very few, and only minor, disciplinary experiences while

7   incarcerated.  He has taken numerous college courses, and has completed a Real

8   Estate course, and an Accounting course.  He obtained a B.A. in 2001.  He has

9   studied French and Spanish.

10  5)  Psychological Assessments.

11       His violence potential is lower than that of the average citizen.

12  6)  Parole Plans.

13       Based on the evidence before it, the panel concluded that Petitioner poses an

14  unreasonable risk of danger to society if released.  (The transcript says the opposite

15  but it is clear from the context what was meant).

16  Petitioner's calculating nature, coupled with his persistent denial of culpability, and

17  his stubborn refusal to program as directed by the eligibility board would give any

18  reasonable person a deep concern that Petitioner might harm others if the

19  circumstances justified it, to his mind.

20       There was ample evidence presented to justify the board's decision.

21

22  The Petition is denied.

23

24  Dated this _20ᵗʰ_ day of August, 2007.

25

26                                    JOHN P. WADE

27                                    JOHN P. WADE
                                      Judge of the Superior Court
28

1    To the Honorable Judges of the California Courts of Appeal

2        Comes now, Samuel A. Dubyak, Petitioner in pro se, and hereby petitions this

3    Court for a writ of habeas corpus and through this petition sets forth the facts

4    and causes for issuance of the writ.

5                                      I.

6        Petitioner is presently incarcerated and confined from his liberty by Warden

7    Curry, at the state prison, Soledad, CA. Petitioner is serving a sentence of 25

8    years 'to life' plus 2 years, pursuant to a judgment imposed by the San Bernardino

9    County Superior Court, Cucamonga, California.

10                                     II.

11       Petitioner hereby incorporates all relevant exhibits, and parole hearing

12   transcripts, numbered and referenced throughout this petition. Petitioner also

13   incorporates a MOTION/REQUEST FOR JUDICIAL NOTICE, attached hereto.

14                                    III.

15       Petitioner asserts that he was found suitable for parole and that he was

16   also found to not be a threat to society, but, his term and release date were

17   not set, in violation of Penal Code §3041(a) and the equal protection clauses

18   of the United States and California Constitutions as set forth in the instant

19   petition.

20                                     IV.

21       Petitioner has no plain, speedy or adequate remedy at law to protect his

22   constitutional rights on these issues other than by this verified petition for

23   writ of habeas corpus.

24                                     //

25                                     //

26                                     //

27

28

                                       i

1

## STATEMENT OF THE CASE

2      Petitioner incorporates the statement of facts (summary of commitment offense)

3  from the parole hearing transcripts, as though set forth in full, (herein after

4  Ex. "A" pp.##).

5

6

## FACTS AS SET FORTH

7      On October 24, 2006 Petitioner appeared before the Board of Parole Hearings

8  (herein after "Board") for a subsequent hearing, his second (2nd) hearing.  As

9  Ex. "A" establishes, Petitioner was suitable for parole and would not pose a risk

10  to society, nonetheless the Board denied a term set and/or release date for

11  Petitioner. The record supports the fact that Petitioner was suitable for parole

12  and there was no evidence in the record to deny his release.

13      Petitioner's second hearing was 2 months late and 9 months late in receiving

14  the transcripts, see attached order from Monterey County Superior Court and the

15  attorney General's reply, attached hereto.

16

17

## JURISDICTION AND VENUE

18      Habeas corpus is the proper remedy for due process violations by the Board.

19  In re Powell (1988) 45 Cal.3d 894, 903. This Court has original jurisdiction to

20  issue the writ, Cal. Const., Art. VI, §10; Cal. P.C. §1508, and venue to adjudicate

21  this petition. Griggs v. Superior Court (1976) 16 Cal.3d 341; see also, In re

22  Sena (2001) 94 Cal.App.4th 836.

23      This Court also issued an ORDER TO SHOW CAUSE on Petitioner's "first" parole

24  suitability denial, which is currently before the Northern District Court in San

25  Francisco.

26                                    //

27                                 //

28                                 ii

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE
LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A
"REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING
WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years
'to life' shall be released on parole unless his release would pose an
unreasonable risk to public safety or unreasonable risk to society if released
from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving
an inmate of life, liberty, or property without due process of law. United States
Constitutional Amendments, V, XIV.

It is now settled that California parole scheme, codified in California
Penal Code section §3041, vests all "prisoners whose sentences provide for the
possibility of parole with a constitutionally protected liberty interest in the
receipt of a parole release date, a liberty interest that is protected by the
procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658,
662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d
1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003);
McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

Under the "clearly established" framework of Greenholtz and Allen, we hold
that California's parole scheme gives rise to a cognizable liberty interest on
parole. The scheme "creates a presumption that parole release will be granted"
unless the statutorily defined determinations are made." Allen, 482 at 378
(quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585,
24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole
applicants continue to have a "liberty interest" in parole release.

//

//

1

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT
OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE
I, Sec. 7(a), WHEN THEY FAILED TO SET A RELEASE DATE AND/OR
UNIFORM TERM AFTER PETITIONER WAS FOUND SUITABLE FOR PAROLE
AND FOUND NOT TO BE A THREAT TO PUBLIC SAFETY.

On October 24, 2006 Petitioner went before the Board of Prison Hearings

(herein after "Board") for his second/subsequent suitability hearing, the subject

of the instant petition before this Court.

The panel consisted of James Davis, Presiding Commissioner, Noreen Blonien,

Deputy Commissioner, Peter Ferguson, Petitioner's Board appointed attorney.

As the record establishes, Petitioner did not receive his hearing transcripts

until July 23, 2007, 9 months late and 2 months late on the 2nd hearing, see

attached Monterey County Order and the Attorney General's response attached

hereto.

Petitioner submits that he was found suitable, and, would not pose a threat

to the public at his hearing (Exhibit "A" p.39):

Commissioner Davis stated at (Ex "A") p.39: "...the panel reviewed all the

information received from the public and relied on the following circumstances

in concluding that the prisoner suitable for parole and would not pose

unreasonable risk of danger to society or threat to public safety if released

from prison." (Emphasis added). Therefore Penal Code §3041(b) has been satisfied

in that Petitioner does not pose a threat to public safety.

The "overarching consideration" in determining whether to grant parole "is

'public safety.'" (See, In re Scott (2005) 133 Cal.App.4th 573, 591 (Scott II).)

That is, under the applicable "Penal Code section §3041, the Board 'shall set

a release date unless it determines that the gravity of the current convicted

... offenses, or the timing and gravity of current or past convicted ... offenses,

is such that consideration of the public safety requires a more lengthy period

of incarceration for this individual...'". The goal of subdivision (a) of Penal

2

1   Code section §3041, it has been noted, is that "release on parole is the rule,

2   rather that the exception." (In re Smith (2003) 114 Cal.App.4th 343, 351 (Smith)

3   accord In re Lee (2006) 143 Cal.App.4th 1400, 1405 (Lee) ["defendant sentenced

4   to indeterminate life term is normally entitled to parole if the board finds

5   he does not pose an unreasonable risk to public safety"]). (In re David Barker,

6   2007 DJDAR 7548, May 24, 2007).

7       As the Court of Appeal put it in Lee, 143 Cal.App.4th, p.1414: "To deny

8   parole, the reason must relate to a defendant's continued unreasonable risk to

9   public safety."

10      "A life term offense or any other offenses underlying an indeterminate

11  sentence must be particularly egregious to justify the denial of a parole date."

12  (Rosenkrantz, 29 Cal.4th at p.683, 128 Cal.Rptr.2d 104, 59 P.3d 174). Also, In

13  re Ramirez, (9-13-2000), (94 Cal.App.4th 549), that court held that: parole could

14  not be withheld absent a factual finding that the offense was "particularly

15  egregious".

16      As Exhibit "A" establishes, not only was Petitioner found suitable for

17  parole, and, would not pose unreasonable risk of danger to society or threat

18  to public safety (at p.39), it is evident from the record (pages 39-43) that

19  the Board used the following excuses from their Rules and Regulations, Title

20  15, §2402 criteria to deny a release date and/or a uniform term setting under

21  P.C. §3041(a):

22      1). "dispassionate and calculated." (p.39). Note* Subdivision (c) of §2402

23  sets forth six factors tending to show unsuitability for parole, which include:

24  (B) The offense was carried out in a dispassionate and calculated manner, such

25  as an execution-style murder. Therefore "dispassionate and calculated manner"

26  cannot be applied to Petitioner as he was not tried or convicted of an execution-

27  style murder.

28      2). "motive ... inexplicable." (p.39).

3

1    3). "Juvenile arrest (no disposition) in 1957." (p.39).

2    4). "used a firearm." (p.39).

3    5). "programmed ... limited manner." (p.39).

4    6). "one 128 counseling chrono." (p.40).

5    7). "one serious 115 in 1994." (Classified as 'Administrative'). (p.40).

6    It is apparent that there is "no evidence" in the record under either the

7    "some evidence" standard, or, "preponderance of evidence" standard, or, even

8    a "modicum" of evidence to support the Board's arbitrary action in not setting

9    a release date for Petitioner after he was found suitable or a term setting as

10   the record establishes that Petitioner has passed through the 'gateway' imposed

11   by §3041(b) to enter into the realm of §3041(a).

12   The Board's arbitrary action to not follow Penal Code §3041(a) deprived

13   Petitioner of a parole date by not calculating his term. The Board cannot apply

14   or use Title 15 C.C.R. §§2400-2411 to over-ride the Legislative intent of P.C.

15   §3041(a)(b). Subsection (b):

16       "The panel or board shall set a release date unless it determines that
17       the gravity of the current offense or offenses, or the timing and
         gravity of current or past convicted offense or offenses, is such that
18       consideration of the public safety requires a more lengthy period of
         incarceration for this individual, and that a parole date, therefore,
         cannot be fixed at this meeting."
19
20       "After the effective date of this subdivision, any decision of the
         parole panel finding an inmate suitable for parole shall become final
21       within 120 days of the date of the hearing." (Note* Petitioner's hearing
         was on October 24, 2006, and, became final within the intent of P.C.
22       §3041(b), on February 21, 2007.)

23   When an administrative regulation conflicts with a statute, the statute

24   controls. (Government Code §11342.2).

25   Regulations that contravenes a statute is/are invalid. R & W Flammann GMBH

26   v. U.S., 339 F.3d 1320 (Fed. Cir. 2003).

27   A statute by its very nature, trumps conflicting regulations. Caldera v.

28   J.S. Alberici Const. Co. Inc., 153 F.3d 1381 (Fed. Cir. 1998).

4

1    An agencies regulations cannot legitimate the violations of constitutional

2  or statutory rights. U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999).

3    A regulation (Title 15 C.C.R. §§2400-2411) cannot over-ride a clearly stated

4  statutory enactment (P.C. §3041(a)(b).) Aerolineas Argentinas v. U.S., 77 F.3d

5  1564 (Fed. Cir. 1996).

6    In Willis v. Kane, USDC N.D. Cal. No. 05-3153 (April 26, 2007), among other

7  issues, the court held that:

8      "Willis' petition for writ of habeas corpus is GRANTED. Having decided
       that the petition will be granted, the next issue concerns the proper
9      remedy. Because Willis has never been found suitable for parole, the
       BPH has never moved past the suitability-finding function in California
10     Penal Code §3041(b) to calculate a term and set a release date as
       required by §3041(a). It is now time to do so. Within thirty days of
11     the date of this order, the BPH must calculate a term for Willis and
       set a date for his release in accordance with the requirements of
12     California Penal Code §3041(a)." (Emphasis in original).

13   The California Supreme Court has concluded that the "nature of the prisoner's

14 offense, alone, can constitute a sufficient basis for denying parole." Dannenberg,

15 29 Cal.4th at p.682. One indicator of parole unsuitability is that "[t]he prisoner

16 committed the offense in an especially heinous, atrocious or cruel manner."

17 (Regs., §2402, subd. (c)(1).) The Dannenberg majority decided that the Board

18 and Governor can find the commitment offense to be especially heinous, atrocious

19 or cruel so long as the crime involved elements beyond "the minimum necessary

20 to sustain a conviction for that offense," without comparing the crime to other

21 similar crimes. (Dannenberg, supra, 34 Cal.4th at pp. 10941098). (See, In re

22 BRANDEE TRIPP, 2007 DJDAR 5877).

23   Nonetheless, the Board found Petitioner 'suitable' and 'that he would not

24 pose a threat to the public'. It is apparent that the Board did not set a uniform

25 term, (See, P.C. §3041(a)), within the Matrix, as Petitioner has currently served

26 28 years (inclusive of earned credits), and the Boards citations to Petitioner's

27 commitment offense, a 50 year old juvenile issue (with no disposition), his 128

28 counseling chrono, a 115 with an age of 13 years which was an "administrative"

5

1  action because of mailing out legal work for another inmate (proof of service),

2  Petitioner's use of a firearm, his alleged lack of programming although Petitioner

3  works on college courses, studies 2 languages, does video reports, and, the fact

4  that the denial of a release date for '3' years with EXACTLY the same rote

5  language as was used to deny Petitioner's release and/or uniform term setting.

6  At p.41 of (Ex. "A"): "With regard to parole plans, we find that you do

7  have appropriate residential parole plans." "With regard to employment, the Panel

8  notes that you are eligible for Social Security."

9  One of the implementing regulations, 15 Cal. Code Regs. §2401, provides:

10  A parole date shall be set if the prisoner is found suitable for parole under

11  Section 2402(d). "A parole date set under this article shall be set in a manner

12  that provides uniform terms for offenses of similar gravity and magnitude with

13  respect to the threat to the public." The regulation also provides that "[t]he

14  panel shall first determine whether the life prisoner is suitable for release

15  on parole. Regardless of the length of time served, a life prisoner shall be

16  found unsuitable for and denied parole if in the judgment of the panel the

17  prisoner will pose an unreasonable risk of danger to society if released from

18  prison." Under state law, the matrix is not reached unless and until the prisoner

19  is found suitable for parole. Id at 1070-71; 15 Cal. Code Regs. §2403(a) ("[t]he

20  panel shall set a base term for each life prisoner who is found suitable for

21  parole"). See, Thomas v. Brown, USDC N.D. Cal., No. C05-1332, Dec. 21, 2006.

22  Although Petitioner was found suitable, and, would not pose a risk to

23  society, CLAIM (III) establishes that an inmate does not have to be found suitable

24  to receive a uniform term set and/or release date. See, Exhibits "B & C".

25  The "PSYCHOLOGICAL EVALUATION", dated August 2006, (Ex. "D"), "his violence

26  potential is lower than the average citizen." Supporting the Board's conclusion

27  that Petitioner would not pose a risk to society, also, no where in the Evaluation

28  is there a need for any 'anger management' self-help book reports.

6

STATE AND FEDERAL CLAIM NUMBER THREE (III)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE
UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT
OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and U.S. Constitution.

The U.S. Constitutions Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." See also, California Constitution Article I, Sec. 7(a). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that, "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However, Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

<div style="text-align:center">EQUAL PROTECTION UNDER "CLASS OF ONE"</div>

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B". (With reference to numbered paragraphs).

Schiold was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into a "SETTLEMENT AGREEMENT" transferring Schiold to Sweden. (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7, of Exhibit "B").

Explicitly at paragraph #8 (of Exhibit "B"): "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph #16 (of Exhibit "B"), establishes that: The agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page 3 (of Exhibit "B"), of the "SETTLEMENT AGREEMENT" expressly states that "he will be held in custody of the government of Sweden UNTIL January 1, 2007." Petitioner asserts that this date, January 1, 2007, established a 'term setting' under §3041(a). (Emphasis added).

A foreign national (Schiold) is being treated distinctly different than 'all' U.S. Citizens, and, foreign nationals that have not caused legal actions

<div style="text-align:center">8</div>

1  to enter into "SETTLEMENT AGREEMENTS", in California serving a sentence of life

2  with the possibility of parole. Petitioner is being treated distinctly different

3  than Schiold because he cannot be transferred to another country, and all

4  similarly situated prisoners, thus creating separate and distinct "classes" of

5  inmates for release criteria.

6      The fact that Schiold was found suitable by the Board is irrelevant to the

7  claim herein, as the Governor over-ruled the Board's determination and found

8  Schiold to be unsuitable, which nullified the Board's finding of suitability.

9  See, paragraphs #2,3,6 (of Exhibit "B"). Schiold's term was set at January 1,

10  2007, AND, Schiold does not have to serve any parole time after being released.

11  See, "SETTLEMENT AGREEMENT".

12      The most basic requirement for a claim of violation of equal protection

13  under the Fourteenth Amendment of the U.S. Constitution lies on the issue of

14  non-equal treatment of a "CLASS", or, a showing of separate and/or distinct

15  difference in treatment, both criminally and civilly, among groups or "CLASSES"

16  of persons.

17      The U.S. Supreme Court has established a "class of one" in the case of

18  Village of Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073

19  (2000) at pp.1074-75: "We granted certiorari to determine whether the Equal

20  Protection Clause gives rise to a cause of action on behalf of a "class of one"

21  where the plaintiff did not allege membership in a class or group." (527 U.S.

22  1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).):

23          "Whether the complaint alleges a class of one or a class of five is
            of no consequence because we concluded that the number of individuals
24          --- in a class is immaterial for equal protection analysis."

25      Our cases have recognized successful equal protection claims brought by

26  a "class of one", where the plaintiff alleges that he/she has been intentionally

27  treated differently from others similarly situated and that there is no rational

28  basis for the difference in treatment. Sioux City Bridge Co., v. Dakota County,

260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburg Coal Co.

v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688

(1989). "In so doing, we have explained that 'the purpose of the equal protection

clause of the Fourteenth Amendment is to secure every person within the State's

jurisdiction against intentional and arbitrary discrimination, whether occasioned

by express terms of a statute or by its proper execution through duly constituted

agents." Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190 (quoting Sunday

Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918).)

"It is clearly established that a state violates the equal protection clauses

when it treats one set of persons differently from others who are similarly

situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

Petitioner has established separate treatment, discrimination, and the

Board's failure to follow U.S. Supreme Court precedents, thus their failure to

set Petitioner's term, as was done to Schiold, violates both the California and

U.S. Constitutions Equal Protection Clauses.

## FAILURE TO CONSIDER TERM SETTING

At no time during the hearing(s), nor at any time during Petitioner's

incarceration has the Board considered the determinate term that Petitioner would

serve, as calculated by Title 15 C.C.R. §2404, (Matrix), or the time he has

actually served as factors in the suitability equation. The Court of Appeals

in, In re Ramirez, (2001) 94 Cal.App.4th 549, at 569 held:

> "The Board cannot ignore the determinate term prescribed for a
> commitment offense when it considers the gravity of the crime as a
> factor weighing against a finding of suitability for parole. The Board
> must make its determination 'in a manner that will provide uniform
> terms for offenses of similar gravity and magnitude in respect to their
> threat to the public.' (P.C. §3041(a).) Determining what would be a
> 'uniform' term for an inmate serving a determinate term for offenses
> that include concurrent determinate terms is not an exact science.
> However, the Board should strive to achieve at least a rough balance
> between the gravity of the offense, the time the inmate has served,
> and the sentences prescribed by law for the commitment offense."

//
//

10

At page 570, the court said:

"The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by P.C. §3041(a)."

The gravity of Petitioner's offense must be measured not in terms of the life maximum potential, but in relation to the determinate terms prescribed for such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note: The Board is still in violation by rules and regulations that they are applying.)

## FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. In re Rodriguez, (1975) 14 Cal.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-19. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior Court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as (Exhibit "C") to MOTION FOR JUDICIAL NOTICE, specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term: "On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term." A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (See, Schiold and Rosenkrants, supra), or by sub-summing term-fixing under the parole function. Petitioner is

11

1    entitled to the fixing of his primary term as an ultimate, immutable release

2    date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment.

3    See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at

4    502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrants, supra.

5        In McGinnis v. Royster, 93 S.Ct. (1973) the court held, at page 1057 that:

6        "Each inmate has both a 'minimum' parole date, which is the earliest
7        date on which he 'may' be paroled at the discretion of the Parole Board,
         and a 'statutory release' date which is the earliest date he 'must'
8        be paroled by the Parole Board. (Fn.3), "He also has a maximum
         expiration date which is the date of the maximum sentence to which
         an inmate can be held if he receives no good time credits at all."

9        The case refers to an 'indeterminate sentence' and establishes that there

10   are actually three (3) dates to such a sentence; (1) the minimum parole date,

11   (2) the statutory release date, (3) the maximum expiration date (i.e., death).

12       While P.C. §1170 et seq., apply to determinate sentences, the current

13   provisions of P.C. §3041 governing parole for inmates serving indeterminate terms

14   were added as part of the bill enacting the Determinate Sentencing Law, and were

15   intended to serve the same purpose as the determinate sentencing provisions.

16   (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176,

17   182). Our Supreme Court has made it clear that the 'uniform terms' called for

18   by section §3041(a) are analytically equivalent to determinate sentences imposed

19   under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96).

20       Apparently, the State of California only follows the law and sets a life

21   prisoner's term when it is convenient, to avoid or terminate legal actions (by

22   entering into "SETTLEMENT AGREEMENTS"), or in an arbitrary manner, with no regard

23   to violating due process and equal protection rights under both California and

24   U.S. Constitutional mandated guidelines.

25                                        //

26                                        //

27                                        //

28

                                         12

STATE AND FEDERAL CLAIM NUMBER FOUR (IV)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE
FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION,
AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), WHEN THEY
DENIED PAROLE SUITABILITY BASED ON UNCHANGING FACTORS, i.e.
HISTORICAL  EVENTS,  WITHOUT  "SOME  EVIDENCE",  AND  APPLYING
ARBITRARY  AND  CAPRICIOUS  CONCLUSIONS  TO  BOOTSTRAP  A
PREDETERMINED DENIAL OF SUITABILITY.

Not withstanding Petitioner's CLAIM NUMBER TWO (II), PAGES 2-6 of this

petition, also see Superior Court's DENIAL attached hereto, Petitioner asserts

this 'some evidence' claim.

At page 39 of exhibit "A", the Boards states:

## DECISION

"The panel the panel (sic) reviewed all the information received from
the public and relied on the following circumstances in concluding that
the prisoner suitable for parole and would not pose unreasonable risk
of danger to society or threat to public safety if released from prison."

Page 39: "The offense was carried out in a manner that dispassionate
(sic) and calculated."

Page 39: "The motive was inexplicable in relation to the offense."
"...used a firearm."

Page 39: "...we find that criminal conduct consists of a juvenile arrest
in 1957."

Page 39: "With regard to institutional behavior we find that you
programmed while (sic) in a limited manner while incarcerated."

Page 40: The Panel strongly encourages you to look beyond your current
education process and look to forms of self-help."

Page 40: "With regard to your other institutional behavior we find that
there is one 128 counseling chrono, the last of which was in 4/99 and
one serious 115 that's been recorded in 2/1994."

Page 40: "According to the psychological report in August 2006 by Dr.
Merek, we find that it is supportive." "The basis of assessing Mr. Dubyak
as 'lower than the average citizen.'"

Page 40: "This is the one in 2003 from Dr. Steward, where in the
assessment of dangerousness, item B if release (sic) to the community
is not (sic) possible to predict the dangerousness since he did not
discuss the event and the details of the conviction."

Page 41: "With regard to parole plans, we find that you do have
appropriate residential parole plans." "With regard to employment, the
Panel notes that you are eligible for Social Security."

13

1    Page 41: "These positive aspects of behavior do not outweigh the factors
2    of unsuitability."

3                          3 YEAR DENIAL

4    Page 41: "In a separate decision, the Hearing Panel finds the prison
     (sic) has been convicted of murder and it is not reasonable to expect
5    him to that (sic), Page 42: parole to be granted within the next three
     years." "We come to this conclusion, first and foremost, by the
6    commitment offense." "The offense was carried out in a manner that (sic)
     dispassionate and calculated manner." "The motive was inexplicable in
7    relation to the offense." "...used a firearm to kill the victim..."
     "We find that there is criminal conduct that exists with a juvenile
8    arrest in 1957; however that you have programmed in a limited manner
     while incarcerated." "The panel strongly encourages you to look beyond
9    your current education process and look to other forms of self-help."
     "There are two incidents of disciplines while incarcerated one a 128
10   counseling chrono in 4/99 and one serious 115 disciplinary report in
     2/1994."

11                          RECOMMENDATIONS

12   Page 43: "With regard to recommendation, the Panel would recommend that
     you have no more 115's, 128's and 128(a)s, that you would participate
13   in self-help programs." "I would encourage you that if you do not find
     a program that are appropriate for you or that you can participate in
14   because you think that limitations that you look to some independent
     reading in the area of self-help." "And the Panel would accept book
15   reports, some sort of report, two or three paragraphs..."

16   Petitioner feels it is important to note, the 115 was not classified as

17   "serious" but rather as "administrative" when Petitioner proof of serviced another

18   inmate's legal mail due to prison staff interference with his legal mailings.

19   Secondly, the 1957 alleged arrest, 50 years ago when Petitioner was 14 years old

20   and wrongly entered a dilapidated empty garage while riding a bicycle down an

21   alley, true, Petitioner had no right what so ever to enter the garage but there

22   is no nexus establishing how this 50 year old historical relic supports a denial

23   of suitability.

24   The Superior Court's scathing denial, attached hereto:

25                       SUPERIOR COURT'S DENIAL

26   "Based on the evidence before it, the panel concluded that petitioner
     poses an unreasonable risk of danger to society if released. (The
27   transcript says the opposite but it is clear from the context what was
     meant)."
28   "Petitioner's calculating nature, coupled with his persistent denial

                              14

of culpability, and <u>his stubborn refusal to program as directed by the eligibility board</u> would give any reasonable person a deep concern that Petitioner might harm others if the circumstances justified it, to his mind." (Emphasis added).

During Petitioner's trial he was offered a 'manslaughter' plea bargain, twice, and acceptable by the trial judge, Petitioner chose to exercise his constitutional right to a trial and was subsequently convicted, 21 years later he is still being punished by the Board and trial court for claiming his innocence, see also P.C. §5011(a)(b). Understanding that Petitioner is only a 'threat' to the public because he did not plead guilty. The trial judge and prosecutor have established over 21 years ago, that Petitioner was not a threat to society within the intent of P.C. §3041(a)(b) because he would have been back among society over 18 years ago.

There are only two (2) excuses given in the superior courts denial; Petitioner's "persistent denial of culpability", and, his "stubborn refusal to program as directed." Obviously a failure in the "some evidence" arena.

### DISPASSIONATE AND CALCULATED

Title 15, C.C.R. §2402(c); Unsuitability criteria factors. At (B): The offense was carried out in a dispassionate and calculated manner, such as an execution style murder. Petitioner was not charged with, tried for nor convicted of an "execution style murder" thus this section and wording cannot be applied to his commitment offense.

Courts must ensure that the evidence relied on by the Board in meeting the 'some evidence' standard is both reliable and of a solid value. (Rosenkrantz, 29 Cal.4th 616 at 655; see C.C.R. §§2402(b), 2281(b); see also In re Scott (2005) 133 Cal.App.4th 573, 591.) It is not sufficient for the Board to derive findings from a silent or misconstrued record.

The Board labeled Petitioner's commitment offense as "dispassionate and calculated", "motive was inexplicable", without explaining how it went beyond the usual callousness inherent in the crime of murder. (In re Smith, 114

15

1   Cal.App.4th at pp.365-366). Absent such an explanation, the Board's finding

2   violated the "some evidence" standard by failing to support the finding with

3   evidence in the record. (Id., at p.667).

4       When reviewing the Board's decision, "[t]he test is not whether some evidence

5   supports the reasons ... for denying parole, but whether some evidence indicates

6   a parolee's release unreasonably endangers public safety." (In re Lee (2006) 143

7   Cal.App.4th 1400, 1408.)

8                        INEXPLICABLE MOTIVE

9       Regarding the Board's statement that "The motive was inexplicable in relation

10  to the offense." As was observed in Scott I, 119 Cal.App.4th at p.892, "An

11  'inexplicable' motive, as we understand it, is one that is unexplained or

12  unintelligible, as where the commitment offense does not appear to be related

13  to the conduct of the victim[s] and has no other discernible purpose. A person

14  whose motive for a criminal act cannot be explained or is unintelligible is

15  therefore unusually unpredictable and dangerous." (Id. at p.893). Barker's motive

16  was not "inexplicable" under this definition.

17      Similarly, the record does not indicate that Barker's motive was "very trivial

18  in relationship to [his] offense." (§2281(c)(1)(E).) "The offense committed by

19  most prisoners serving life terms is, of course, murder. Given the high value

20  our society places upon life, there is no motive for unlawfully taking the life

21  of another human being that could not reasonably be deemed 'trivial'. The

22  Legislature has foreclosed that approach, however, by declaring that murderers

23  with life sentences must 'normally' be given release dates when they approach

24  their minimum eligible parole dates... (Scott I, 119 Cal.App.4th at p.893).

25                    SELF-HELP BOOK REPORTS

26      At page 40 of Exhibit "A"; "The panel strongly encourages you to look beyond

        current education process and look to forms of self-help", again at page

        nd the Panel would accept book reports, some sort of report, two or three

                                    16

1   paragraphs...", also eloquently stated by the superior court: "...and his stubborn

2   refusal to program as directed by the eligibility board..."

3       Although worded as an 'encouragement' to Petitioner it is only meant as

4   another hoop to jump through for an excuse to bolster a predetermined denial

5   without even taking the most basic steps to ensure that the prison library does

6   in fact have self-help books available. Even if one could figure out how writing

7   "two or three paragraphs" would make him a less danger to public safety regardless

8   of the fact that the clinical psychologist made no such finding for self-help

9   in his observations, defies common sense and logic.

10      A plethora of very recently issued California state and district court

11  decisions uniformly holds that evidence of even particularly egregious facts of

12  commitment offenses is not tantamount to evidence of undue current parole risk

13  absent articulation of a nexus between those entities. Willis v. Kane, 485

14  F.Supp.2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of

15  the crime, the critical question the BPH was supposed to decide at the parole

16  suitability hearing was whether 'consideration of the public safety requires a

17  more lengthy period of incarceration for this individual' ... Willis' 1983 crime

18  did not provide sufficient evidence to find him unsuitable for parole in 2003"];

19  Martin v. Marshall, 431 F.Supp.2d 1038, 1049 (N.D. Cal. 2006); Blankenship v.

20  Kane, 2007 WL 1113798 at *10 (N.D. Cal. 2007) ["...the California regulations

21  require ... some evidence that the prisoner poses a present danger to society

22  ... continued reliance over time on an unchanging factor ... the commitment offense

23  ... does not provide evidence of a present danger to society"]; Thomas v. Brown,

24  2006 WL 3783555 at *6 (N.D. Cal. 2006) [not some evidence that the murder shows

25  current parole unsuitability]; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1086

26  (C.D. Cal. 2006) ["the facts surrounding petitioner's crime no longer amount to

27  'some evidence' supporting the conclusion that petitioner would pose an

28  unreasonable risk of danger if released on parole"]. State cases: In re Scott,

1  133 Cal.App.4th at 595 ["the commitment offense can negate suitability only if
2  circumstances of the crime ... rationally indicate that the offender will present
3  an unreasonable public safety risk if released from prison"]; In re Elkins, 144
4  Cal.App.4th at 496, 499 ["Thus, a governor, in reviewing a suitability
5  determination, must remain focused not on circumstances that may be aggravating
6  in the abstract but, rather, on facts indicating that release currently poses
7  'an unreasonable risk of danger to society'"]; In re Lee, 143 Cal.App.4th at 1413
8  ["... the board and Governor must focus their parole decisions on whether a
9  prisoner continues to pose an unreasonable risk to public safety ..."]; see also
10 In re Lawrence, 150 Cal.App.4th 1511, 1554-1556 (2007); In re Gray, 151 Cal.App.4th
11 379 (2007); In re Barker, 151 Cal.App.4th 346, 375-377 (2007).
12    The Board deemed Petitioner unsuitable for parole (absent CLAIM NUMBER TWO)
13 by reciting several of the sub-factors listed under Title 15 C.C.R. §2402(c)(1)
14 describing the commitment offense as being "carried out in a manner that
15 dispassionate (sic) and calculated", "The motive was inexplicable in relation
16 to the offense."
17    These factors are sub-categories listed under the heading of a murder
18 committed "in an especially heinous, atrocious, or cruel manner." (15 C.C.R.
19 §2402(c)(1).) The Board copied the language from Cal. Penal Code §190.2, a "special
20 circumstances" applicable only to particularly egregious first degree murders
21 punishable by the "death penalty or life imprisonment without parole." Sub-section
22 (a)(14) of the special circumstances statute, Cal. P.C. §190.2, reads, "the murder
23 was especially heinous, atrocious, or cruel" which, the statute explains, means
24 "manifesting exceptional depravity ... a conscious or pitiless crime that is
25 unnecessarily tortuous to the victim."
26    Accordingly, the Board deemed Petitioner a current unreasonable risk to public
27 safety by arbitrarily and capriciously characterizing his commitment offense as
28 a premeditated special circumstance first-degree murder.

1    In Irons v. Carey, 479 F.3d 658 (2001), the Ninth Circuit's third in a trilogy
2    that includes Biggs and Sass addressed the issue whether, consistent with due
3    process, the immutable facts of commitment offenses may be employed repeatedly
4    or interminably to preclude the parole of one like Petitioner who indisputably
5    satisfies all parole requirements, has been psychologically evaluated to pose
6    no parole risk and has served 28 years (inclusive of earned credits).

7        The court held that the BPH panel's use of Iron's crime, a particularly
8    egregious murder, before he had served the minimum prison term imposed by the
9    trial court, satisfied the "some evidence" test sufficiently to uphold the BPH
10   panel's decision finding that Irons was unsuitable for parole. The court focused
11   on Irons' egregious murder: he fired 12 rounds into the victim, then, when he
12   found the victim was still alive, stabbed him twice. After leaving the corpse
13   in a sleeping bag for 10 days, Irons removed and weighted it, and dropped it in
14   the ocean.

15       The court emphasized that Irons, like Sass and Biggs before him, had not
16   served "the minimum number of years to which they had been sentenced at the time
17   of the challenged parole denial by the Board." The court explained, contrary to
18   the Board's notion, why Biggs was not overturned by Sass, and re-emphasized that
19   continued use of the commitment offense facts to find such an inmate unsuitable
20   for parole may constitute a due process violation after the minimum term has been
21   served:

22          "We note that in all the cases in which we have held that a parole
            board's decision to deem a prisoner unsuitable for parole solely on
23          the basis of his commitment offense comports with due process, the
            decision was made before the inmate had served the minimum number of
24          years required by his sentence. Specifically, In Biggs, Sass, and here,
            the petitioners had not served the minimum number of years to which
25          they had been sentenced at the time of the challenged parole denial
            by the Board. [] All we held in those cases and all we hold today,
26          therefore, is that, given the particular circumstances of the offenses
            in these cases, due process was not violated when these prisoners were
27          deemed unsuitable for parole prior to the expiration of their minimum
            terms." (Irons v. Carey, supra, at 664-665).
28

19

1    Under the Irons standard, at the time of Petitioner's 2006 parole hearing,

2  his second, at age 65, he had served (including jail time and earned credits)

3  twenty eight (28) years in prison, 11 years more than the minimum and at the

4  maximum in the Matrix.

5    A district court recently elaborated on Iron's reasoning:

6        "Another critical difference between this case and Biggs, Sass and Irons
        is that Brown has served a substantial amount of time beyond the minimum
7        sentence. This court must consider that at some point after an inmate
        has served his minimum sentence the probative value of his commitment
8        offense as an indicator of "unreasonable risk of danger to society"
        recedes below the "some evidence" required by due process to support
9        a denial of parole. See, Irons, 479 F.3d at 665. A decision to revoke
        parole based solely on an inmate's commitment offense that can no longer
10       be considered probative of dangerousness to society would be arbitrary
        and not comport with the "some evidence" standard. See Hill, 472 U.S.
11       at 545-55, 457. This is one of those cases..."

12    The wording of "minimum term" is being mis-applied. Under California law

13  an indeterminately sentenced inmate, like Petitioner, must be granted parole at

14  his **initial** hearing or no later than at his first subsequent hearing at which

15  his parole no longer poses an unreasonable risk of danger to public safety, Cal.

16  P.C. §3041; 15 C.C.R. §§2401, 2402(a). The 'initial' hearing occurs one year before

17  the inmate's minimum eligible parole date (MEPD) (Ibid.), "the earliest date on

18  which an ISL or life prisoner may be legally released on parole" (15 C.C.R.

19  §2000(b)(67)), which in Petitioner's case was August 30, 2003 (one year prior

20  to the MEPD).

21    The Board appears to only take into consideration "earned credits" **after**

22  the inmate is found suitable, then a date is calculated which is always far past.

23  This act defies logic and common sense because the MEPD date is based on earned

24  credits of 1/3rd time, i.e., Petitioner was sentenced to 25 years to life plus

25  a 2 year gun enhancement, thus 27 years to life, less earned credits establish

26  a minimum sentence of 18 years. (See Proposition 7 of 1978).

27    In, In re Ramirez, Marin County Superior Court, Case No. SC109829A (9-13-

28  2000), (94 Cal.App.4th 549), the court held that parole could not be withheld

1  absent a <u>factual</u> <u>finding</u> that the offense was "particularly egregious."

2      To re-iterate a fact, Petitioner asserts that the Board's DECISION never

3  even addressed the wording of "particularly egregious" and with the understanding

4  of Ramirez, supra, that, reasonably interpreted, a factual finding of "particularly

5  egregious" must be found to deny a parole date. See also, In re Rosenkrantz, 29

6  Cal.4th 616, 683, 128 Cal.Rptr.2d 104, 161 (2002)

7                    <u>PSYCHOLOGICAL EVALUATION</u>

8      The facts at issue regarding the psychological evaluation are that the report

9  is    prepared   by    a    state    licensed,    expert   in   his   field,   professional

10  psychiatrist/psychologist with years of formal education and training with the

11  ability to make sound judgments regarding an inmate's "potential" for "future

12  violence" thus a threat or risk level assessment of current risk to public safety.

13      The   Commissioners   however   have   no   such   formal   training,   and   none   is

14  established in Exhibit "A", or rather the lack of existence in the record that

15  the Commissioners have a modicum of psychiatric knowledge or training, lacking

16  professional credentials as a board certified expert or even at the level of

17  knowledge required for a CDC Correctional Counselor as set forth in the Department

18  of Corrections Operational Manual, at §62090.14.1 requiring staff to have at least

19  two (2) years of "graduate training in psychiatry" to make an evaluation for

20  an inmate. When the Board over-rides or contravenes a Psychological Evaluation

21  without "some evidence" to support their "re-evaluation" they are indeed practicing

22  medicine without a license under California law.

23      The   Psychological   Evaluation   Report   is   'always'   over-ridden   and/or

24  contradicted by the Board when the evaluation is favorable to an inmate for

25  suitability of release on parole. The Board, nearly always, requires "selfhelp,

26  book reports, AA, NA, and/or anger management in spite of what the Evaluation

27  states or rather what is <u>not</u> recommended by the psychologist making the evaluation.

28      Exhibit "D", under 'XI': "If paroled, he plans to live with his sister and

                                        21

1  collect Social Security. The prognosis for successful, responsible, legal,
2  prosocial community is good." (Emphasis added).

3  At 'XII': "He exhibited no depressive or psychotic symptomatology. His
4  intellectual functioning was estimated to be in the average range. He was calm,
5  cooperative and alert. His mood affect and flow of thought were all normal. His
6  insight and judgment were good. He is not currently in need of any mental health
7  treatment."(Emphasis added).

8  At 'XIV': "...his violence potential is lower than the average citizen."

9  At 'XV': "He does not have a mental health disorder that would necessitate
10 treatment either while incercerated or on parole." "There are no obvious mandatory
11 conditions of parole and recommendations."

12 The Board cannot legally apply 15 C.C.R. §§2400-2411 to over-ride or control
13 the legislative intent of Cal. P.C. §3041. See, Aerolineas Argentinas v. U.S.,
14 77 F.3d 1564 (Fed. Cir. 1996).

15 When an administrative regulation conflicts with a statute, the statute
16 controls. (Government Code §11342.2). Petitioner asserts that §§2400-2411 rules
17 and regulations are in direct conflict with P.C.'s §3041 et seq., wherein §3041
18 only carries one basic requirement for a parole release date, i.e., consideration
19 of public safety. Although the Board may use 'all' available information to arrive
20 at their decision the intent of the penal code still controls and the Board cannot
21 change, add to or delete the requirements for parole release suitability, an issue
22 already decided (threat level assessment) by a state certified Psychiatrist.

23 An agencies regulations cannot legitimate the violations of constitutional
24 or statutory rights. U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999). No other
25 excuses/reasons given by the Board for denial of suitability are legally valid.

26 The Board has effectively amended P.C. §3041(a)(b) and the legislative intent
27 has been circumvented. Proposition 7, 1978, did not allow such amendment without
28 voters approval. See, In re Oluwa, (1989) 207 Cal.App.3d 447.

22

UNCHANGABLE CIRCUMSTANCES

Greenholtz, supra, spoke in detail about the purpose of parole being rehabilitation and, most important, recognized that an inmate's record <u>during confinement</u> indicates whether release on parole is appropriate. Therefore, even in the absence of Ninth Circuit case law clarifying the scope of Biggs, Greenholtz is still compelling law.

The facts of the unchanged circumstances must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events. Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D. Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D. Cal. 2005).

In Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D. Cal. 2005) the court asks rhetorically:

> "What is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility."

The court's holding that the Board's use of unchanging factors to deny parole is in violation of due process. Rosenkrantz v. Marshall, 444 F.Supp.2d, 1063 (C.D. Cal. 2006).

RECIDIVISM STUDIES

The purpose of this information is to bring to the court's attention of studies done several years ago regarding recidivism rates among inmates that the Board appears to ignore, given the no parole policy due to alleged threat or risk level to the public safety, always used by the Board and/or governor as excuses for parole suitability denials, at the current rate of 99% denials, I submit the

23

1  following information.

2                  *   *   *   *   *   *   *   *   *   *   *   *   *

3       "Studies of parole success repeatedly indicate that those who commit murder

4  are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation

5  and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard

6  to the commission of felonies in general and the crime of homicide, no other

7  offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty

8  in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some

9  of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd

10 Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2.

11 "Compared with other groups, murderers are actually the best parole risks." Bedau,

12 Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton

13 p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in

14 10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death

15 Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the

16 California Board of Prison Terms (1983-1987) it was concluded that no one released

17 after committing a murder had been returned to prison for murder. Ellwood, Eldridge

18 T., PH.D, Research Projects On Life Prisoners, p.3, April 1989, California BPT.

19 "As a matter of statistical probability, murderers released from a prison are

20 far less likely to commit a new crime than any other category of offender." Orland,

21 Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be

22 released immediately after conviction with little likelihood of offending again."

23 Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of

24 Incarceration, p.126, 1976. These authorities, from some of the most respected

25 sociologists in our country, reveal the fallacy of assumptions regarding the

26 dangerousness of those convicted of murder.

27      In reference to a murder case: Hending v. Smith, 781 F.2d 850 (11th Cir.

28 1986) ["[i]t is a matter of general knowledge that except for professional killers,

                                        24

1  few people commit more than one murder in a life time. It is a crime involving

2  a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444

3  F.Supp.2d 1063, 2006 WL 2327085 at *12-17.

4                                        //

5                                        //

6                                        //

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE AND FEDERAL CLAIM NUMBER FIVE (V)

THE STATE OF CALIFORNIA HAS CREATED A MORE COMPREHENSIVE
RIGHT FOR ITS RESIDENTS THAN THE FEDERAL GOVERNMENT FOR THE
APPLICABLE EVIDENCE STANDARD APPLIED TO PAROLE SUITABILITY
HEARINGS UNDER CALIFORNIA EVIDENCE CODE Sec. §115 HEREIN.

The Board of Prison Hearings has violated Petitioner's due process and equal

protection rights under the Fourteenth Amendment of the U.S. Constitution, and,

California Constitution Article I, Sec. 7(a), a right created by the Legislature

of California and by its intent to create an evidence code (§115) that creates

a minimal standard of 'evidence' requirement for all situations.

'Some evidence', as applied by the Board, and, used as a judicial tool to

review the Board's decision for due process violations, is not the legal standard,

especially under California law, see Evidence Code §115; also, U.S. Supreme Court

precedents, herein asserted, establish that "preponderance of evidence" is the

legal (minimum) evidence standard for parole suitability hearings and not the

defunct 'some evidence' standard relied upon by either the Board, and/or Governor.

Although the courts do rely on "some evidence" to determine if there is any

evidence in the Board's denials (records) it must be "some evidence" that a

"preponderance of evidence' exists in the record to support a denial.

The U.S. Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633,

2651, 159 L.Ed.2d 578 (2004) stated that:

"As the Government itself has recognized, we have utilized the "some
evidence" standard in the past as a standard of review, not as a
standard of proof."

The Court further explains that:

"It primarily has been employed by courts in examining an administrative
record developed after an adversarial process at least of the sort
that we today hold is constitutionally mandated in the citizen
enemy-combatant setting." See, e.g., Hill, 472 U.S., at 455457, 105
S.Ct. 2768.

The Hamdi court further explains that: "...for determining the procedures

that are necessary to ensure that a citizen is not "deprived of life, liberty

or property, without due process of law," U.S. Const. Amdt. 5, is the test that

26

we articulated in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, (1976):

> "We agree with the prevailing view and conclude that Hill addressed only the appropriateness of 'some evidence' as a standard of appellate review, not as a standard of proof. Therefore, we now seek to determine through our own analysis the appropriate fact-finding standard to be used by the DOC. To determine whether a standard of proof in a particular type of proceeding satisfies due process, the Supreme Court has prescribed a three-factor test that examines: (1) the private interest affected, (2) the risk of erroneous deprivation of such interest, and (3) the government's interest."

In Carrillo, Supreme Court of Minnesota, 710 N.W.2d 763, 2005 Minn. LEXIS, 424, Filed July 28, 2005, that court relied on Eldridge and Hamdi and held that:

> "Taking the Supreme Court's three factors into consideration, we conclude that the "some evidence" standard is inappropriate for use by the DOC at the fact-finding level. We conclude that the "preponderance of evidence" standard better protects against an erroneous deprivation of an inmate's liberty interest in his supervised release date and does not pose an unacceptable burden on the DOC. Therefore, we conclude that a DOC hearing officer must find by a preponderance of evidence that Carrillo has committed a disciplinary offense before the commissioner can extend the date of his supervised release. Accordingly, we hold that the district court and the court of appeals erred when they denied Carrillo's petition for writ of habeas corpus."

The State of California, by Legislative intent, has conferred more, or a greater, evidence standard upon the Board, and Governor's review, (and judicial review), by making the 'minimum' evidence standard "preponderance of evidence", rather than that espoused in Hill, i.e., "some evidence". See also, Jurasek v. Utah State Hospital, 158 F.3d 506 (10th Cir. 1998), "The state may confer more comprehensive due process protection upon its citizens than does the federal government."

Petitioner contends that a reasonable understanding of the holding in Hamdi v. Rumsfeld, relied upon in Carrillo, supra, Eldridge, supra, is that a court will apply the "some evidence" standard to review records, of both the Board's and Governor's denials for suitability of parole, to see if there was proof under the "preponderance of evidence" standard mandated by California Evidence Code

1   Sec. §115, not, that the record of the Board's, or Governor's, denial of

2   suitability, decision only requires "some evidence" of proof, as is always applied

3   by the Board for denial, and, by the Governor for review.

4        Petitioner's due process rights were violated when the defunct minimally

5   necessary evidence (some evidence) standard was applied in place of preponderance

6   of evidence as is mandated by California Evidence Code section §115, second

7   paragraph; "Except as otherwise provided by law, the burden of proof requires

8   proof by a preponderance of the evidence."), and U.S. Supreme Court precedents

9   herein listed.

10       Thus, the Hill, supra, "some evidence" standard is being applied to

11  circumvent and over-ride the California Constitutions duly elected Legislatures

12  intent to confer a greater due process protection upon its citizens when they

13  enacted Evidence Code §115 (Preponderance of evidence as the minimal standard

14  of proof or review) than does the federal courts Hill standard of "some evidence".

15                                    //

16                                    //

17                                    //

18

19

20

21

22

23

24

25

26

27

28

<div align="center">CONCLUSION</div>

1

2     It is established in the Psychological Evaluation that Petitioner is not

3 a current threat or risk to public safety. There was no evidence either under

4 the "some evidence" "modicum of evidence" or any other evidence standard to support

5 the denial of suitability, nor was there any evidence to support the Board's

6 requirement for book reports under the guise of self-help as a requisite to

7 suitability.

8     Petitioner was entitled to a term setting under his equal protection "class

9 of one" claim at his first (initial) hearing.

10     The Board's predetermined denial was arbitrary and capricious and fails 'any'

11 evidence test to support the denial.

12     Remanding Petitioner back to the Board for another pre-determined denial

13 would be fruitless as is obvious to the courts that the Board does not follow

14 direction or constructive criticism in various court orders, nor does the Board

15 follow the intent of California Penal Codes and defies the California and U.S.

16 Constitution with impunity.

17     The only alternative is for this court to issue and order to the Board to

18 set Petitioner's release date as required by law. See, In re Scott, 133 Cal.App.4th

19 at pp.603-604 [ordering immediate release instead of remand where no evidence

20 supported denying parole].

21                      Respectfully submitted,

22

23

24 /0 - 30 - 07

          Samuel A. Dubyak

25

26

27

28

PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests that this Court declare/order that:

1). Respondents show cause why Petitioner is not entitled to the relief requested:

2). The Board set a release date consistent with Title 15 C.C.R. 'Matrix' and as is established in P.C. §3041(a):

3). There was no evidence in the record to deny Petitioner a release date and/or uniform term setting after being found suitable and would not pose a risk to public safety:

4). The Board's denial of a release date was arbitrary and contrary to P.C. §3041(a)(b) language:

5). The Board set Petitioner's term as was done to Schiold and Rosenkrants (Claim No. III):

6). If the Board fails to set a parole release date and/or uniform term under Petitioner's Claims No. TWO and THREE, that this Court issue an order for Petitioner's release forthwith:

7). The Boards decision on October 24, 2006 became final 120 days after, per P.C. §3041(b):

8). Petitioner's release date and/or uniform term date become effective on October 24, 2006:

9). Grant Petitioner such other relief as this Court deems just and proper in the interest of justice as Petitioner is a layman at law.

//
//
//

1  Samuel A. Dubyak D-54700
   Box 689    C-115L
2  California State Prison
   Soledad, CA 93960-0689
3
            Petitioner, in pro se
4

5

6
                IN THE SUPERIOR COURT OF CALIFORNIA
7
              FOR THE COUNTY OF SAN BERNARDINO
8

9  SAMUEL A. DUBYAK,            )    Case No. _____
                                )
10           Petitioner,        )
                                )
11 v.                           )    MOTION/REQUEST FOR JUDICIAL NOTICE
                                )
12 CURRY, Warden,               )
                                )
13           Respondent.        )
                                )
14 _____  )

15 To: THE HONORABLE JUDGE(S) OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN

16 BERNARDINO.

17     Pursuant to California Evidence Code sections 451 subdivision (a), 452

18 subdivision (a), (c) & (d), and 459 subdivision (a), Commode Home System, Inc.

19 v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and, Adamson v. Zipp, (1984)

20 163 Cal.App.3d Supp. 1, n.17, Petitioner hereby asks this Court to take "Judicial

21 Notice" of the documents submitted and currently attached to the herein petition

22 as the following listed exhibits: "A", Parole Board suitability hearing

23 transcripts, "B" designated as "SETTLEMENT AGREEMENT, Re, Schiold, "C" designated

24 as an order, Re, Rosenkrantz, "D" designated as Petitioner's Psychological

25 Evaluation.

26     This Court must take Judicial Notice of the factual findings of other courts,

27 and this court's previous orders, even though the Court need not accept the truth

28 of those findings. See, Mack v. State Bar of California, (2001) 92 Cal.App.4th

                                   1

1  957, 961, rehearing denied, review denied; <u>Duggal v. G.E. Capitol Communications</u>

2  <u>Service, Inc.</u>, (2000) 81 Cal.App.4th 81, 82; <u>People v. Moore</u>, (1997) 59 Cal.App.4th

3  168, 178.

4      Petitioner has obtained the above mentioned documents from the prison law

5  library and from the Swedish Consulate's office, (through another inmate Petitioner

6  assisted). All of the attached cases arose out of habeas corpus proceedings in

7  the aforementioned Courts. Review of the attached cases will assist this Court

8  in evaluating the claims presented in Petitioner's habeas corpus petition along

9  with this MOTION/REQUEST FOR JUDICIAL NOTICE.

10                     Respectfully submitted,

11

12

13

14  /0-30-07                    Samuel A. Dubyak

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                           2

# EXHIBIT

# A

**FILED**

JUL 05 2007

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
DEPUTY

S. GARSIDE

1           SUPERIOR COURT OF CALIFORNIA

2               COUNTY OF MONTEREY

3

4  In re                        )  Case No.: HC 5740

5     Samuel A. Dubyak         )  ORDER

6             On Habeas Corpus.  )

7

8      On May 29, 2007, Petitioner Samuel A. Dubyak filed a petition for writ of habeas corpus.

9      Petitioner is currently incarcerated at the Correctional Training Facility (CTF) in Soledad.

10     Petitioner describes the background of the petition as follows.

11      On October 24, 2006, Petitioner's second parole suitability hearing was held. To date,

12  Petitioner has not received a copy of the transcript from this hearing.

13      Pursuant to California Rules of Court, 4.551(b), the court requests an informal response

14  from the Attorney General's Office (Respondent). The informal response should address when

15  Petitioner will receive a copy of his parole suitability hearing transcript.

16      The informal response shall be filed within 15 days from the date of service of the order.

17  Petitioner may file a reply within 15 days from the date of service of the informal response upon

18  Petitioner.

19      IT IS SO ORDERED.

20  Dated: July 5, 2007.

21

22                         Hon. James W. Luther
                              Judge of the Superior Court

23

24

25



*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public:  (415) 703-5500
Telephone:  (415) 703-5774
Facsimile:  (415) 703-5843
E-Mail: Stacey.Schesser@doj.ca.gov

July 20, 2007

The Honorable James W. Luther
Monterey County Superior Court
P.O. Box 1051
Salinas, CA 93902-0414

RE:    INFORMAL RESPONSE
       <u>In re SAMUEL A. DUBYAK, Case No. H5740</u>

Dear Judge Luther:

    This letter is written pursuant to the court's request for an informal response to inmate Samuel Dubyak's petition for writ of habeas corpus. Petitioner Dubyak is a California state inmate at the Correctional Training Facility (CTF) who alleges that he has not received a copy of the transcript from his parole consideration hearing held on October 24, 2006. (Petn.) Petitioner's claims, however, are moot.

    As a general principle, it is the duty of a court to decide only "actual controversies" by judgments which can be carried into effect. Courts must avoid rendering opinions on moot questions, abstract propositions, or declaring rules of law which cannot affect a matter at issue in a pending case. (*National Association of Wine Bottlers v. Paul* (1969) 268 Cal.App.2d 741, 746.) "[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or questions which will not be decided by the court." (*Wilson v. Los Angeles County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453.)

/// 

///

///

James W. Luther
July 20, 2007
Page 2

       Attached to this informal response is a copy of Dubyak's October 24, 2006 parole consideration hearing.  (Exh. 1 -- Parole Consideration Hearing Transcript.)  Given that Dubyak will receive a copy of this informal response and the attached exhibit upon service, he will have the parole consideration hearing transcript he requested.  Because Dubyak already received the relief requested, this court can no longer grant relief and respondent requests the petition be dismissed.

                    Sincerely,

                    *Stacey D. Schesser*

                    STACEY D. SCHESSER
                    Deputy Attorney General
                    State Bar No. 245735

          For    EDMUND G. BROWN JR.
                    Attorney General

SDS:ls

Attachments: Exhibit 1

20096325.wpd

1

1      PROCEEDINGS

2                    --oOo--

3           DEPUTY COMMISSIONER BLONIEN:  We are on record.

4           PRESIDING COMMISSIONER DAVIS:  This is a

5    subsequent parole consideration hearing for Samuel

6    Dubyak.

7           INMATE DUBYAK:  Yes, sir.

8           PRESIDING COMMISSIONER DAVIS:  Am I pronouncing

9    that correctly?

10           INMATE DUBYAK:  Yes, sir.

11           PRESIDING COMMISSIONER DAVIS:  CDC number D-

12    54700.  Today is date is October 24, 2006 and we're

13    located at CTF in Soledad.  The inmate was received on

14    April 23, 1987 from San Bernardino County.  The life term

15    beginning on April 23, 1987 with a minimum eligible

16    parole date of August 31, 2004.  The controlling offense

17    for which the inmate has been committed is murder first

18    with use of a firearm.  Case number CR12056, count one

19    Penal Codes Section 187/12022.5 for which he received a

20    term of 25 years to life plus two. This hearing is being

21    tape recorded so for the purpose of voice identification

22    we'll each state our first and last name, spelling our

23    last name.  And when it reaches you Mr. Dubyak if you'll

24    also give us your CDC number, please sir.  I'll start and

25    move to my left, I'm James Davis, D-A-V-I-S,

26    Commissioner.

27           DEPUTY COMMISSIONER BLONIEN:  I'm Noreen Blonien,

2

1    B-L-O-N-I-E-N, Deputy Commissioner.

2              DEPUTY DISTRICT ATTORNEY DAWSON:  Jennifer

3    Dawson, D-A-W-S-O-N, Deputy District Attorney, San

4    Bernardino County.

5              ATTORNEY FERGUSON:  Peter Ferguson,

6    F-E-R-G-U-S-O-N, counsel for Mr. Dubyak.

7              INMATE DUBYAK:  Samuel Dubyak, D-U-B-Y-A-K.

8              PRESIDING COMMISSIONER DAVIS:  And your CDC

9    number?

10             INMATE DUBYAK:  Oh sorry, D-54700.

11             PRESIDING COMMISSIONER DAVIS:  Very well thank

12   you, and let the record reflect that we are joined today

13   with two correctional officers who are here for security

14   purposes and will not be actively participating in the

15   hearing.  Mr. Dubyak, in front of you in that laminated

16   piece of paper is the American's with Disabilities Act,

17   will you please read that aloud?

18             INMATE DUBYAK:  "The Americans with

19             Disabilities Act, ADA, is a law to help

20             people with disabilities.  Disabilities

21             are problems that make it harder for some

22             people to see, hear, breathe, talk, walk,

23             learn, think, work or take care of

24             themselves than it is for others.  Nobody

25             can be kept out of public places or

26             activities because of disabilities.  If

27             you have a disability you have the right

1           to ask for help to get ready for your BPT

2           Hearing, get to the hearing, talk, read

3           forms and papers, and understand the

4           hearing process. BPT will look at what

5           you ask for to make sure that you have a

6           disability that is covered by ADA, and

7           that you have asked for the right kind of

8           help. If you do not get help or if you

9           don't think you got the kind of help you

10          need, ask for a BPT Form 1074 grievance

11          form, you can also get help to fill it

12          out."

13      PRESIDING COMMISSIONER DAVIS: Very well, thank

14  you.  Our records indicate that on May 10, 2006 that

15  together with staff at the institution on November 18,

16  2005 you reviewed and signed a BPT form 1073 indicating

17  that you do not have any disabilities that would

18  qualifying under the American's with Disabilities Act, is

19  that correct?

20      INMATE DUBYAK:  That is correct.

21      PRESIDING COMMISSIONER DAVIS:  Has anything

22  changed since that time?

23      INMATE DUBYAK:  No.

24      PRESIDING COMMISSIONER DAVIS:  And you were able

25  to read that without glasses, do you normally need

26  glasses?

27      INMATE DUBYAK:  I'm blind in my right eye, that's

4

1    why I move it back and forth.  I have glasses yes.

2              PRESIDING COMMISSIONER DAVIS:  Okay but you were

3    able to read it without them.  But you do have glasses as

4    an accommodation in the event that you need them?

5              INMATE DUBYAK:  Yes.

6              PRESIDING COMMISSIONER DAVIS:  And you had those

7    when you read your C-File in preparation of this hearing?

8              INMATE DUBYAK:  Yes.

9              PRESIDING COMMISSIONER DAVIS:  And you can hear

10   me all right?

11             INMATE DUBYAK:  Yes.

12             PRESIDING COMMISSIONER DAVIS:  And you made it up

13   here under your own steam, you walked here all right?

14             INMATE DUBYAK:  Yes.

15             PRESIDING COMMISSIONER DAVIS:  Feel healthy and

16   fit and ready to go?

17             INMATE DUBYAK:  Ready.

18             PRESIDING COMMISSIONER DAVIS:  Any reason that

19   you can think of that you would not be able to actively

20   participate in this hearing today?

21             INMATE DUBYAK:  No.

22             PRESIDING COMMISSIONER DAVIS:  I do see that you

23   have some medical conditions including not lifting

24   certain things, no climbing, no bending, stooping and so

25   forth, some other medical conditions that did not

26   interfere with you getting to the hearing?

27             INMATE DUBYAK:  No, I'm careful when I climb

5

1    steps I try to make steps (inaudible),

2         PRESIDING COMMISSIONER DAVIS:  So you have a cane

3    as a partial accommodation as well. And you're able to

4    make it up the steps all right.

5         INMATE DUBYAK:  Yes.

6         PRESIDING COMMISSIONER DAVIS:  All right.

7    Counsel and you're satisfied with that as well?

8         ATTORNEY FERGUSON:  Yes, sir.

9         PRESIDING COMMISSIONER DAVIS:  This hearing is

10   being conducted pursuant to Penal Code Section 3041 and

11   3042 of the Rules and Regulations of the Governing Board

12   of Parole for life inmates.  The purpose of today's

13   hearing is to once again consider the number and nature

14   of the crimes that you were committed, your prior

15   criminal and social history, and your behavior and

16   programming since your commitment.  We've had the

17   opportunity to review your Central File and your prior

18   transcripts.  And you'll be given the opportunity to

19   correct or clarify the record as we proceed.  Now we will

20   reach a decision today and inform you whether or not we

21   find you suitable for parole and the reasons for our

22   decisions.  If you are found suitable for parole the

23   length of your confinement will be explained to you.

24   Nothing that will happen here today will change the

25   findings of the court.  The Panel is not here to retry

26   your case, we are here for the sole purpose of

27   determining your suitability for parole, do you

6

1    understand that sir?

2         **INMATE DUBYAK:**  Yes.

3         **PRESIDING COMMISSIONER DAVIS:**  This hearing will

4    be conducted in two phases.  First I will discuss with

5    you the crime that you were committed for, your prior

6    criminal and social history.   Commissioner Blonien will

7    discuss with you your progress since your commitment,

8    your counselor's report, and your psychological

9    evaluation, your parole plans, and any letters of support

10   or opposition as they may exist.  Once that's concluded

11   the Commissioners, the District Attorney, your attorney

12   will have the opportunity to ask you questions.   The

13   questions that come from the District Attorney will asked

14   through the Chair and you will respond back to the Panel

15   with your answer.  Following that the District Attorney,

16   then your attorney will have an opportunity for a final

17   closing statement.  Which will be followed by your

18   closing statement, which should focus on your suitability

19   for parole.  The California Code of Regulations states

20   that regardless of time served an inmate shall be found

21   unsuitable and denied if in the judgement of the Panel

22   the inmate would pose an unreasonable risk of danger to

23   society if released from prison.  And you have certain

24   rights those rights include a timely notice to the

25   hearing, the right to review your Central File and the

26   right to present relevant documents.  Counsel are you

27   satisfied that your client's rights have been met today?

7

1          ATTORNEY FERGUSON:  Yes, we are.

2          PRESIDING COMMISSIONER DAVIS:  You have an

3    additional right to be heard by an impartial panel, you

4    heard Commissioner Blonien and I introduce ourselves

5    today, do you have any reason to believe that we would

6    not be impartial?

7          INMATE DUBYAK:  I have no knowledge of either of

8    (inaudible).

9          PRESIDING COMMISSIONER DAVIS:  You believe that

10   we would be impartial?

11         INMATE DUBYAK:  That you don't have anything

12   against me.

13         PRESIDING COMMISSIONER DAVIS:  All right, very

14   well. You will receive a written copy of our tentative

15   decision today, that decision becomes effective within

16   120 days and a copy of the decision and a copy of the

17   transcript will be sent to you.  The Board has eliminated

18   it's appeal process, if you do disagree with anything in

19   today's hearing you have the right to go directly to

20   court with your appeal.  Now you're not required to

21   discuss your offense or admit your offense, however the

22   Panel does accept the findings of the court as true.  Do

23   you understand that?

24         INMATE DUBYAK:  Yes, sir.

25         PRESIDING COMMISSIONER DAVIS:  All right,

26   Commissioner Blonien, are we going to be using anything

27   from a confidential file.

8

1       DEPUTY COMMISSIONER BLONIEN:  There is nothing in

2   a confidential file.

3       PRESIDING COMMISSIONER DAVIS:  All right.  I

4   previously passed to both counsel a checklist counsel and

5   district attorney the checklist of documents.  Will you

6   both take a look at that please, make sure that you both

7   have those?

8       ATTORNEY FERGUSON:  We've received the indicated

9   documents.

10      DEPUTY DISTRICT ATTORNEY DAWSON:  I have them all

11  here.

12      PRESIDING COMMISSIONER DAVIS:  Counsel, any

13  additional documents?

14      ATTORNEY FERGUSON:  Yes, Mr. Dubyak has very

15  consciously put together a whole packet, which includes

16  various documents as far as his plans go.

17      PRESIDING COMMISSIONER DAVIS:  Good, thank you,

18  we'll take a look at those at the appropriate time.  Any

19  preliminary objections?

20      ATTORNEY FERGUSON:  None at this time.

21      PRESIDING COMMISSIONER DAVIS:  All right, and

22  will your client be speaking to us today?

23      ATTORNEY FERGUSON:  Yes, and he will be

24  stipulating to the official version of the facts.

25      PRESIDING COMMISSIONER DAVIS:  All right, then.

26  Is that you don't want to talk about the incident offense

27  itself then, your just going to stipulate that?  That way

9

1    we'll just avoid any questions regarding the incident

2    offense.  All right, if you'll raise your right hand then

3    for all other matters.  Do you solemnly swear or affirm

4    that the testimony that you at to give at this hearing

5    will be the truth and nothing but the truth?

6         INMATE DUBYAK:  I do.

7         PRESIDING COMMISSIONER DAVIS:  All right, without

8    objection I'd like to incorporate reference the Court of

9    Appeals document pages two through three.  And refer to

10   the Board report dated July 2003 for the summary of the

11   crime, which states that,

12        "On August 27, 1985, Mr. Raul Rodriguez

13         R-O-D-R-I-G-U-E-Z of Marovis,

14         M-A-R-O-V-I-S, Puerto Rico, contact the

15         police department regarding the

16         disappearance of his sister, Lourdes

17         L-O-U-R-D-E-S, Dubyak.  The investigation

18         was turned over to Detective Beckman, B-

19         E-C-K-M-A-N, Mr. Rodriguez advised

20         Detective Beckman that no one had seen or

21         heard from Lourdes after the accident in

22         1985.  Mr. Rodriguez further indicated

23         that the victim kept in close contact

24         with her family.  In addition, Mr.

25         Rodriguez indicated that had his sister

26         left the area, she would have taken her

27         two year old daughter Angelica, A-N-G-E-

10

1         L-I-C-A, Mr. Rodriguez had also advised

2       Detective Beckman that he had been in

3       contact with Lourdes' husband Samuel

4       Dubyak, the defendant and had received

5       inconsistent statements from him. He

6       also advised Detective Beckman that he

7       had called his sister at 9:00 p.m.

8       Pacific Daylight time and was advised by

9       Dubyak that she was not home. According

10      to the information received from a

11      neighbor the victim left her house

12      between 8:15 and 8:30 p.m. and would have

13      easily returned home prior the 9:00 p.m.

14      telephone call. Mr. Rodriguez indicated

15      that his sister and her husband have been

16      having marital problems for a period of

17      time and the victim had consulted with

18      him regarding divorcing her husband. Mr.

19      Rodriguez had further indicated that the

20      victim had been having affairs with

21      several individuals over the last several

22      months, a fact that which the inmate was

23      aware. Upon receiving this information,

24      Detective Beckman started his own

25      investigation about the whereabouts of

26      Lourdes Dubyak. Detective Beckman was

27      able to establish that on the weekend of

11

1    August 9th through August 11th, 1989, the

2    victim spent time with her lover, Marcel

3    Berasalece, B-E-R-A-S-A-L-E-C-E, in a

4    motel.  Mr. Berasalece dropped the victim

5    off at her residence on August 11, 1985

6    in the early afternoon.  The victim

7    telephoned him later that afternoon and

8    what was the last he heard of her.  They

9    made arrangements to have a lunch date on

10   Tuesday, August 13, 1985, however the

11   victim failed to keep her engagement.

12   Detective Beckman interviewed Debbie

13   Alongis, A-L-O-N-G-I-S, a close friend

14   and neighbor of the victim.  She

15   indicated that she had last seen the

16   victim on August 11, 1985 at

17   approximately 8:00 p.m. the victim left

18   her residence and was on her way home.

19   That was the last Ms. Alongis ever saw

20   the victim.  However the following

21   morning Dubyak arrived at Ms. Alongis'

22   home and requested a videotape which had

23   been loaned to her family.  Mr. Dubyak

24   advised Ms. Alongis that the victim had

25   left him.  On August 30, 1985 the inmate

26   was interviewed by Detective Beckman

27   after being advised his rights, Dubyak

12

1   advised that his wife, Lourdes, had left

2   him on Sunday, August 11, 1985, between

3   9:00 and 9:30 p.m. he indicated that she

4   made a telephone call dropped off the

5   baby off in his room and said she had to

6   go out for awhile.  Mr. Dubyak assumed

7   that the victim had taken her car.

8   However upon waking in the morning he

9   discovered that his wife had not left in

10  the automobile.  As the investigation

11  continued Detective Beckman learned that

12  Dubyaks slept in separate bedrooms and

13  the bedroom that Mrs. Dubyak slept in had

14  been converted into a television room.

15  The double bed that Mrs. Dubyak slept in

16  was currently gone.  When Detective

17  Beckman question Mr. Dubyak regarding

18  this, he indicated that the victim must

19  have taken this as he had no idea where

20  the bed was.  The investigation of

21  Lourdes Dubyak continued, Detective

22  Beckman learned that on August 16, 1985

23  the inmate and his brother, Peter Dubyak,

24  along with a 13 year old juvenile from

25  the neighborhood had loaded a bed from

26  Dubyak's house into a truck.  And

27  subsequently and had dumped it on the

13

1      side of the road, east of Ontario

2      International Airport.  On November 5,

3      1985, that bed was discovered

4      approximately 200 yards east of Vineyard

5      Street in Ontario.  The bed was

6      subsequently identified by family members

7      and neighbors as the bed, which was

8      originally in the victim's bedroom.  On

9      November 6, 1985 the mattress, box

10     springs, and headboard were preliminary

11     examined by a San Francisco crime

12     laboratory.  Tests for traces of human

13     blood were conducted negative results,

14     however during the examination two holes

15     were found to have been cut in the foam

16     part of the mattress.  The complete

17     examination of the bed was completed on

18     November 8, 985, at which time a

19     projectile exit hole was located on the

20     underside of the mattress.  The

21     projectile exit hole was found in the box

22     spring of the mattress.  The projectiles

23     were later determined to be made from a

24     .22 caliber long rifle with gold-jacketed

25     bullet.  After presenting the above

26     information, Detective Beckman obtained

27     an arrest warrant for the inmate and his

14

1     brother Peter Dubyak for investigation of

2     murder.  On December 2, 1985 a search

3     warrant was executed at 12248 Kumquat,

4     K-U-M-Q-U-A-T, Street.  On that date a

5     luminol, L-U-M-I-N-O-L, reagent test was

6     conducted by San Bernardino County

7     Criminalistics Laboratory.  The test was

8     made in an attempt to locate traces of

9     blood in the residence.  When the luminol

10    reagent was applied in the bedroom in

11    which the bed had been, traces of

12    bloodstains were located in the wall near

13    the headboard of the bed around the light.

14    switch and on the carpet itself.  In

15    addition, bloodstains were also located

16    on the carpet of the hallway leading up

17    to the laundry room and the garage.

18    Additionally, the presence of blood was

19    located in the rear hatchback of the

20    vehicle belonging to Dubyak.  In

21    addition, several hundred rounds of

22    Remmington .22 caliber ammunition were

23    recovered from the residence.  Although

24    the inmate was arrested on December 2,

25    1985, charges were not filed and he was

26    subsequently released on December 4,

27    1985.  At that point the investigation

15

| | |
|---|---|
| 1 | continued, at that point the additional |
| 2 | information was obtained continued to |
| 3 | indicate that Samuel Dubyak was |
| 4 | responsible for the disappearance and |
| 5 | probable death of Lordes Dubyak.  Checks |
| 6 | of the victim's charged card revealed |
| 7 | that no charges had been made during that |
| 8 | time and there had been no activity on |
| 9 | the part of the victim on a joint |
| 10 | checking account. During the time it had |
| 11 | been established that Dubyak had reported |
| 12 | to work on Monday August 12, 1985. |
| 13 | However after being there approximately |
| 14 | 45 minutes, he had left ill.  Dubyak |
| 15 | subsequently returned to work the |
| 16 | following day, during that time the |
| 17 | investigation continued as to the |
| 18 | whereabouts of the victim and other |
| 19 | evidence was obtained from additional |
| 20 | witnesses.  On March 3, 1986 Dubyak |
| 21 | contacted Vivian Almovodar, |
| 22 | A-L-M-O-V-O-D-A-R, the victim's aunt. |
| 23 | The inmate showed the Mrs. Almovodar a |
| 24 | letter which he said had been received on |
| 25 | March 1, 1986, Mrs. Almovodar indicated |
| 26 | that the letter was typed, however the |
| 27 | letter was signed by the victim, Lourdes. |

16

1.   The letter was subsequently obtained by

2    Chino Police Department on April 1986,

3    however tests from the Federal Bureau of

4    Investigations indicated that the

5    signature of "Lourdes" had been traced

6    from another signature.  On September 3,

7    1986, after almost 13 months of

8    investigation the inmate was again

9    arrested for the murder of Lourdes

10   Dubyak.  On November 12, 1986 criminal

11   information was filed in the West

12   District Superior Court by Deputy

13   District Attorney Robert Guizzino,

14   G-U-I-Z-Z-I-N-O, accusing the defendant

15   of murder in violation of Penal Code

16   Section 187, an additional allegations

17   that the defendant used a firearm pursant

18   to Penal Code Section 12022.5.  On

19   February 26, 1987 after deliberating less

20   than six hours the jury found the

21   defendant guilty of murder in the first

22   degree with enhancement of use of a

23   firearm."

24   And this was all from the probation officer's report.

25   And as always counsel if your client would like to he

26   certainly welcome to address the Board however we

27   understand that he has an absolute right not to and that

17

1    will not be held against him.  Under prisoner's version

2    in the same report it does state that on March 9, 1987

3    the inmate was interviewed that the San Bernardino County

4    Jail.  Mr. Dubyak assisted in completing the face sheet

5    of the probation report, however indicated that on the

6    advice of an attorney he did not wish to discuss the

7    matter with the undersigned officer related that he

8    anticipates his conviction to be appealed.  He did state

9    however to the undersigned officer "I am innocent."  Mr.

10   Dubyak was aware that he would be sentenced to state

11   prison on the matter however requested the clerk postpone

12   his delivery to the Department of Corrections until after

13   April of 1987.  And it goes on to that's really to some

14   exception of the statement.  In terms of prior arrests,

15   we note that in terms of the juvenile record you have a

16   record 6/4/1987 from Los Angeles Police Department had

17   one arrest for suspicion of burglary.  There was no

18   disposition available.  And that the commitment offense

19   was the only adult offense for Mr. Dubyak.  Is that

20   correct sir?

21          INMATE DUBYAK:  There was no disposition; there

22   was a trial on 19th of December.

23          PRESIDING COMMISSIONER DAVIS:  And what happened

24   as a result of that?

25          INMATE DUBYAK:  Does that say '87?

26          PRESIDING COMMISSIONER DAVIS:  Oh that's the

27   record from 1987, on 3/11/1957 was the burglary arrest.

18

1    Was there a trial for that?

2              INMATE DUBYAK:  No.

3              PRESIDING COMMISSIONER DAVIS:  Okay.

4              INMATE DUBYAK: (Inaudible).

5              PRESIDING COMMISSIONER DAVIS:  Oh, it was in

6    1957.  But no adult arrests other than the commitment

7    offense, is that correct sir?

8              INMATE DUBYAK:  Correct.  (Inaudible)

9              PRESIDING COMMISSIONER DAVIS:  Okay.

10             INMATE DUBYAK:  There was an arrest in either 68

11   or 69when I worked at a grocery store.  There was a child

12   and I (inaudible).

13             PRESIDING COMMISSIONER DAVIS:  What was the crime

14   that you were accused of?

15             INMATE DUBYAK:  I seen him liquored up at the

16   store and I had sold him my car and I needed registration

17   and I didn't change the registration and (inaudible).  The

18   car was impounded the next day.

19             PRESIDING COMMISSIONER DAVIS:  You had nothing to

20   do with it whatsoever.  Okay.

21             INMATE DUBYAK:  But I got arrested for it.

22             PRESIDING COMMISSIONER DAVIS:  So you were born

23   in Pennsylvania.

24             INMATE DUBYAK:  Yes, sir.

25             PRESIDING COMMISSIONER DAVIS:  The middle child

26   of three siblings, the family moved to California, you

27   settle in Los Angeles.  Attended Washington High School

19

1    from 1958 to 1960. And attended the Northrop Institute

2    from 63-64, what's the Northrop Institute?

3         INMATE DUBYAK: That's aircraft technology,

4    aircraft engineering.

5         PRESIDING COMMISSIONER DAVIS: And what did you

6    learn to do there?

7         INMATE DUBYAK: I did some engineering and I did

8    some aircraft (inaudible).

9         PRESIDING COMMISSIONER DAVIS: In '66-'67 you

10   attended Rose School of Aviation in Hawthorne as a

11   commercial pilot, so you were a commercial pilot at one

12   time?

13        INMATE DUBYAK: Yes, sir.

14        PRESIDING COMMISSIONER DAVIS: And for whom did

15   you fly?

16        INMATE DUBYAK: Just Rose Aviation and

17   (inaudible).

18        PRESIDING COMMISSIONER DAVIS: So you were flying

19   what, private?

20        INMATE DUBYAK: Yes, private and air tours.

21        PRESIDING COMMISSIONER DAVIS: In terms of

22   employment history you worked for Ethic Manufacturing in

23   Los Angeles as a foreman from 72-77. And is it Andal

24   Corporation,

25        INMATE DUBYAK: A-M-D-A-L

26        PRESIDING COMMISSIONER DAVIS: Oh, it's A-M,

27   Amdal Corporation in Marina Del Rey. As a production

20

1   planner from 77-82 and Hughes Helicopters in Culver City

2   as a production analyst from 82-86.  You were in the

3   United States Marine Corp from 1960-63, and honorable

4   discharge.  What was your rank at discharge?

5          INMATE DUBYAK:  Lance Corporal E trade. E-3 J.D.

6          PRESIDING COMMISSIONER DAVIS:  You previously

7   married a Virginia Chicon?

8          INMATE DUBYAK:  Chicon.

9          PRESIDING COMMISSIONER DAVIS:  In 1973, oh the

10  marriage ended in divorce in 73 or 75?

11         INMATE DUBYAK:  I think it was  73 or 72.

12         PRESIDING COMMISSIONER DAVIS:  It says you have a

13  five children, is that from the first marriage?

14         INMATE DUBYAK:  Four in the first marriage and

15  the fifth one in the second marriage.

16         PRESIDING COMMISSIONER DAVIS:  Do you keep in

17  contact with your children?

18         INMATE DUBYAK:  Yes, I do.

19         PRESIDING COMMISSIONER DAVIS:  All of them?

20         INMATE DUBYAK:  Yes, I do.

21         PRESIDING COMMISSIONER DAVIS:  Including the one

22  from the second marriage?

23         INMATE DUBYAK:  Yes.

24         PRESIDING COMMISSIONER DAVIS:  And how do you,

25  cards and letters so forth.

26         INMATE DUBYAK:  We started writing and I found

27  (inaudible) I started writing and she responded back and

21

1    I was able to make a few telephone calls and (inaudible).

2         PRESIDING COMMISSIONER DAVIS:  And now when you

3    say she, it's the daughter of Lourdes?

4         INMATE DUBYAK:  Lourdes.

5         PRESIDING COMMISSIONER DAVIS:  Lourdes and your

6    daughter.  During the interview of 4/3/03 (inaudible)

7    married in Costa Rica and were divorced in Torrence

8    California, not in Las Vegas, Nevada, as stated in the

9    P.O.R, Dubyak and Lourdes, the victim were married on the

10   Queen Mary in the Long Beach Harbor in 1981.

11        INMATE DUBYAK:  Correct.

12        PRESIDING COMMISSIONER DAVIS:  Let me know if

13   there is an error at some point in time.  Anything else

14   about your life prior to the incident offense itself or

15   your prior arrest record or anything else you want to

16   clarify or add any detail to?

17        INMATE DUBYAK:  No.

18        PRESIDING COMMISSIONER DAVIS:  All right, if you

19   think of something as we move along, please don't

20   hesitate say wait a minute I remember one of those

21   things.  Questions?

22        ATTORNEY FERGUSON:  None.

23        PRESIDING COMMISSIONER DAVIS:  All right, then

24   I'll ask you to move your attention over to Commissioner

25   Blonien.

26        DEPUTY COMMISSIONER BLONIEN:  Mr. Dubyak, this is

27   your first subsequent hearing and your last appearance

22

1    before the Board was September 2, 2003.  And the Panel

2    decision was a three year denial, the Panel recommended

3    that you become and remain disciplinary free and you

4    participate in self help.  Specific recommendation was to

5    participate in anger management.  Your custody level is

6    medium A, your classification score is 19, which is the

7    lowest possible for a lifer inmate.  So in order to do

8    this report, I read the Board Report, prepared by your

9    counselor, Berdsoto, B-E-R-D-S-O-T-O, dated June 30 of

10   2006.  I read the new psych report by Dr. Merek,

11   M-E-R-E-K, dated Septemeber of '06.  I've gone through

12   your C-File and I see that you did an Olsen review of

13   your C-File on May 10 of '06.  Correct?

14        INMATE DUBYAK:  Correct.

15        DEPUTY COMMISSIONER BLONIEN:  And I've gone

16   through the whole Board packet.  So since you've been in

17   the institution you've only had one 115 in 1994 and that

18   was for manipulating the mail process.  You had one 128

19   in 1999 for a physical, a very minor physical

20   altercation.  At your last hearing they asked you about

21   your high school diploma, that wasn't in your C-file, it

22   is now in your C-File.  You graduated in June 1, 1960,

23   correct?

24        INMATE DUBYAK:  Correct.

25        DEPUTY COMMISSIONER BLONIEN:  And you've taken

26   several college courses in Political Science, Accounting,

27   Real Estate, Spanish, you completed Spanish course in

23

1    2000 and 2001.  You completed the Real Estate course in      ✓

2    November of 2005 and you're currently taking the

3    Accounting course, right?

4         INMATE DUBYAK:  I just finished the Accounting

5    course (inaudible) two, three, four months ago.

6         DEPUTY COMMISSIONER BLONIEN:  What grade did you

7    get?

8         INMATE DUBYAK:  I'm waiting for my results.

9         DEPUTY COMMISSIONER BLONIEN:  Well you do well in

10   the courses that you take, I saw that.  And you also have

11   a Bachelor of Science from Embry-Riddle Aeronautic

12   University in Aviation Technology.  And you got that in

13   2001.  I was compiling a lot of my grades in my downtime

14   and my previous aeronautic experience.

15        DEPUTY COMMISSIONER BLONIEN:  So that must have

16   taken you quite a bit of time to put that together.

17        INMATE DUBYAK:  Well I've been flying for 49

18   years, I've got quite a few hours on my commercial

19   (inaudible).

20        DEPUTY COMMISSIONER BLONIEN:  So where is Embry-

21   Riddle Aeronautic University?

22        INMATE DUBYAK:  They have one in San Francisco, I

23   think in Florida.

24        DEPUTY COMMISSIONER BLONIEN:  So you put together

25   a packet of the courses that you've taken and your flying

26   time and you submitted that to them.

27        INMATE DUBYAK:  And some other different

24

1    (inaudible), just a minute.

2            DEPUTY COMMISSIONER BLONIEN:  Okay, do you need

3    water?

4            INMATE DUBYAK:  I just took some pills before

5    (inaudible).

6            DEPUTY COMMISSIONER BLONIEN:  You need a minute.

7            INMATE DUBYAK:  No, a little dry mouth as I

8    expected to get.  I got some help from a person on the

9    outside that got some of my past history together

10   (inaudible).  My flight time.

11           DEPUTY COMMISSIONER BLONIEN:  Do you want to take

12   a break just for five minutes?

13           ATTORNEY FERGUSON:  Just some water.

14           INMATE DUBYAK:  I don't want to pass out.

15           DEPUTY COMMISSIONER BLONIEN:  We don't want you

16   to do that.  Well we got you in a very stable chair.

17   Well let's just go off for a minute, let him drink his

18   water?

19           PRESIDING COMMISSIONER DAVIS:  Sure.

20   (OFF RECORD)

21           DEPUTY COMMISSIONER BLONIEN:  Okay, you were

22   telling me about how you put together this packet.

23           INMATE DUBYAK:  I put together my flight time and

24   total aviation administration, my commercial pilot's

25   license.  And through my flight hours and my education

26   and my other credits, I was entitled to a degree from the

27   school.

25

1        DEPUTY COMMISSIONER BLONIEN:  And in talking with

2   your counselor, your psychologist, you study different

3   legal issues also related to your case?

4        INMATE DUBYAK:  Yes, I studied different

5   languages, French and Spanish.

6        DEPUTY COMMISSIONER BLONIEN:  I saw all the

7   Spanish, I didn't see the French.  How much French did

8   you have?

9        INMATE DUBYAK:  I have to take a course and quite

10  frankly the rules (inaudible) I can't recognize words and

11  memorize (inaudible).

12       DEPUTY COMMISSIONER BLONIEN:  It's different than

13  Spanish and English. You worked as a ~~wayne~~ *WING* porter.

14       INMATE DUBYAK:  Yes.

15       DEPUTY COMMISSIONER BLONIEN:  Although your

16  supervisor evaluations, I couldn't find one after 03 and

17  they were totally satisfactory.  But I didn't see a

18  current one.

19       INMATE DUBYAK:  (Inaudible).

20       DEPUTY COMMISSIONER BLONIEN:  I'm not sure

21  either, I do see that.  You were assigned there.  In

22  terms of -- well the big question.  The last Panel was

23  pretty specific in recommending that you participate in

24  self-help therapy and specificity in anger management and

25  anger control.  And I don't see anything in that arena,

26  are you reading a book in that area?

27       INMATE DUBYAK:  No, but I invest about two or

26

1  three hours a day in anger management.  Walking out on
2  the wing, going to the yard and people have no idea what
3  you have to deal with in here and in the get into the
4  shower and have to wait for other people who are shooting
5  up drugs.  And sitting down by your table and they're
6  getting and yelling in your ears, while you're trying to
7  hold a conversation.  I'm getting to go through more
8  anger management in the general population then any class
9  is going to get me. (Inaudible).
10    DEPUTY COMMISSIONER BLONIEN:  There are different
11  ways to approach anger control and anger management.  In
12  what you're just talking about is a possible way.  But
13  you and I having a conversation about it is not the same
14  as presenting documentation that you've given it some
15  thought.  That you've been introspective about your past
16  life and decisions that you made there.  And how critical
17  thinking is bringing you a way from an angry response
18  now.  And if you'll just document it, what you're doing
19  in that arena, the Board accepts self-help in terms of
20  self-study.  In terms of we talked about education, we
21  talked about work, we talked about (inaudible) since '94.
22  When I look at your psych report by Dr. Merek, he talks a
23  lot about your education history and gives you no
24  diagnosis under anything wrong under Axis I or Axis II.
25  He notes that your many physical issues and gives you a
26  Global Assessment Functioning Score of 80.  So there was
27  never any alcohol or drug abuse in your history.

27

1        INMATE DUBYAK:  I never used drugs in my life.  I

2    maybe drink once a month (inaudible).  That's been my

3    (inaudible) since I've been 24-25 years old.

4        DEPUTY COMMISSIONER BLONIEN:  It's sort of

5    unusual with a military history.

6        INMATE DUBYAK:  Yes.

7        DEPUTY COMMISSIONER BLONIEN:  You sort of see a

8    lot of people with military history, and for some reason

9    drinking issues.  How did you stay out of that?

10        INMATE DUBYAK:  I entered the Marine Corps when I

11    was 17 years old.  (Inaudible) and when I came out of

12    high school I was, I don't want to use the word naïve, I

13    was a country boy and I just never drank, never really

14    cared for it.  I took a drink one time in the Marine

15    Corps when they have what they call a Beer Bust parties

16    out in the desert someplace, I always drunk a can of Coke

17    or something, just never got into it.

18        DEPUTY COMMISSIONER BLONIEN:  I know once a Marine

19    always a Marine, when did you get out of the Marine Corps.

20        INMATE DUBYAK:  I guess I'm not out.  I got out in

21    '63.

22        DEPUTY COMMISSIONER BLONIEN:  And how come you

23    didn't pursue your flying?

24        INMATE DUBYAK:  When I went in at 17, at the time

25    I had a 144 IQ so they waived the college requirement on

26    me.  I was supposed to go right into the (inaudible)

27    program, but because I was 17 they said I couldn't get

28

1    into the program until I was 18. And that was six to nine

2    months down the road. When I became 18 I needed to

3    reenlist and I was short of time the way they did the

4    program and I just didn't care the way they did the

5    (inaudible).

6         **DEPUTY COMMISSIONER BLONIEN:** So you pursued that

7    interest on the private sector. In talking about your

8    assessment of dangerousness, the doctor said in a

9    controlled setting your violence potential is lower than

10   that of an average inmate, you only received the one 115

11   and one custodial chrono. But if released to the

12   community your violence potential is lower than that of

13   the average citizen. You spent most of your life being

14   responsible and the incident offense is the only adult

15   conviction. He is indeed guilty of the current offense,

16   it doesn't seem likely that he would commit murder again.

17   Since he does not have a life pattern of violence, the

18   only apparent risk factor a precursor to violence would be

19   to some how revisit the same sort of marriage scenario

20   that you had with your second wife and not seeing where

21   this could lead. It would seem based on his history of

22   responsible behavior, good institutional behavior, efforts

23   as self improvement, intelligence and an external desire

24   to not return to prison, that he would be able to

25   extricate himself from this predicament before it got

26   worse. He's confident and responsible for his behavior

27   and has the capacity to abide by institutional standards

29

1  and has primarily done so during his incarceration.  He

2  does not have a mental health disorder and that would

3  necessitate treatment while incarcerated or on parole.

4  There's no obvious mandatory conditions or

5  recommendations.  Parole decisions should be based on

6  custody factors.  So with that I am going to return to the

7  chair.

8      PRESIDING COMMISSIONER DAVIS:  Can you explain the

9  115 in 1994?

10     DEPUTY COMMISSIONER BLONIEN:  The mail?

11     PRESIDING COMMISSIONER DAVIS:  Yep.

12     INMATE DUBYAK:  I used to do legal work for

13  inmates.  And this one inmate used to hassle with his

14  staff and his mail getting out.  And I didn't a service

15  for him, it was my address on the outside of the envelope.

16  (Inaudible).  But I was nonetheless given the 115.

17     DEPUTY COMMISSIONER BLONIEN:  The other thing that

18  I didn't say that I should have said that you also sit

19  with other inmates and help them with their reading. And I

20  think that's pretty important.  Oh and I didn't talk to

21  you about your parole plans and you made this wonderful

22  packet here.  That you plan to reside with your sister,

23  you have a type written letter from your sister dated

24  6/22/06, her name is Delores Warwick, W-A-R-W-I-C-K, and

25  that you are welcome to live with her, that you have her

26  support and the support of your daughters that will help

27  you reintegrate back into society in a positive way.  That

1  she knows you'll be applying for social security.  She

2  also knows about your physical issues, she also knows

3  about your education and that you've received while you're

4  in the institution.  I don't recommend you become a day

5  trader, I think that would be pretty amazing.

6       INMATE DUBYAK:  I'm talking about day trading on

7  the computer, I used to play stocks a few years ago.

8       DEPUTY COMMISSIONER BLONIEN:  It's going well

9  right now.  You also have your estimated social security

10  benefits, which would be $875 a month at 62, and if you

11  wait until your full retirement which is 65 and four

12  months you'll get 1148, you also probably eligible for

13  disability, SSI.  And you have the application that you

14  filled out for that.  You have a letter from the Federal

15  Aviator Administration on 10/11, the date's a little

16  blurred here talking about your commercial license

17  certification, wanted a copy of that, and correspondence

18  dealing with that issue.  A letter from your counsel to

19  the Federal Aviation Administration talking about your

20  lack of participation in drugs or alcohol while

21  incarcerated.  Talking about your entrepreneurship class.

22  So you live with your sister, you get social security, and

23  then you continue your education and use your education to

24  succeed in the area of stocks and you visit your children

25  when you have permission of your parole agent.  And your

26  sister lives in Pomona California.  Where's that?  _A_

27       INMATE DUBYAK:  It's about 80 miles down the road

31

1    a little.

2          DEPUTY COMMISSIONER BLONIEN:  Does she come visit

3    you?

4          INMATE DUBYAK:  No.  Basically I've been permitted

5    to visit since I've been here (inaudible).

6          DEPUTY COMMISSIONER BLONIEN:  We also sent out

7    3042 notices to law enforcement, victim next of kin, and

8    although I don't get any written letters in response, the

9    District Attorney from San Bernardino is here and at the

10    appropriate time she'll be allowed to make her comments on

11    the record.  So anything else I missed that we haven't

12    talked about in terms of what you've been doing in the

13    institution?

14          INMATE DUBYAK:  Apparently I'm waiting for,

15    there's only about 12 to 14 courses that I can get at.

16    I'm waiting for business math, a business law course

17    (inaudible).

18          DEPUTY COMMISSIONER BLONIEN:  How do you pay for

19    these courses?

20          INMATE DUBYAK:  These ones are free.

21          DEPUTY COMMISSIONER BLONIEN:  Does anyone on the

22    outside send you any money?

23          INMATE DUBYAK:  Occasionally my daughter and my

24    sister send me something, my sister sends me a quarter

25    package, a package every quarter.  My daughter in

26    Washington DC (inaudible).  And the Spanish course I had a

27    former girlfriend holding $2 that I had because she bought

32

1   a Spanish course years ago and it cost something like

2   $386, (inaudible).

3        DEPUTY COMMISSIONER BLONIEN:  And have you ever

4   thought about going to a self-help course.  Are you on any

5   waiting list or anything?

6        INMATE DUBYAK:  Honestly, I'm not (inaudible) I

7   have problems sitting and problems standing.  I have real

8   bad problems with drug addicts and alcoholics (inaudible).

9        DEPUTY COMMISSIONER BLONIEN:  There's a lot of

10  drug addicts out in society now.

11       INMATE DUBYAK:  Yeah.

12       DEPUTY COMMISSIONER BLONIEN:  And the world's gone

13  (inaudible).

14       INMATE DUBYAK:  It's just, it's just not my thing.

15       DEPUTY COMMISSIONER BLONIEN:  I'll turn back to

16  the chair.

17       PRESIDING COMMISSIONER DAVIS:  All right thank

18  you.  Any of the -- with your disability you do quite a

19  bit of sitting, so how are you able to complete that given

20  the limitations that you have.

21       INMATE DUBYAK:  I take about five semester credits

22  a month and between (inaudible).

23       PRESIDING COMMISSIONER DAVIS:  I mean in terms of

24  your sitting and reading.

25       INMATE DUBYAK:  I either take a book out to the

26  yard with me or I do one chapter and then I got my answers

27  (inaudible).

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )          CDC Number D-54700
Hearing of:               )
                          )
SAMUEL DUBYAK             )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 24, 2006

1:30 P.M.



PANEL PRESENT:
JAMES DAVIS, PRESIDING COMMISSIONER
NOREEN BLONIEN, DEPUTY COMMISSIONER

OTHERS PRESENT:

SAMUEL DUBYAK, INMATE
PETER FERGUSON, ATTORNEY FOR INMATE
JENNIFER DAWSON, DEPUTY DISTRICT ATTORNEY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes              Transcript Memorandum

Beth Lewis          Northern California Court Reporters

ii

## INDEX

|                           | Page |
|---------------------------|------|
| Proceedings ............................................................. | 1 |
| Case Factors ........................................................... | 9 |
| Pre-Commitment Factors ................................. | 17 |
| Post-Commitment Factors ................................ | 22 |
| Parole Plans ........................................................... | 29 |
| Closing Statements ................................................ | 33 |
| Recess ................................................................... | 38 |
| Decision ................................................................ | 39 |
| Adjournment ......................................................... | 44 |
| Transcriber Certification ..................................... | 45 |

--oOo--

33

1          PRESIDING COMMISSIONER DAVIS: And have you

2    thought about using any of the self-help books in the same

3    way?

4          INMATE DUBYAK: Honestly no. Not that I haven't

5    thought about it, I just haven't looked at it.

6          PRESIDING COMMISSIONER DAVIS: Do you know that

7    the last Panel told you was important?

8          INMATE DUBYAK: I just didn't feel like I had an

9    anger management problem, I wasn't an alcoholic, I just

10   couldn't see --

11         PRESIDING COMMISSIONER DAVIS: I'm talking about

12   self-help, not AA or anything like that.

13         INMATE DUBYAK: Oh I thought self-help was more

14   toward me furthering my education and guidelines.

15         PRESIDING COMMISSIONER DAVIS: That's self-help as

16   well but it doesn't get to the more specific issue of

17   anger management and so forth. But you described what you

18   were doing. I don't have any questions, Commissioner do

19   you?

20         DEPUTY COMMISSIONER BLONIEN: No, I don't.

21         PRESIDING COMMISSIONER DAVIS: Does the District

22   Attorney have questions?

23         DEPUTY DISTRICT ATTORNEY DAWSON: No, sir.

24         PRESIDING COMMISSIONER DAVIS: All right, Counsel

25         ATTORNEY FERGUSON: I have no questions.

26         PRESIDING COMMISSIONER DAVIS: All right, closing?

27         DEPUTY DISTRICT ATTORNEY DAWSON: Thank you,

34

1    although the Board has already touched on it, I believe

2    that the previous Board in no uncertain terms explained

3    that they wanted him to participate in self-help in

4    dealing with this situation. He claims that he is not an

5    angry person yet there was indication that his wife was

6    having an affair and that she was murdered. I find the

7    doctor's statement on his second to last page, that he is

8    indeed guilty of the current offense. I think that is an

9    obscene statement for the doctor to put in his report

10   considering this man was found guilty by a jury and

11   through the appeals process continues to be found guilty.

12   Obviously he has an anger problem, he has a low tolerance

13   for quite a few people. He obviously had an episode with

14   his wife. He not only killed her, her body's never been

15   found. He tried to destroy all of the evidence that would

16   link him to that murder. He is an intelligent man, who

17   used his intelligence for that. However the forensics

18   were a little bit better than he was. He is still a

19   danger. There has been no insight into anything. The

20   Distirct Attorney's Office of San Bernardino would ask the

21   Board at this time to deny parole date at this time.

22          PRESIDING COMMISSIONER DAVIS: All right, thank

23   you. Counselor?

24          ATTORNEY FERGUSON: Yes, thank you. Much has been

25   said here about anger management and self-help. This kind

26   of institution is a pretty volatile place and I think

27   we're all aware of that, there's conflictual situations

35

1   that come up on a daily if not hourly basis for somebody
2   in Mr. Dubyak's position.  He's been remarkably been able
3   to deal with those situation and deflect any kind of
4   conflict that has come his way over these many years.
5   There must have been dozens, scores, untold numbers of
6   occasions wherein Mr. Dubyak had to turn the other cheek,
7   extricate himself from somebody coming at him in a
8   physical manner.  Given the fact that he has had zero
9   incidents of any kind of violence within the institution.
10  Really any disciplinary history of any nature whatsoever,
11  I think speaks volumes of the fact that he is not a
12  violent person.  In fact he's quite adaptive in avoiding
13  violence.  That's born out by the lack of any 115s, other
14  than the single one so many years ago.  Wherein he was
15  accused of circumventing the mail procedures.  Otherwise,
16  as the doctor pointed out he has been an excellent
17  prisoner.  And the Board back in 03 acknowledged that as
18  well.  But in any event, the self-help has benefit for
19  some people clearly, somebody that needs or has AA or NA,
20  people who are involved in conflictual.  (tape turned
21  over)
22          DEPUTY COMMISSIONER BLONIEN:  Side two.
23          ATTORNEY FERGUSON:  And it's not that Mr. Dubyak
24  is the type of inmate that is just killing time.  He keeps
25  himself busy, clearly.  He studies languages, reads a lot,
26  has channeled his energy into constructive manners and
27  with regards to the things that he's accomplished.  Other

1    than the life crime, Mr. Dubyak really has no other

2    history.  It's the mission of this Board to determine if

3    Mr. Dubyak presents an unreasonable risk of danger to be

4    released into free society.  And on that count it's not

5    only his lack of problems within the institutional

6    setting, but is also underscored by the doctor's

7    assessment of dangerousness.  Wherein Dr. Merek indicates

8    that while in a controlled setting his violence potential

9    is lower than that of the average inmate, he too

10   acknowledges the fact that there's only been the one 115.

11   And further more if released to the community his violence

12   potential is lower than the average citizen.  Lower than

13   the average citizen.  Not the same as the average citizen,

14   but lower than the average citizen.  And the doctor

15   acknowledges that he doesn't have the pattern of violence,

16   the only apparent significant risk factor and precursor to

17   violence would be if some how revisiting the same sort of

18   marital scenario he had with his second wife and not see

19   where this could lead.  And it would be seem based on his

20   history of responsible behavior and institutional

21   adjustment efforts in self-improvement and intelligence in

22   external desire to not return to prison that he would be

23   able to extricate himself from this predicament before it

24   got worse.  To me that's a complete endorsement of Mr.

25   Dubyak's readiness for parole.  That coupled with the fact

26   that he does have family, his sister in Pomona who has a

27   place for him to go to.  The residence situation is taken

.37

1    care of.  He has provided the Board with a well thought

2    out packet of information wherein he has established that

3    he has the financial resources in terms of Social Security

4    and that can also be enhanced with disability payments

5    which he would seemingly be entitled to.  So for all these

6    reasons, we would urge the Board to find Mr. Dubyak

7    suitable because we believe strongly that has a

8    (inaudible).  And with that we'll submit.

9              PRESIDING COMMISSIONER DAVIS:  All right, thank

10   you.  Mr. Dubyak it is now your opportunity to address the

11   Panel directly regarding your suitability for parole.

12   You've been sitting here now for a little bit I know you

13   have some difficulty sitting and so forth for longer

14   periods of time, do you need a break before you start?

15             INMATE DUBYAK:  No.

16             PRESIDING COMMISSIONER DAVIS:  Okay.

17             INMATE DUBYAK:  Well, I would like to say that my

18   understanding of, that my furthering my education it was

19   more on the self-help basis.  That I believe I don't have

20   an anger management problem.  But the Board does see that

21   I have an anger management problem twenty years ago.  The

22   incident that I was convicted of twenty years ago is

23   appropriate for today statement that I had an anger

24   management problem.  I've done, I've kept myself clean.

25   I've never had any alcohol or drug problems in here that

26   I've seen more drugs in here than I see on the outside.

27   I'm not a violent person, most people see a violent crime

38

1   that (inaudible) conviction.  So that was 21 years in the

2   past, I am 64 years old.  Deputy District Attorney stated

3   that the forensics were better than me, that is not the

4   case.

5           PRESIDING COMMISSIONER DAVIS:  Mr. Dubyak, I would

6   like you to confine yourself to your suitability for

7   parole. Not answering what the District Attorney said.

8           INMATE DUBYAK:  I plan on furthering my education

9   on the outside (inaudible) paralegal of course.  I've

10  educated myself since high school and never stopped.  I've

11  never had any problems in high school or (inaudible).

12  There is no reason in my mind for denial. If I need more

13  (inaudible) or I need self-help I can still legally get a

14  date.  (Inaudible).  That's all I don't know what else to

15  say.  (Inaudible).  Thanks and I don't know what else to

16  say.

17          PRESIDING COMMISSIONER DAVIS:  All right.  Thank

18  you very much.  We'll now recess for deliberations.

19

20                      R E C E S S

21

22

23

24

25

26

27

39

CALIFORNIA BOARD OF PAROLE HEARINGS

DECISION

1
2
3    DEPUTY COMMISSIONER BLONIEN:   We are on record.

4    PRESIDING COMMISSIONER DAVIS:   All right, let the

5    record reflect that all those previously identified as

6    being in the room have returned.   This is in the matter

7    of Samuel Dubyak, CDC number D-54700.  The panel the panel

8    reviewed all the information received from the public and

9    relied on the following circumstances in concluding that

10   the prisoner suitable for parole and would not pose

11   unreasonable risk of danger to society or threat to

12   public safety if released from prison.   We come to this

13   conclusion, first and foremost, by the commitment

14   offense.   The offense was carried out in a manner that

15   dispassionate and calculated.  The motive was

16   inexplicable in relation to the offense.   These

17   conclusions are drawn from the statement of facts where

18   the prisoner, based on his conviction, used a firearm to

19   kill the victim, then went to great length and

20   significant deception to hide his involvement.   Given his

21   history he clearly had the opportunity and ability to

22   choose other non-violent options but did not do so.   With

23   regard to criminal conduct, we find that criminal conduct

24   consists of a juvenile arrest in 1957.   With regard to

25   institutional behavior we find that you programmed while

26   in a limited manner while incarcerated.  You have

27   SAMUEL DUBYAK    D-54700    DECISOIN PAGE 1      10/24/06

40

1   described your pursuit of education as self-help, however

2   you have a responsible job and education when you were

3   convicted of this murder.   The Panel strongly encourages

4   you to look beyond your current education process and

5   look to forms of self-help.   With regard to your other

6   institutional behavior we find that there is one 128

7   counseling chrono, the last of which was in 4/99 and one

8   serious 115 that's been recorded in 2/1994.   According to

9   the psychological report in August 2006 by Dr. Merek, we

10  find that it is supportive.   The basis of assessing Mr.

11  Dubyak as 'lower than the average citizen'.   And looking

12  to into the future if released and he does not find

13  himself in a similar situation seems at best

14  questionable.   And seemingly based on a questionable,

15  seeming to base the question on whether or not Mr. Dubyak

16  had committed the crime for which he has been convicted.

17  We also note that seems to be in conflict with the prior

18  assessment.   This is the one in 2003 from Dr. Steward,

19  where in the assessment of dangerousness, item B if

20  release to the community is not possible to predict the

21  dangerousness since he did not discuss the event and the

22  details of the conviction. Since inmate Dubyak is not a

23  mass murderer it is unlikely he would recommit such an

24  offense, however if he were to become involved in a

25  trusting and intimate relationship in which he feels

26  betrayed then there's potential of him handling the

27  SAMUEL DUBYAK   D-54700   DECISOIN PAGE 2      10/24/06

41

1  situation in a similar manner. However one hopes that

2  with maturity he would not do so. There is concern for

3  his calculating and detached nature in which he conducted

4  himself during the investigation. And I would underline

5  however that this is simply the doctor report and the

6  Panel again does not hold the fact that he does not

7  discuss his conviction against him. With regard to

8  parole plans, we find that you do have appropriate

9  residential parole plans. With regard to employment, the

10 Panel notes that you are eligible for Social Security.

11 The plan to be a day trader is something that the Panel

12 cannot assess, except to say that does not seem to be a

13 strong option with the track record of success for most

14 people. With regard to the 3042 notices we note that the

15 District Attorney from San Bernardino County is here in

16 person by representative and does oppose parole. And

17 never the less we want to commend you for obtaining your

18 B.S. from Embry-Middle University, for your accounting

19 work the class that you just completed and are awaiting

20 the results, your real estate course, for being a ~~wayne~~ WING

21 porter with satisfactory rating through 2003. However

22 there has been no rating since 2003 that we can find.

23 These positive aspects of behavior do not outweigh the

24 factors for unsuitability. In a separate decision, the

25 Hearing Panel finds the prison has been convicted of

26 murder and it is not reasonable to expect him to that

27 SAMUEL DUBYAK  D-54700  DECISOIN PAGE 3    10/24/06

42

1  parole to be granted within the next three years.  We

2  come to this conclusion, first and foremost, by the

3  commitment offense.  The offense was carried out in a

4  manner that dispassionate and calculated manner.  The

5  motive was inexplicable in relation to the offense.

6  These conclusions are drawn from the statement of facts

7  wherein the prisoner, based on his conviction, used a

8  firearm to kill the victim, then went to great lengths

9  and significant deception to hide his involvement.  Given

10  his history he clearly had the opportunity and ability to

11  choose other non-violent options but did not do so.  We

12  find that there is criminal conduct that exists with a

13  juvenile arrest in 1957, however that you have programmed

14  in a limited manner while incarcerated.  You have

15  described your pursuit of education as self-help, however

16  you have a responsible job and education when you

17  committed the murder.  The Panel strongly encourages you

18  to look beyond your current education process and look to

19  other forms of self-help.  There are two incidents of

20  disciplines while incarcerated one a 128 counseling

21  chrono in 4/99 and one serious 115 disciplinary report in

22  2/1994.  The psychological report of August 2006 by Dr.

23  Merek is supportive.  However is somewhat questionable on

24  part of the Panel for all of the reasons previously

25  quoted in the first decision.  In regard to the parole

26  plans, we do note that you have appropriate plans for a

27  **SAMUEL DUBYAK   D-54700   DECISOIN PAGE 4**   10/24/06

43

1    residence.  And do have an (inaudible) for Social

2    Security.  However the plan to be a day trader is

3    something that the Panel cannot assess.  Except to say

4    that it does not seem to be a strong option with the

5    track record of success for most people. With regard to

6    the 3042 notices we note that the District Attorney from

7    San Bernardino County is here in person by representative

8    and does oppose parole.  With regard to recommendation,

9    the Panel would recommend that you have no more 115s,

10   128s, and 128(a)s, that you would participate in self-        ✂

11   help programs.  I would encourage you that if you do not

12   find a program that are appropriate for you or that you

13   can participate in because you think that limitations

14   that you look to some independent reading in the area of    ✂

15   self-help.  And the Panel would accept book reports, some

16   sort of report, two or three paragraphs, indicating that

17   you understand that you read and the impact that it had

18   on you and the effect that it had on you.  That you

19   continue to earn positive chronos.  Commissioner do you

20   have anything you'd like to add?

21          DEPUTY COMMISSIONER BLONIEN:  No I don't, thank

22   you.

23   --//

24   --//

25   --//

26   --//

27   SAMUEL DUBYAK   D-54700   DECISOIN PAGE 5      10/24/06

44

1            PRESIDING COMMISSIONER DAVIS:  All right, we wish

2    you the best of luck and we are adjourned.

3

4                        A D J O U R N M E N T

5                           --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED THREE YEARS

24    THIS DECISION WILL BE FINAL ON: February 21, 2007

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    SAMUEL DUBYAK    D-54700    DECISOIN PAGE 6    10/24/06

45

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, BETH LEWIS, a duly designated transcriber,
NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare
and certify under penalty of perjury that I have
transcribed tape(s) which total two in number and cover a
total of pages numbered 1 through 44, and which recording
was duly recorded at CORRECTIONAL TRAINING FACILITY, in
SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT
PAROLE CONSIDERATION HEARING of SAMUEL DUBYAK, CDC No. D-
54700, on OCTOBER 24, 2006 and that the foregoing pages
constitute a true, complete, and accurate transcription
of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in
the above-captioned matter and have no interest in the
outcome of the hearing.

Dated January 14, 2007 at Sacramento County,
California.


_____
Beth Lewis
Transcriber
Northern California Court Reporters

# EXHIBIT

# B

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

In re

MIKAEL SCHIOLD,

                         Petitioner-Appellee,

On Habeas Corpus.

A103107

San Francisco County Superior Court No. 4523.
The Honorable Ksenia Tsenin, Judge

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

|  |  |
|---|---|
| In re<br><br>  MIKAEL SCHIOLD,<br><br>                         Petitioner-Appellee,<br><br>On Habeas Corpus. | A103107 |

## SETTLEMENT AGREEMENT AND FULL
## AND FINAL RELEASE OF ALL CLAIMS

"Releasor":  MIKAEL SCHIOLD

"Releasees":  GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

   1.    Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon.  Schiold's sentence is fifteen years to life plus one year.  Schiold is
identified by the Department of Corrections as inmate number D-31112.

   2.    The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002.  On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

   3.    Schiold filed a petition for writ of habeas corpus in San Francisco

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.  Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.  This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.  Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.  Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.      Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.      Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.     Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.     In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them. It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made. Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

COPY

16.    Facsimile signatures shall bind the parties to this agreement.

Date: 10/22/03

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold

Date: 10/22/03

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

40009425.wpd

5

# EXHIBIT

# C

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk
By _____, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,                              ) Case No.: BH003529
                                    ) ORDER RE: WRIT OF HABEAS CORPUS
ROBERT ROSENKRANTZ,                 )
                                    )
            Petitioner,             )
                                    )
      On Habeas Corpus              )
                                    )
                                    )
                                    )

The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

ep                                  1                                  I

1    unsuitability based on commitment offense, the Board may consider as a factor whether the

2    victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15,

3    § 2402(c)(1)(C).)  Here, the Board found that the victim was "abused" due to "the number of

4    times he was shot and the manner in which he was shot."  In addition, the Board concluded that

5    the case "rises to the highest level of second-degree murder."  The Board further stated in its

6    decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed

7    parole.  While the Board is required to consider such opposition (see Penal Code section 3042),

8    that opposition is not a factor on which the Board may rely to deny parole as enumerated in title

9    15, section 2281 of the California Code of Regulations.

10        Towards the conclusion of the hearing, the Board summarily mentioned its concern that

11   petitioner is a danger to his brother, Joey.  The court finds that this assertion is not only

12   unsupported by the record, but belied by the record, which contains documented evidence that

13   contradicts any fear that the petitioner is a threat to his brother's safety.  Furthermore, the court

14   rejects the Board's inference that the absence of yearly supportive letters from petitioner's

15   brother shows that petitioner is a danger to his brother.  In fact, the petitioner's denial and

16   traverse draws attention to a recent psychological evaluation addressing and dismissing the

17   Board's concern for the safety of petitioner's brother.  However, because this psychological

18   evaluation was not evidence before the Board at the time of petitioner's hearing, the court may

19   not properly rely upon it in reviewing the Board's decision.  Regardless, the court finds that there

20   is no evidence in the record that supports the conclusion that petitioner remains a danger to his

21   brother.

22        The Board's sole reliance on the gravity of the offense to justify denial of parole can be

23   initially justified as fulfilling the requirements set forth by state law.  (*Biggs v. Terhune* (9th Cir.

24   2003) 334 F.3d 910, 916.)  However, over time, should petitioner continue to demonstrate

25   exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the

26   nature of the commitment offense raises serious questions involving his liberty interest in parole.

27   (*Id.* at p. 917.)  Here, petitioner's record is replete with reports of petitioner's exemplary conduct

28   as well as his vocational and educational achievements over a period of many years.  Indeed,

1    petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2    may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3    (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4         The court finds that petitioner's continual parole denials have been based mainly on the

5    gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6    Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7    original sentence of life with the possibility of parole into a sentence of life without the

8    possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9    crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10   358 F.Supp.2d 936, 947.)

11        Prior Board panels have found petitioner suitable for parole. Petitioner was found

12   suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13   subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14   the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15   the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16   parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17   Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18   maximum term for both second degree and first degree murder. Therefore, the commitment

19   offense should no longer function as a factor for unsuitability and in that case, it should no longer

20   operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21   point in which the denial of parole can no longer be justified by reliance on his commitment

22   offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23   rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24   //

25   //

26   //

27   //

28   //

ep

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2  granted.

3

4  June 26, 2006

5

6                                          DAVID S. WESLEY

7                                          Judge of the Superior Court

8  Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep

4

# EXHIBIT

# D

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
REVISED AUGUST 2006
PAROLE CONSIDERATION HEARING
SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

CORRECTIONAL TRAINING FACILITY-SOLEDAD
August 18, 2006

This is the third psychological evaluation for the Board of Parole Hearings on inmate Samuel Dubyak, CDC# D-54700. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Dubyak is a 63-year-old, single, Caucasian male serving 25-years-to life for Murder in the First Degree. His stated religion is Catholic. He denies nicknames or aliases and has no unusual physical characteristics.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim. He says he was born at home.

## III. EDUCATION:

He has a Bachelor of Science degree in Aeronautical Engineering. He has a 12-plus measured grade point level. He has no history of special education or academic/behavioral problems. His current interests are in legal work and in studying Spanish and French. He said he recently completed a college real estate course and two semesters of accounting.

## IV. FAMILY HISTORY:

His father died of a heart attack at age 62. His mother died at 77. He has an older sister, age 69, who has five children. He has a younger brother, age 58, who has one child. No one in the family has been involved in criminal activity. He is primarily in contact with his sister, who lives in California.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk behavior or sexual aggression.

## VI. MARITAL HISTORY:

His first marriage in 1966 lasted five years. This union produced four children. The marriage was good until the second or third year when she began to accuse him of false infidelities. They divorced in 1973. His second marriage (to Lourdes, the victim) began in 1981 and ended in 1985, when he was arrested for her murder. His file indicates that she was unfaithful to him. This marriage produced one child, who lives in Puerto Rico. He is in contact with all five children.

## VII. MILITARY HISTORY:

He served in the Marine Corps from 1960 to 1963. He received an honorable discharge as a lance corporal (E-3).

## VIII. EMPLOYMENT/INCOME HISTORY:

When 13 years old, he worked full-time in a grocery store so he could pursue flying lessons while attending school. At age 17, he entered the Marines. Following his discharge three years later, he entered a trade school in aeronautical engineering, while also returning to work in the same supermarket where he was employed as a teenager. From 1968 to 1972, when he was approximately 26 to 30, he worked for NCR as a warehouse foreman. From 1972 to 1976, age 30 to34, he worked in a manufacturing company in the parts department. From 1976 to 1981, age 34 to 39, he worked for a company as a production control planner. From 1981 to 1986, age 39 to 44, he worked for Hughes Aircraft as a production control analyst.

## IX. SUBSTANCE ABUSE HISTORY:

He says he never abused alcohol or drugs. He rarely drank.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

He has several current medical problems including a pinched sciatic nerve, legs that become numb, a degenerative disc, prostate problems, stomach difficulties, carpal tunnel syndrome and has only 10% vision in his right eye. Some of the medical issues are the consequence of a 1981 car accident. Due to the pinched sciatic nerve, he walks with a cane but sometimes loses his grip.

## XI. PLANS IF GRANTED RELEASE:

If paroled, he plans to live with his sister and collect Social Security. The prognosis for successful, responsible, legal, prosocial community adjustment is good.

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology. His intellectual functioning was estimated to be in the average range. He was calm, cooperative and alert. His mood,

affect and flow of thought were all normal. His insight and judgment were good. He is not currently in need of any mental health treatment.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      None
AXIS II:     None
AXIS III:    Multiple physical problems
AXIS IV:     Incarceration
AXIS V:      GAF=80

The prognosis for him maintaining his current mental status is good.

## XIII. REVIEW OF LIFE CRIME:

He chose not to discuss the case. Since he has denied any role in the death of his wife, he expressed no remorse or regret.

## XIV. ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, his violence potential is lower than the average inmate. He has only received one 115 and one Custodial Chrono during his incarceration. If released to the community, his violence potential is lower than the average citizen. He spent much of his adult life being responsible with the instant offense his only adult conviction. If he is, indeed, guilty of the current offense, it does not seem likely that he would commit murder again. Since he does not have a life pattern of violence, the only apparent significant risk factor and precursor to violence would be his somehow revisiting the same sort of marital scenario he had with his second wife and not seeing where this could lead. It would seem, based on his history of responsible behavior, good institutional adjustment, efforts at self-improvement, intelligence and an external desire to not return to prison, that he would be able to extricate himself from this predicament before it got worse.

## XV. CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior and has the capacity to abide by institutional standards and has primarily done so during his incarceration. He does not have a mental health disorder that would necessitate treatment either while incarcerated or on parole. There are no obvious mandatory conditions of parole and recommendations. Parole decisions should be based on custody factors.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad


B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare that;

    I am over 18 years of age and that I am the pro per Petitioner to the within cause of action; my complete mailing address is; Samuel A. Dubyak, D-54700, Box 689   C-115L, California State Prison, Soledad, CA 93960-0689. That I served a true and correct copy or original of the within:

PETITION FOR REVIEW, EVIDENTIARY HEARING REQUESTED.

    Served on the interested parties by placing said documents in sealed envelopes with postage fully prepaid and placing each envelope in the prison U.S. Mail Box. To the address(es) listed below.

CLERK OF THE COURT
SUPREME COURT OF CALIFORNIA
350 McALLISTER St.
SAN FRANCISCO, CA 94102

    I declare under penalty of perjury that the foregoing is true and correct. Executed this _30_ day of _OCTOBER_ , 2007, at Soledad, CA.


                        Samuel A. Dubyak

*Proof of Service -- Mail*

## PROOF OF SERVICE

Re:    Case Number S157841
       Case Title Dubyak (Samuel A.) on H.C. (review)

     I hereby declare that I am a citizen of the United States, am over 18 years of age, and am/am not a party in the above-entitled action.  I am employed in~~========~~ County of San Francisco and my business~~========~~ address is 350 McAllister, room 1295, San Francisco, Ca  94102

     On November 5, 2007 , I served the attached document described as a Petition for review

on the parties in the above-named case.  I did this by enclosing true copies of the document in sealed envelopes with postage fully prepaid thereon.  I then placed the envelopes in a U.S. Postal Service mailbox in San Francisco , California, addressed as follows:

Court of Appeal
Fourth Appellat District
3389 Twelfth Street
Riverside, Ca  92501

San Bernardino Superior Court
303 West Third Street
San Berna_dino, Ca  92415

Attorney General, Los Angeles Office
300 S. Spring Street
Los Angeles, Ca  90012

     I, Joseph Cornetta , declare under penalty of perjury that the foregoing is true and correct.

     Executed on November 5, 2007 , at _____
San Francisco , California.

_____
Signature

ATTORNEY GENERAL
LOS ANGELES
2007 NOV -7 AM 9:52
RECEIVED
SAM T. VUU